**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------x
:
In re: : Chapter 11
:
LA PALOMA GENERATING COMPANY, : Case No. 16-12700 (CSS)
LLC, *et al.*,[1] :
: Jointly Administered
Debtors. :
: **Re: D.I. 9, 58, 74**
:
: **Objection Deadline: January 12, 2017
:  @ 12:00 p.m. (by agreement)**
:
: **Hearing Date: January 18, 2017 @ 10:00 a.m.**
:
------------------------------------------------------------x

**OBJECTION OF SUNTRUST BANK TO DEBTORS'
EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING USE OF SUNTRUST
BANK'S CASH COLLATERAL, AND (II) DIRECTING
<u>IMMEDIATE RELEASE OF FUNDS IN CERTIFICATE OF DEPOSIT</u>**

SunTrust Bank ("<u>SunTrust</u>") files this Objection (the "<u>Objection</u>") to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of SunTrust Bank's Cash Collateral, and (II) Directing Immediate Release of Funds in Certificate of Deposit [D.I. 9] (the "<u>Motion</u>"), and respectfully represents as follows.[2]

**PRELIMINARY STATEMENT**

1.     Through the Motion, the Debtors seek to virtually deplete SunTrust's pre-petition cash collateral held in the SunTrust Collateral Account that secures the SunTrust L/C Facility (including the Debtors' indemnification obligations thereunder), while holding in reserve and not

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are La Paloma Generating Company, LLC (9359), La Paloma Acquisition Co, LLC (2500), and CEP La Paloma Operating Company, LLC (2503). The address of the Debtors' corporate headquarters is 1700 Pennsylvania Avenue, NW, Suite 800, Washington, DC 20006.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

9053873

using post-petition cash generated by their operations. The Debtors assert that their post-petition revenue receipts are unencumbered. Yet, contrary to established bankruptcy practice, they seek to use encumbered Cash Collateral prior to using unencumbered cash.

2. The Debtors' first lien lenders assert that they hold valid, perfected liens on substantially all of the Debtors' assets other than the Cash Collateral. If they are correct, then the Debtors have no ability to provide adequate protection to SunTrust on account of its Cash Collateral.

3. Notwithstanding the fact that the Debtors' requested relief unnecessarily forces SunTrust to shoulder substantially all of the risk of operational failure and/or liquidation of the Debtors, SunTrust is not requesting that it hold indefinitely the remaining approximately $21.5 million currently in the SunTrust Collateral Account. Rather, SunTrust is objecting to the inadequacy and unreasonableness of the $4,445,000.00 reserve proposed by the Debtors — a mere $405,000.00 in excess of the outstanding letter of credit — and is requesting that it hold a reasonable reserve of $7,550,000.00 (the "Reserve") to satisfy (a) any outstanding letters of credit under the SunTrust L/C Facility, and (b) SunTrust's expense reimbursement and potential indemnification claims against the Debtors. Other courts in this district have provided secured creditors reserves for potential indemnification claims under similar circumstances. Permitting SunTrust such a reserve is fair and equitable, particularly when there is uncertainty as to whether SunTrust may face indemnifiable claims from other creditors or parties in interest.

4. In addition to the Reserve, as additional protection against the risks of the Debtors' operational failure and/or liquidation, any order permitting the Debtors to use the Cash Collateral should condition such use on the Debtors (a) using their unencumbered cash generated from their operations before using the Cash Collateral, and (b) segregating the Cash Collateral

from the Debtors' other cash, both encumbered and unencumbered. While these protections do not insulate SunTrust from all the risks associated with this bankruptcy case, such protections are reasonable, fair and equitable under the circumstances.

## BACKGROUND

### A. The SunTrust L/C Facility

5.    La Paloma Generating Company, LLC ("La Paloma") and SunTrust entered into the SunTrust L/C Facility — which is comprised of the Amended and Restated Letter of Credit Agreement (the "L/C Agreement," attached hereto as Exhibit A) and the Assignment of Deposit (the "L/C Assignment," attached hereto as Exhibit B) — on February 20, 2014. Under the SunTrust L/C Facility, the Debtors could have caused SunTrust to issue up to $30 million in letters of credit in favor of counterparties or obligees of La Paloma. When a letter of credit is drawn upon by the applicable beneficiary under the SunTrust L/C Facility, La Paloma is required to reimburse SunTrust in the amount of the draw no later than the following business day. *See* L/C Agreement, § 2.1. No other party has guaranteed La Paloma's obligations.

6.    Currently, one letter of credit remains outstanding under the SunTrust L/C Facility in the amount of $4,050,000.00. That letter of credit matures on January 31, 2017.

7.    In addition to the obligations relating to the outstanding letter of credit, La Paloma must pay SunTrust's costs and expenses (including attorneys' fees) incurred in connection with the SunTrust L/C Facility. *See* L/C Agreement, § 12.3; L/C Assignment, § 8. Further, and importantly, La Paloma has indemnification obligations to SunTrust under the L/C Agreement. *See* L/C Agreement, § 11.2. La Paloma owes these obligations to SunTrust until they are satisfied in full. *See* L/C Agreement § 2.2(e); L/C Assignment, §§ 15, 16.

8. All of La Paloma's obligations under the SunTrust L/C Facility, including for expense reimbursement and indemnification, are secured by a perfected first lien on the SunTrust Collateral Account and the Cash Collateral contained therein (as well as all income, earnings, profits, interest, premium or other payments on such Cash Collateral, and the proceeds of any disposition of the Cash Collateral). The initial amount held in the SunTrust Collateral Account was $30,000,000.00.

9. SunTrust's liens securing La Paloma's obligations under the SunTrust L/C Facility are the only perfected liens on the Cash Collateral. In the event that La Paloma fails to timely reimburse SunTrust as required by the SunTrust L/C Facility, SunTrust is permitted to set off the funds in the SunTrust Collateral Account in satisfaction of La Paloma's reimbursement obligations. *See* L/C Agreement, §§ 2.1, 12.4. SunTrust is only required to end the L/C Assignment and execute a release in favor of La Paloma when all of La Paloma's obligations to SunTrust are satisfied in full. *See* L/C Agreement § 2.2(e); L/C Assignment, §§ 15, 16.

**B. The Debtors' Bankruptcy and Use of Cash Collateral**

10. In a precipitous filing, La Paloma and the other Debtors sought relief under Chapter 11 of the Bankruptcy Code on December 6, 2016. In connection with their bankruptcy filing, the Debtors sought emergency relief to force SunTrust to release all but $4,455,000.00 the Cash Collateral. [D.I. 9.] On December 8, 2016, the Court held a first day hearing in the bankruptcy case where it considered the Motion and the interim relief sought thereby and heard arguments from various parties, including SunTrust.

11. After substantial negotiations with the Debtors, the first lien lenders and the United States Trustee during and after the first day hearing, SunTrust released $4,000,000.00 of

the Cash Collateral to the Debtors pursuant to the terms and conditions contained in the interim order entered by the Court on December 9, 2016 [D.I. 58] (the "<u>First Interim Order</u>").

12. Immediately after entry of the First Interim Order, SunTrust, the Debtors, the first lien lenders and the United States Trustee continued negotiations regarding a consensual use of the Cash Collateral. Ultimately, the parties reached an agreement encompassed in the second interim order entered by the Court on December 14, 2016 [D.I. 74] (the "<u>Second Interim Order</u>," together with the First Interim Order, the "<u>Interim Orders</u>").

13. Pursuant to the Second Interim Order, SunTrust released an additional $4.5 million of its Cash Collateral — for a total of $8.5 million — to the Debtors. SunTrust currently holds ~$21.5 million of Cash Collateral in the SunTrust Collateral Account.

14. Notwithstanding the Debtors' "emergency" need to use $8.5 million, as of January 6, 2017, the Debtors have only used $2.93 million of the total $8.5 million of the Cash Collateral released to them pursuant to the Interim Orders.

15. Moreover, the Debtors do not need all of the remaining Cash Collateral held in the SunTrust Collateral Account. Indeed, in their projected 13-week budget following the expiration of the Second Interim Order, the Debtors forecast a need to use ~$13 million to fund operations and an additional ~$6.5 million to pay professional fees. Less the Cash Collateral they currently hold but have not used, the Debtors need an additional $7.5 million during the 13-week period to fund operations (excluding professional fees). The combined, projected amounts are less than the $21.5 million of Cash Collateral currently held by SunTrust in the SunTrust Collateral Account.

16. The Debtors also have other potential sources of cash that they could use to fund their bankruptcy cases. In the Motion, La Paloma only seeks relief to use nearly all of

SunTrust's Cash Collateral. While the Motion states that "[t]he Debtors expect to have access to unencumbered cash from operations in the future," the Debtors are not purporting to use any unencumbered cash. Mot. at 9, n. 8. In fact, the Debtors' 13-week budget *does not* include the use of *any* operating revenue to fund the Debtors' ongoing operations. The Debtors also have not sought to use an additional $21 million of cash that may be encumbered by liens of the first and second lien lenders. See id.

17. As of today, SunTrust, the Debtors, the first lien lenders, the second lien lenders and the United States Trustee are attempting to reach a consensual resolution with respect to a Final Order. However, in the event such a resolution is not possible, the Court should not grant the relief sought by the Debtors in the Motion for the reasons stated below.

## ARGUMENT

### A. The Court Should Establish a $7,550,000.00 Reserve Held By SunTrust for Its Expense Reimbursement and Potential Indemnification Claims

18. As discussed above, SunTrust has certain rights under the L/C Agreement. First, Sun/Trust is entitled to reimbursement for any disbursements it makes on account of currently outstanding letters of credit. *See* L/C Agreement, § 2.1; L/C Assignment, § 5. A letter of credit totaling $4,050,000.00 is outstanding, and the Debtors have agreed to reserve an amount sufficient to satisfy their reimbursement obligations under the SunTrust L/C Facility.

19. Second, SunTrust is entitled to payment of its attorneys' fees and costs incurred in connection with the SunTrust L/C Facility. *See* L/C Agreement, § 12.3; L/C Assignment, § 8. Today, the value of the Cash Collateral exceeds the currently known claims of SunTrust. Accordingly, SunTrust is oversecured and entitled to payment of its pre- and post-petition attorneys' fees and expenses. *See* 11 U.S.C. § 506(c).

20. Finally and importantly, SunTrust has indemnification rights under the SunTrust L/C Facility. *See* L/C Agreement, § 11.2. Under the L/C Agreement, in addition to their obligations to reimburse SunTrust for the fees and expenses SunTrust incurs in connection with the L/C Agreement, including defending any claims asserted against it, the Debtors are required to indemnify SunTrust against any liability that might eventually result from such claims. *See id.* Thus, the indemnification provision creates contingent expense reimbursement and indemnification obligations that the Cash Collateral secures.

21. While these rights give rise to contingent claims, SunTrust is under no obligation to release any of the Cash Collateral or its security interests therein until La Paloma has satisfied these obligations in full. *See* L/C Agreement § 2.2(e); L/C Assignment §§ 15, 16. There is no exception in the L/C Agreement or L/C Assignment for contingent indemnification obligations to be treated differently. Yet, the relief sought by the Debtors would treat such obligations differently.

22. Under the Debtors' proposed order, SunTrust would be entitled to a reserve on account of these obligations in the minimal amount of $405,000.00. This proposed reserve, however, is woefully inadequate to protect SunTrust from the obligations the Debtors must satisfy in full to compel SunTrust to release its security interests in the Cash Collateral.

23. If the Debtors had significant unencumbered assets with which to satisfy any superpriority administrative claim that might arise as a result of SunTrust's expense reimbursement and indemnification rights, it might be fair, reasonable and equitable for the Court to approve the paltry reserve of $405,000.00 proposed by the Debtors. The circumstances here, however, are starkly different.

24. If the first lien lenders are correct that they have valid, perfected liens on substantially all of the Debtors' assets — as they have claimed — then any protection provided by the Debtors on account of SunTrust's contingent indemnification claims is not adequate. In other words, there would be no assets from which to pay SunTrust's superpriority administrative expense claims to which SunTrust is entitled under the Interim Orders. Thus, to the extent the Debtors use the Cash Collateral, SunTrust's sources for payment of its expense reimbursement and indemnification claims evaporate, leaving SunTrust completely exposed to these liabilities when it otherwise could have satisfied them with funds in its possession over which it has a valid, perfected security interest and contractual (and common law) rights of setoff.

25. To protect lenders from the risks associated with depletion of assets that could be used to satisfy lenders' indemnification claims, courts in this jurisdiction have required the establishment of adequate reserves. For example, in *In re Am. Business Fin. Svcs., Inc.*, Case No. 05–10203 (MFW), 2008 WL 1702095, at *10 (Bankr. D. Del. Apr. 10, 2008), the court determined that $2 million should be reserved as adequate protection for the DIP lender who had contingent indemnification claims against the debtors under the DIP loan facility. Similarly, in *In re RadioShack Corp.*, Case No. 15-10197, D.I. 1746, Hr'g Tr. 20:1-6 (Bankr. D. Del. Mar. 30, 2015, PM Session), Judge Shannon indicated that the parties should establish a reasonable reserve for contingent indemnification claims of the first lien lenders. Thereafter, the parties ultimately agreed to establish as adequate protection for the first lien lenders $5 million for expenses and $7 million for contingent indemnification claims. *See In re RadioShack Corp.*, Case No. 15-10197, D.I. 2250, at 3 (Bankr. D. Del. May 26, 2015). Courts in other jurisdictions agree. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 540, 549–50 (W.D. Pa. 2005) (noting that the bankruptcy court established a fee and

expense reserve, along with a reserve of $2,000,000.00 to cover potential contingent indemnification claims).

26. To be clear, SunTrust is not seeking to continue to hold all of the Cash Collateral currently in its possession. Rather, under the circumstances here, SunTrust is asking the Court to establish a reasonable Reserve to protect SunTrust from significant risks foisted upon it.

27. While it is unaware of the number and amount of potential indemnification claims as of today, SunTrust could be subject to such claims for which it has indemnification rights against the Debtors. The Challenge Period does not expire until February 27, 2017, and it is possible other parties may seek to bring indemnifiable claims against SunTrust after the Challenge Period expires. Moreover, as discussed above, with each day passing and the Debtors' use of the Cash Collateral, SunTrust's security for its expense reimbursement and potential indemnification claims diminishes.

28. Indeed, SunTrust has been reasonable to date. It has already agreed in the Interim Orders to release $8.5 million of the Cash Collateral, the majority of which (~$5.5 million) the Debtors have yet to use.[3] Moreover, the Debtors' projected 13-week budget only seeks to use an additional ~$13 million for operating expenses (excluding ~$6.5 million in professional fees), meaning the Debtors only need an additional $7.5 million to fund their operations (excluding professional fees) through mid-April 2017. Given these facts, it is entirely reasonable to protect SunTrust from the risks associated with the Debtors' operational failure and/or liquidation by establishing a Reserve in the amount of $7,550,000.00.

---

[3] SunTrust is by no means suggesting that the Debtors should have used more of SunTrust's Cash Collateral. SunTrust is merely observing that the Debtors have not established a need to use the entirety of the Cash Collateral, particularly when they have unencumbered cash they are not purporting to use.

9053873

29. Thus, to the extent the Debtors are using the Cash Collateral, a reasonable Reserve in the amount of $7,550,000.00 held by SunTrust should be established to cover any SunTrust indemnification claims, as well as its expense and fee reimbursement claims.

**B. The Debtors Should Be Required to (1) Use Unencumbered Cash Before Using the Cash Collateral, and (2) Segregate the Cash Collateral from Other Cash.**

30. Establishing a reserve for SunTrust's expense reimbursement and potential indemnification claims as one form of protection for SunTrust makes eminent sense under the circumstances here. As further protection for SunTrust, the Court should condition the Debtor's use of the Cash Collateral on two additional requirements: the Debtors must (a) use unencumbered cash before using SunTrust's Cash Collateral, and (b) segregate the Cash Collateral from all of the Debtors' other cash.

31. While the Debtors have yet to provide any information regarding their post-petition revenues, the Debtors assert that such revenues are unencumbered. Mot. at 9, n. 8. Yet, it does not appear the Debtors have been using unencumbered operating revenues to fund or maintain their post-petition operations. Indeed, the Debtors have never provided any evidence of the amount of the unencumbered cash in their possession, nor have they provided an explanation as to why they believe they are entitled to use SunTrust's cash collateral before using unencumbered cash in the ordinary course of business. 11 U.S.C. § 363(c)(1).

32. Additionally, the Debtors admit that they have approximately $21 million of other cash that could be subject to the perfected liens of the Debtors' first and second lien lenders. Mot. at 9, n. 8. As noted above, the Debtors have not sought authority to use such cash.

33. The combination of these two decisions demonstrates that the Debtors are seeking to force SunTrust to shoulder the risks associated with the Debtors' potential operational failures and possible liquidation. It is patently inequitable to require SunTrust to shoulder these risks,

particularly where SunTrust has indemnification rights that are secured and the Debtors have indicated that they have access to unencumbered cash.

34. By requiring the Debtors to use such unencumbered cash before they are permitted to use the Cash Collateral, the preserved Cash Collateral could be used to pay any expense reimbursement and indemnification claims of SunTrust that may arise. 11 U.S.C. § 363(c)(1). In essence, requiring the Debtors to use unencumbered cash first acts as a cleaner substitute to the granting of replacement liens on unencumbered cash as adequate protection. Indeed, SunTrust is not seeking replacement liens on the Debtors' unencumbered cash (in contrast to the first lien lenders who do not have perfected liens in the Cash Collateral).

35. When coupled with a requirement that the Debtors must first use unencumbered cash, a requirement that the Debtors segregate the Cash Collateral from their unencumbered operating revenues and other (arguably) encumbered cash provides additional protection. SunTrust's right to the segregation of its Cash Collateral from other forms of cash held by the Debtors is expressly contemplated by the Bankruptcy Code. *See* 11 U.S.C. § 363(c)(4). Its purpose is to protect lenders, like SunTrust, in the event of a debtor's failure and liquidation, allowing the lender to trace its identifiable cash collateral.

36. Requiring both the use of unencumbered cash first and segregation of the Cash Collateral provides SunTrust additional protections from depletion of funds that would otherwise be available to satisfy SunTrust's indemnification and expense reimbursement claims. While these protections alone may not constitute "adequate protection" for purposes of Section 363(e) of the Bankruptcy Code,[4] they nonetheless provide some protections for SunTrust in the event that the Debtors fail and have to liquidate. Accordingly, the Court should condition the Debtors'

---

[4] Importantly, the Debtors have the burden to demonstrate that they are providing SunTrust with adequate protection at the hearing. 11 U.S.C. § 363(p)(1).

9053873

11

use of the Cash Collateral on the Debtors (a) using their unencumbered cash, to the extent it exists, before using the Cash Collateral, and (b) segregating the Cash Collateral from the Debtors' other cash — both unencumbered and encumbered.

## CONCLUSION

WHEREFORE, for the foregoing reasons, SunTrust respectfully requests that any final order entered by the Court granting the Debtors authority to use the Cash Collateral:

(a) contain protections for SunTrust similar to those protections contained in the First Interim Order and the Second Interim Order;

(b) permit SunTrust to retain $7,550,000.00 as a reserve to satisfy any outstanding obligations under the SunTrust L/C Facility, including SunTrust's expense reimbursement and potential indemnification claims;

(c) require the Debtors to use unencumbered cash before using the Cash Collateral;

(d) require the Debtors to segregate the Cash Collateral from its other cash; and

(e) grant SunTrust such other and further relief as may be just and proper.

[*Remainder of page intentionally left blank*]

| | |
|---|---|
| Dated: January 12, 2017 | **MORRIS JAMES LLP**<br><br>*/s/ Stephen M. Miller*<br>Stephen M. Miller (DE Bar No. 2610)<br>500 Delaware Avenue, Suite 1500<br>P.O. Box 2306<br>Wilmington, DE 19899-2306<br>Telephone: (302) 888-6853<br>Facsimile: (302) 571-1750<br>E-mail: smiller@morrisjames.com<br><br>and<br><br>Sarah R. Borders, Esq.<br>Thaddeus D. Wilson, Esq.<br>KING & SPALDING LLP<br>1180 Peachtree Street, NE<br>Atlanta, GA 30309<br>Telephone: (404) 572-4600<br>Facsimile: (404) 572-5100<br>E-mail: sborders@kslaw.com<br>E-mail: thadwilson@kslaw.com<br><br>Attorneys for SunTrust Bank |