# EXHIBIT A

========================================================

# COLLATERAL AGENCY AND INTERCREDITOR AGREEMENT

Dated as of August 16, 2005

by and among

**CEH LA PALOMA MERGER CO, LLC,**
Prior to the Consummation of the Merger, as Borrower

**LA PALOMA GENERATING COMPANY, LLC,**
From and after the Consummation of the Merger, as Borrower

**LA PALOMA ACQUISITION CO, LLC,**
as Buyer

**MORGAN STANLEY SENIOR FUNDING, INC.,**
in its capacity as First-Lien WCF Administrative Agent

**MORGAN STANLEY SENIOR FUNDING, INC.,**
in its capacity as First-Lien Term Loan Administrative Agent

**DEUTSCHE BANK AG NEW YORK BRANCH,**
in its capacity as First-Lien Special LC Facility Administrative Agent

**MORGAN STANLEY SENIOR FUNDING, INC.,**
in its capacity as Second-Lien Administrative Agent

**MORGAN STANLEY CAPITAL GROUP INC.,**
in its capacity as MS Counterparty

**THE BANK OF NEW YORK,**
in its capacity as Collateral Agent

AND

**EACH OF THE OTHER PARTIES HERETO FROM TIME TO TIME**

========================================================

## TABLE OF CONTENTS

Page

SECTION 1.          DEFINITIONS.................................................................................4

   **1.1**  Defined Terms ...........................................................................4
   **1.2**  Terms Generally .......................................................................22

SECTION 2.          LIEN PRIORITIES........................................................................23

   **2.1**  Relative Priorities ....................................................................23
   **2.2**  Prohibition on Contesting Liens ..............................................26
   **2.3**  No New Liens ...........................................................................26
   **2.4**  Similar Liens and Agreements..................................................27

SECTION 3.          ENFORCEMENT. ..........................................................................27

   **3.1**  Exercise of Remedies................................................................27
   **3.2**  Consents....................................................................................34
   **3.3**  Termination Payments ..............................................................34

SECTION 4.          PAYMENTS. ..................................................................................34

   **4.1**  Application of Proceeds.............................................................34
   **4.2**  Payments Over...........................................................................36
   **4.3**  Debt Balances ...........................................................................37

SECTION 5.          OTHER AGREEMENTS. ...............................................................37

   **5.1**  Releases ....................................................................................37
   **5.2**  Refinancing of First-Lien Documents and Second-Lien Documents...................38
   **5.3**  When Discharge of First-Lien Obligations Deemed to Not Have Occurred..........41
   **5.4**  When Discharge of Second-Lien Obligations Deemed to Not Have Occurred.........42
   **5.5**  Purchase Right ..........................................................................42
   **5.6**  Certain Actions .........................................................................43
   **5.7**  Legend ......................................................................................44
   **5.8**  MS Counterparty Springing First Lien .....................................44

SECTION 6.          BANKRUPTCY. .............................................................................45

   **6.1**  Finance and Sale Issues ............................................................45
   **6.2**  Relief from the Automatic Stay ................................................45
   **6.3**  Adequate Protection..................................................................46
   **6.4**  No Waiver..................................................................................47
   **6.5**  Avoidance Issues ......................................................................48

i

| | | |
|---|---|---|
| **6.6** | Reorganization Securities | 48 |
| **6.7** | Post-Petition Interest | 48 |
| **6.8** | Waiver | 49 |

| | | |
|---|---|---|
| SECTION 7. | COLLATERAL AGENT | 49 |

| | | |
|---|---|---|
| **7.1** | Appointment | 50 |
| **7.2** | Delegation of Duties | 50 |
| **7.3** | Exculpatory Provisions | 50 |
| **7.4** | Reliance by Collateral Agent | 51 |
| **7.5** | Notice of Event of Default | 52 |
| **7.6** | Non-Reliance on Collateral Agent and Other Secured Parties | 52 |
| **7.7** | Collateral Agent in Its Individual Capacity | 53 |
| **7.8** | Successor Collateral Agent | 53 |
| **7.9** | Consultants | 54 |
| **7.10** | SCE Deliverable | 54 |
| **7.11** | Security Documents; Letter Agreement | 55 |
| **7.12** | Indemnification | 55 |

| | | |
|---|---|---|
| SECTION 8. | RELIANCE; WAIVERS; ETC. | 56 |

| | | |
|---|---|---|
| **8.1** | Reliance | 56 |
| **8.2** | No Warranties or Liability | 57 |
| **8.3** | No Waiver of Lien Priorities; No Amendments; Approval of Amendments and Waiver | 58 |
| **8.4** | Obligations Unconditional | 62 |

| | | |
|---|---|---|
| SECTION 9. | MISCELLANEOUS. | 63 |

| | | |
|---|---|---|
| **9.1** | Conflicts | 63 |
| **9.2** | Voting. | 63 |
| **9.3** | Debt Service Reserve Accounts | 64 |
| **9.4** | Effectiveness; Continuing Nature of this Agreement; Severability | 64 |
| **9.5** | Amendments; Waivers | 65 |
| **9.6** | Information Concerning Financial Condition of La Paloma and its Subsidiaries | 65 |
| **9.7** | Subrogation | 66 |
| **9.8** | Application of Payments | 67 |
| **9.9** | Governing Law; Submission To Jurisdiction; Waivers. | 67 |
| **9.10** | Notices | 68 |
| **9.11** | Further Assurances | 69 |
| **9.12** | Binding on Successors and Assigns | 69 |
| **9.13** | Specific Performance | 69 |
| **9.14** | Headings | 70 |
| **9.15** | Counterparts | 70 |

SD\491395.17

| | | |
|---|---|---|
| **9.16** | Authorization | 70 |
| **9.17** | No Third Party Beneficiaries | 70 |
| **9.18** | Provisions Solely to Define Relative Rights | 70 |
| **9.19** | La Paloma Obligations | 71 |
| **9.20** | Force Majeure | 71 |
| **9.21** | Consequential Damages | 71 |

EXHIBIT A – ACCESSION AGREEMENT
EXHIBIT B – SCE ACKNOWLEDGEMENT AND CONSENT AGREEMENT
EXHIBIT C – FORM OF CONSENT AND AGREEMENT
EXHIBIT D – FORM OF CERTIFICATE OF OBLIGATIONS

SD\491395.17

This COLLATERAL AGENCY AND INTERCREDITOR AGREEMENT, dated as of August 16, 2005 (this **"Agreement"**), is entered into by and among CEH LA PALOMA MERGER CO, LLC, a limited liability company formed and existing under the laws of the State of Delaware (**"Merger Sub"**), LA PALOMA GENERATING COMPANY, LLC, a limited liability company formed and existing under the laws of the State of Delaware (**"La Paloma"**), LA PALOMA ACQUISITION CO, LLC, a limited liability company formed and existing under the laws of the State of Delaware (**"Buyer"**), MORGAN STANLEY SENIOR FUNDING, INC., in its capacity as administrative agent for the First-Lien WCF Claimholders (in such capacity, the **"First-Lien WCF Administrative Agent"**), MORGAN STANLEY SENIOR FUNDING, INC., in its capacity as administrative agent for the First-Lien Term Loan Claimholders (in such capacity, the **"First-Lien Term Loan Administrative Agent"**), DEUTSCHE BANK AG NEW YORK BRANCH, in its capacity as administrative agent for the First-Lien Special LC Facility Claimholders (in such capacity, the **"First-Lien Special LC Facility Administrative Agent"**), MORGAN STANLEY SENIOR FUNDING, INC., in its capacity as administrative agent for the Second-Lien Claimholders (in such capacity, the **"Second-Lien Administrative Agent"**), MORGAN STANLEY CAPITAL GROUP INC., a Delaware corporation, in its capacity as counterparty under the MS Tolling Agreement (in such capacity, the **"MS Counterparty"**), THE BANK OF NEW YORK, in its capacity as collateral agent for the Secured Parties (in such capacity, the **"Collateral Agent"**), and EACH OF THE OTHER PARTIES HERETO FROM TIME TO TIME. Capitalized terms used in this Agreement have the meanings assigned to them in Section 1.1 below.

## RECITALS

A.    La Paloma is the owner of a natural gas-fired, combined-cycle electric generating facility with a nominal generating capacity of approximately 1,022 MW (net) located near McKittrick, California.

B.    Buyer has assigned all of its right, title and interest in, to and under the Purchase and Sale Agreement to Merger Sub.

C.    Merger Sub, an indirect subsidiary of Complete Energy Holdings, LLC, a Delaware limited liability company, on the date hereof will acquire 100% of the membership interests in La Paloma (the **"Acquisition"**) pursuant to the terms and conditions of the Purchase and Sale Agreement.

D.    Merger Sub has entered into that certain First-Lien Working Capital Agreement, dated as of the date hereof (the **"First-Lien WCF Agreement"**), among Merger Sub, La Paloma, the lenders party thereto from time to time (the **"First-Lien WCF Lenders"**), Morgan Stanley Senior Funding, Inc., as joint lead arranger, co-syndication agent and co-bookrunner, the First-Lien WCF Administrative Agent, and WestLB AG, New York Branch, as issuing bank, joint lead arranger, co-syndication agent and co-bookrunner, which provides for, among other things, the borrowing of first-lien senior secured revolving and term loans and the issuance of letters of credit in an aggregate principal and stated amount of up to $65,000,000.

E.     Merger Sub has entered into that certain First-Lien Term Loan Credit Agreement, dated as of the date hereof (the **"First-Lien Term Loan Credit Agreement"**), among Merger Sub, La Paloma, the lenders party thereto from time to time (the **"First-Lien Term Loan Lenders"**), Morgan Stanley Senior Funding, Inc., as joint lead arranger, co-syndication agent and co-bookrunner, the First-Lien Term Loan Administrative Agent, and WestLB AG, New York Branch, as issuing bank, joint lead arranger, co-syndication agent and co-bookrunner, which provides for, among other things, the borrowing of up to $265,000,000 in aggregate principal amount of first-lien senior secured term loans and the issuance of up to $40,000,000 in aggregate stated amount of synthetic letters of credit.

F.     Merger Sub has entered into that certain First-Lien Special Letter of Credit Facility, dated as of the date hereof (the **"First-Lien Special LC Facility"**), among Merger Sub, La Paloma, the lenders party thereto from time to time (the **"First-Lien Special LC Facility Lenders"**), Deutsche Bank Securities Inc., as sole arranger, syndication agent and bookrunner, the First-Lien Special LC Facility Administrative Agent, and Deutsche Bank AG, New York Branch, as issuing bank, which provides for, among other things, the issuance of up to $250,000,000 in aggregate stated amount of one or more letters of credit to MS Counterparty to secure the Borrower's obligations under the Master Power Purchase and Sale Agreement, dated as of July 8, 2005 (together with the confirmation letter, lien annex and cover sheet issued thereunder, the **"MS Tolling Agreement"**), between Merger Sub and MS Counterparty.

G.     Merger Sub has entered into that certain Second-Lien Term Loan Credit Agreement, dated as of the date hereof (the **"Second-Lien Term Loan Agreement"**), among Merger Sub, La Paloma, the lenders party thereto from time to time (the **"Second-Lien Lenders"**), Morgan Stanley Senior Funding, Inc., as joint lead arranger, co-syndication agent and co-bookrunner, the Second-Lien Administrative Agent, and WestLB AG, New York Branch, as joint lead arranger, co-syndication agent and co-bookrunner, which provides for, among other things, the borrowing of up to $155,000,000 in aggregate principal amount of second-lien senior secured term loans.

H.     La Paloma and certain purchasers of Power from the Project may from time to time after the date hereof enter into certain power purchase agreements.

I.     La Paloma and certain providers of Fuel to the Project may from time to time after the date hereof enter into certain fuel supply agreements.

J.     Merger Sub intends to use a portion of the proceeds of the borrowings under the First-Lien Term Loan Credit Agreement and the Second-Lien Term Loan Agreement to pay for a portion of the purchase price under the Purchase and Sale Agreement.

K.     Immediately after the consummation of the Acquisition, Merger Sub will merge into La Paloma as contemplated by the Merger Agreement, with La Paloma being the surviving limited liability company and with La Paloma assuming all of Merger Sub's obligations hereunder and under the other Financing Documents.

2

L.     The obligations of the Borrower under the First-Lien WCF Agreement will be secured on a first priority basis by Liens on (1) substantially all of the assets of the Borrower (other than the Pending Claims) and (2) all of the membership interests of Borrower, in each case pursuant to the terms of the First-Lien WCF Collateral Documents.

M.     The obligations of the Borrower under the First-Lien Term Loan Credit Agreement will be secured on a first priority basis by Liens on (1) substantially all of the assets of the Borrower (other than the Pending Claims) and (2) all of the membership interests of Borrower, in each case pursuant to the terms of the First-Lien Term Loan Collateral Documents.

N.     The obligations of the Borrower under the First-Lien Special LC Facility will be secured on a first priority basis by Liens on (1) substantially all of the assets of the Borrower (other than the Pending Claims) and (2) all of the membership interests of Borrower, in each case pursuant to the terms of the First-Lien Special LC Facility Collateral Documents.

O.     From and after the MS First-Lien Grant Date, the First-Lien MS Secured Obligations will be secured on a first priority basis by Liens on (1) substantially all of the assets of the Borrower (other than the Pending Claims) and (2) all of the membership interests of Borrower, in each case pursuant to the terms of the First-Lien Collateral Documents.

P.     The obligations of the Borrower under the Second-Lien Term Loan Agreement and the MS Tolling Agreement will be secured on a second priority basis by Liens on (1) substantially all of the assets of the Borrower (other than the Pending Claims) and (2) all of the membership interests of Borrower, in each case pursuant to the terms of the Second-Lien Collateral Documents.

Q.     The obligations of the Borrower under the Qualifying Secured Project Documents may be secured on a third priority basis by Liens on (1) substantially all of the assets of the Borrower (other than the Pending Claims) and (2) all of the membership interests of Borrower, in each case pursuant to the terms of the Third-Lien Collateral Documents.

R.     The First-Lien Documents, the Second-Lien Documents and the Third-Lien Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral.

S.     Each of the parties hereto desires to appoint The Bank of New York as collateral agent for each of the Secured Parties.

T.     In order to induce the First-Lien Claimholders, the Second-Lien Claimholders and the Third-Lien Claimholders to enter into the transactions contemplated by the First-Lien Documents, the Second-Lien Documents and the Third-Lien Documents, respectively, each of the parties hereto has agreed to the agency, intercreditor and other provisions set forth in this Agreement.

3

AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## SECTION 1.  Definitions

**1.1     Defined Terms**.  As used in the Agreement, the following terms shall have the following meanings:

"**Accession Agreement**" means an Accession Agreement substantially in the form attached hereto as Exhibit A.

"**Accounts**" has the meaning assigned to that term in the Security Deposit Agreement.

"**Acquisition**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Act of First and Second Lien Lenders**" means, as to any matter at any time:

(a)     a direction in writing delivered to the Collateral Agent by the Applicable First-Lien Administrative Agent representing the written consent of the holders of more than 50% of the sum of (determined in accordance with Section 9.2):

(i)     the aggregate outstanding principal amount of First-Lien WCF Obligations and First-Lien Term Loan Obligations at such time (in each case, including outstanding letters of credit whether or not drawn, but only to the extent of the amount under such letters of credit which at such time may be drawn by the beneficiary thereof);

(ii)     the Special LC Facility Voting Amount at such time;

(iii)     the aggregate unfunded commitments to extend credit under the First-Lien WCF Agreement or the First-Lien Term Loan Credit Agreement at such time which, when funded, would constitute First-Lien Obligations; and

(iv)     from and after the date on which a termination event has occurred under any of the Interest Rate Protection Agreements (provided that the counterparty thereto is an Interest Rate Hedge Provider), the aggregate outstanding amount of the termination payments thereunder at such time; and

4

(b)    a direction in writing delivered to the Collateral Agent by the Second-Lien Administrative Agent representing the written consent of the Required Second-Lien Lenders.

**"Act of Required Lenders"** means, as to any matter at any time:

(a)    prior to the Discharge of First-Lien Obligations, a direction in writing delivered to the Collateral Agent by the Applicable First-Lien Administrative Agent representing the written consent of the holders of more than 50% of the sum of (determined in accordance with Section 9.2):

(i)    the aggregate outstanding principal amount of First-Lien WCF Obligations and First-Lien Term Loan Obligations at such time (in each case, including outstanding letters of credit whether or not drawn, but only to the extent of the amount under such letters of credit which at such time may be drawn by the beneficiary thereof);

(ii)    the Special LC Facility Voting Amount at such time;

(iii)    from and after the date on which a termination event has occurred under any of the Interest Rate Protection Agreements (provided that the counterparty thereto is an Interest Rate Hedge Provider), the aggregate outstanding amount of the termination payments thereunder at such time; and

(iv)    from and after the MS First-Lien Grant Date and (A) from and after the date any Termination Payments are due and payable, the aggregate outstanding amount of First-Lien MS Secured Obligations or (B) from and after the date on which all of the First-Lien Obligations (other than the First-Lien MS Secured Obligations) have been repaid in full in cash, cash collateralized (if and to the extent applicable) and all commitments related thereto have been terminated, in each case in accordance with the terms of the applicable First-Lien Documents, the aggregate outstanding amount of First-Lien MS Secured Obligations; and

(b)    at any time from and after the Discharge of First-Lien Obligations, a direction in writing delivered to the Collateral Agent by the Second-Lien Administrative Agent representing the written consent of the Required Second-Lien Lenders.

For purposes of this definition and any other voting matter hereunder, any Obligations registered in the name of, or beneficially owned by, La Paloma or any Affiliate of La Paloma will be deemed not to be outstanding.

**"Advances"** means any advances paid by the Seller to La Paloma in respect of the CAISO Receivable, the SCE Receivable and the PG&E Receivable.

"**Affiliate**" means, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries Controls, or is Controlled by or is under common Control with, the Person specified.

"**Agreement**" has the meaning assigned to that term in the Preamble to this Agreement.

"**Ancillary Services**" means those services necessary to support the transmission and distribution of Power from point of generation to point of delivery while maintaining reliable operation of the transmission system, including spinning reserves, non-spinning reserves, replacement reserves, regulation, black-start capability, voltage regulation and any other ancillary services.

"**Applicable First-Lien Administrative Agent**" means either the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent or the First-Lien Term Loan Administrative Agent, which for purposes of this Agreement shall be determined by reference to which agent administers the larger aggregate outstanding principal amount under its respective loan facility on the date the applicable action is required to be taken by such agent as contemplated herein.

"**Appraisal**" means a current appraisal of the Project, prepared by a nationally recognized appraisal company (using appropriate appraisal methodologies, techniques, assumptions, and adjustments ) in connection with the applicable Refinancing.

"**Asset Coverage Ratio**" means, as of date of determination, (a) the then-current fair market value of the Project, based on the most recent Appraisal, divided by (b) the monetary amount of all First-Lien Obligations at such time.

"**Bankruptcy**" means, with respect to any Person, the occurrence of any of the following events, conditions or circumstances:  (a) such Person shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer or consent seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under the Bankruptcy Law or any present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, or shall seek, apply for or consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of such Person or of all or any substantial part of its Property (the term "acquiesce," as used in this definition, includes the failure to file a notice of appeal, petition or motion to vacate, remove or discharge any order, judgment or decree within ten days after entry of such order, judgment or decree); (b) an involuntary case or other proceeding shall be commenced or filed against such Person seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief with respect to such Person or its debts under the Bankruptcy Law or any present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or of all or any substantial part of its Property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of

60 consecutive days; (c) a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against such Person seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Law, or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, reorganization or other relief for debtors, and such Person shall acquiesce in the entry of such order, judgment or decree or such order, judgment or decree shall remain unvacated and unstayed for a period of 60 consecutive days from the date of entry thereof, or any trustee, receiver, conservator or liquidator of such Person or of all or any substantial part of its Property shall be appointed without the consent or acquiescence of such Person and such appointment shall remain unvacated and unstayed for a period of 60 consecutive days; (d) such Person shall admit in writing its inability to pay its debts as they mature or shall generally not be paying its debts as they become due; (e) such Person shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or (f) such Person shall take any corporate, limited liability company or partnership action for the purpose of effecting any of the foregoing.

"**Bankruptcy Case**" means, with respect to any Person, any case under the Bankruptcy Law commenced voluntarily or involuntarily against such Person.

"**Bankruptcy Code**" means the United States Bankruptcy Reform Act of 1978, as amended.

"**Bankruptcy Law**" means Title 11, United States Code, and any other state or federal insolvency, reorganization, moratorium or similar law for the relief of debtors, or any successor statute.

"**Borrower**" means (a) prior to the consummation of the Merger, Merger Sub and (b) from and after the consummation of the Merger, La Paloma.

"**Breakage Costs**" means, with respect to any loans made under any of the First-Lien Documents or the Second-Lien Documents, the loss, cost and expense attributable to (a) the prepayment of the principal amount of such loan other than on the last day of the applicable interest period for such loan, (b) the prepayment of the principal amount of such loan on any date other than on the last day of the applicable interest period for such loan specified in a notice of prepayment given by the Borrower, or (c) the revocation by the Borrower of any notice of borrowing submitted pursuant to any such Financing Document after the applicable minimum period for the submission of such notice of borrowing specified therein.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"**Buyer**" has the meaning assigned to that term in the Preamble to this Agreement.

"**CAISO Receivable**" has the meaning assigned to that term in the Consideration Agreement as of the Closing Date.

7

"**Claims**" means any and all actions, suits, penalties, claims and demands and reasonable out-of-pocket liabilities, losses, costs and expenses (including reasonable and documented attorney's fees and expenses) of any nature whatsoever.

"**Closing Date**" means August 16, 2005.

"**Collateral**" means all of the Property of any Grantor, whether real, personal or mixed, constituting or intending to constitute all of the First-Lien Collateral, the Second-Lien Collateral or the Third-Lien Collateral.

"**Collateral Agent**" has the meaning assigned to that term in the Preamble to this Agreement.

"**Collateral Documents**" means, collectively, the First-Lien Collateral Documents, the Second-Lien Collateral Documents and the Third-Lien Collateral Documents.

"**Consent and Agreement**" means each Consent and Agreement, among a Project Party, La Paloma and the Collateral Agent (for the benefit of the Secured Parties) substantially in the form attached hereto as Exhibit C.

"**Consideration Agreement**" means the Consideration Agreement, dated as of May 17, 2005, among La Paloma, the Seller, the Buyer and the Security Agent.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**", "**Controlled**" and "**under common Control with**" have meanings correlative thereto.

"**Deed of Trust**" means the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the Closing Date, by La Paloma in favor of Fidelity National Title Insurance Company, on behalf of the Collateral Agent (for the benefit of the Secured Parties).

"**Depositary**" means The Bank of New York, not in its individual capacity, but solely as securities intermediary, bank and depositary agent under the Security Deposit Agreement.

"**DIP Financing**" has the meaning assigned to that term in Section 6.1.

"**Discharge Date**" means the date on which the Discharge of First-Lien Obligations and the Discharge of Second-Lien Obligations has occurred.

"**Discharge of First-Lien Obligations**" means, except to the extent otherwise expressly provided in Section 5.3:

　　　　(a)　　payment in full in cash of the principal of and Interest Expense (including Interest Expense accruing on or after the commencement of any Bankruptcy, whether or not such Interest Expense would be allowed in such Bankruptcy) on all

8

Indebtedness outstanding under the First-Lien Documents and constituting First-Lien Obligations;

       (b)    payment in full in cash of all other First-Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and Interest Expense are paid;

       (c)    termination or expiration of all commitments, if any, to extend credit that would constitute First-Lien Obligations; and

       (d)    cancellation, termination or cash collateralization at 102.5% of the stated amount thereof (in a manner reasonably satisfactory to the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent or the First-Lien Term Loan Administrative Agent, as applicable) of all letters of credit issued under the First-Lien Documents and constituting First-Lien Obligations.

    **"Discharge of Second-Lien Obligations"** means, except to the extent otherwise expressly provided in Section 5.4:

       (a)    payment in full in cash of the principal of and Interest Expense (including Interest Expense accruing on or after the commencement of any Bankruptcy, whether or not such Interest Expense would be allowed in such Bankruptcy) on all Indebtedness outstanding under the Second-Lien Documents and constituting Second-Lien Obligations;

       (b)    payment in full in cash of all other Second-Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and Interest Expense are paid;

       (c)    termination or expiration of all commitments, if any, to extend credit that would constitute Second-Lien Obligations; and

       (d)    cancellation, termination or cash collateralization at 102.5% of the stated amount thereof (in a manner reasonably satisfactory to the Second-Lien Administrative Agent) of all letters of credit issued under the Second-Lien Documents and constituting Second-Lien Obligations.

    **"Environmental Law"** means, whenever enacted or promulgated, any federal, state, county or local law, statute, ordinance, code, rule, regulation, license, permit, authorization, approval, covenant, administrative or court order, judgment, decree, injunction, code or requirement of or any agreement with, any Governmental Authority, in any case applicable to the Project:

       (a)    relating to pollution (or the cleanup, removal, or remediation thereof, or any other response thereto), or the regulation or protection of human health, safety or the environment, including ambient or indoor air, water vapor, surface water, groundwater, drinking water, land (including surface or subsurface), plant, aquatic and animal life, or

9

(b)    concerning exposure to, or the Use or Release or threatened Release or remediation of any Hazardous Material,

in each case as amended and as now or hereafter in effect, and any common law or equitable doctrine (including injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries (whether personal or property) or damages due to or threatened as a result of the presence of, exposure to, or ingestion of, any Hazardous Material, whether such common law or equitable doctrine is now or hereafter recognized or developed. Environmental Laws include the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; the Refuse Act, 33 U.S.C. §§ 401 et seq.; the Hazardous Materials Transportation Act of 1975, 49 U.S.C. §§ 1801-1812; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300 et seq.; and the Occupational Safety and Health Act of 1970.

"**Event of Default**" means an "Event of Default" as defined in any of the First-Lien WCF Agreement, the First-Lien Special LC Facility, the First-Lien Term Loan Credit Agreement or the Second-Lien Term Loan Agreement.

"**Facility**" means the approximately 1,022 MW (net) natural gas-fired combined-cycle electric generating facility, together with all other equipment necessary for the receipt of natural gas and the generation and transmission of electric energy output to the interconnection point, located near McKittrick, California.

"**Financing Documents**" means, collectively, the First-Lien Documents, the Second-Lien Documents and the Third-Lien Documents.

"**Financing Statements**" means all financing statements, continuation statements, recordings, filings or other instruments of registration necessary or appropriate to perfect a Lien by filing in any appropriate filing or recording office in accordance with the UCC or any other relevant Legal Requirements.

"**First-Lien**" means a first priority Lien granted pursuant to the First-Lien Collateral Documents to the Collateral Agent (for the benefit of the holders of the First-Lien Obligations) upon the First-Lien Collateral to secure First-Lien Obligations.

"**First-Lien Administrative Agent**" means, collectively, the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent and the First-Lien Term Loan Administrative Agent.

"**First-Lien Claimholders**" means, at any relevant time, the holders of First-Lien Obligations at that time, including the First-Lien Administrative Agents, the First-Lien Lenders and the agents, issuing banks and trustees under the First-Lien Documents, the Depositary, the Collateral Agent and the Interest Rate Hedge Providers and, from and after the MS First-Lien Grant Date, MS Counterparty.

10

"**First-Lien Collateral**" means, collectively, the First-Lien Term Loan Collateral, the First-Lien Special LC Facility Collateral and the First-Lien WCF Collateral.

"**First-Lien Collateral Documents**" means, collectively, the First-Lien WCF Collateral Documents, the First-Lien Special LC Facility Collateral Documents, the First-Lien MS Collateral Documents and the First-Lien Term Loan Collateral Documents and any other agreement, document or instrument pursuant to which a Lien is granted securing any First-Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First-Lien Debt Service Reserve Account**" means the Account of such name established pursuant to Security Deposit Agreement.

"**First-Lien Documents**" means, collectively, the First-Lien WCF Documents, the First-Lien Special LC Facility Documents, the First-Lien MS Collateral Documents, the First-Lien Term Loan Documents and each of the other agreements, documents and instruments providing for or evidencing any other First-Lien Obligation (including the Interest Rate Protection Agreements) among one or more holders of First-Lien Obligations, on-the-one-hand, and any Grantor, on-the-other, to the extent such are effective at the relevant time.

"**First-Lien Lenders**" means, collectively, the First-Lien WCF Lenders, the First-Lien Special LC Facility Lenders and the First-Lien Term Loan Lenders.

"**First-Lien MS Secured Obligations**" has the meaning set forth in Section 5.8.

"**First-Lien MS Collateral Documents**" means, collectively, this Agreement, the Deed of Trust, the Security Deposit Agreement, each Consent and Agreement, the First-Lien Pledge Agreement (Merger Sub), the First-Lien Pledge Agreement (La Paloma), the First-Lien Security Agreement (Merger Sub), the First-Lien Security Agreement (La Paloma) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First-Lien MS Secured Obligations or under which rights or remedies with respect to such Liens are governed.

"**First-Lien Obligations**" means, collectively, the First-Lien WCF Obligations, the First-Lien Special LC Facility Obligations, the First-Lien Term Loan Obligations and the Interest Rate Hedge Obligations and, from and after the MS First-Lien Grant Date, the First-Lien MS Secured Obligations.

"**First-Lien Pledge Agreement (La Paloma)**" means the First-Lien Pledge Agreement, dated as of the Closing Date, by the Buyer and the Collateral Agent (for the benefit of the First-Lien Claimholders), in respect of the pledge by the Buyer of its membership interests in La Paloma.

"**First-Lien Pledge Agreement (Merger Sub)**" means the First-Lien Pledge Agreement, dated as of the Closing Date, by the Buyer and the Collateral Agent (for the benefit of the First-Lien Claimholders), in respect of the pledge by the Buyer of its membership interests in Merger Sub.

11

"**First-Lien Recovery**" has the meaning set forth in Section 6.5.

"**First-Lien Security Agreement (Merger Sub)**" means the First-Lien Security Agreement, dated as of the Closing Date, by Merger Sub and the Collateral Agent (for the benefit of the First-Lien Claimholders).

"**First-Lien Security Agreement (La Paloma)**" means the First-Lien Security Agreement, dated as of the Closing Date, by La Paloma and the Collateral Agent (for the benefit of the First-Lien Claimholders).

"**First-Lien Special LC Facility**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First-Lien Special LC Facility Administrative Agent**" has the meaning assigned to that term in the Preamble to this Agreement.

"**First-Lien Special LC Facility Claimholders**" means, at any relevant time, the holders of First-Lien Special LC Facility Obligations at that time, including the First-Lien Special LC Facility Administrative Agent, the First-Lien Special LC Facility Lenders and the agents and issuing banks under the First-Lien Special LC Facility Documents.

"**First-Lien Special LC Facility Collateral**" means all of the Property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First-Lien Special LC Facility Obligations.

"**First-Lien Special LC Facility Collateral Documents**" means, collectively, this Agreement, the Deed of Trust, the Security Deposit Agreement, each Consent and Agreement, the First-Lien Pledge Agreement (Merger Sub), the First-Lien Pledge Agreement (La Paloma), the First-Lien Security Agreement (Merger Sub), the First-Lien Security Agreement (La Paloma) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First-Lien Special LC Facility Obligations or under which rights or remedies with respect to such Liens are governed.

"**First-Lien Special LC Facility Documents**" means, collectively, the First-Lien Special LC Facility, each of the notes issued thereunder, each of the letters of credit issued thereunder, the First-Lien Special LC Facility Collateral Documents and, except for the MSCG Fee Letter, each of the other agreements, documents and instruments providing for or evidencing any other First-Lien Special LC Facility Obligation among one or more holders of First-Lien Special LC Facility Obligations, on-the-one-hand, and any Grantor, on-the-other, to the extent such are effective at the relevant time (it being acknowledged and agreed that the MSCG Fee Letter shall be deemed not to be a First-Lien Special LC Facility Document).

"**First-Lien Special LC Facility Lenders**" has the meaning assigned to that term in the Recitals to this Agreement.

12

"**First-Lien Special LC Facility Obligations**" means all Obligations outstanding under the First-Lien Special LC Facility and the other First-Lien Special LC Facility Documents.

"**First-Lien Term Loan Administrative Agent**" has the meaning assigned to that term in the Preamble to this Agreement.

"**First-Lien Term Loan Claimholders**" means, at any relevant time, the holders of First-Lien Term Loan Obligations at that time, including the First-Lien Term Loan Administrative Agent, the First-Lien Term Loan Lenders and the agents, issuing banks and trustees under the First-Lien Term Loan Documents.

"**First-Lien Term Loan Collateral**" means all of the Property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First-Lien Term Loan Obligations.

"**First-Lien Term Loan Collateral Documents**" means, collectively, this Agreement, the Deed of Trust, the Security Deposit Agreement, each Consent and Agreement, the First-Lien Pledge Agreement (Merger Sub), the First-Lien Pledge Agreement (La Paloma), the First-Lien Security Agreement (Merger Sub), the First-Lien Security Agreement (La Paloma) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First-Lien Term Loan Obligations or under which rights or remedies with respect to such Liens are governed.

"**First-Lien Term Loan Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First-Lien Term Loan Documents**" means, collectively, the First-Lien Term Loan Credit Agreement, each of the notes issued thereunder, each of the letters of credit issued thereunder, the First-Lien Term Loan Collateral Documents and each of the other agreements, documents and instruments providing for or evidencing any other First-Lien Term Loan Obligation among one or more holders of First-Lien Term Loan Obligations, on-the-one-hand, and any Grantor, on-the-other, to the extent such are effective at the relevant time.

"**First-Lien Term Loan Lenders**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First-Lien Term Loan Obligations**" means all Obligations outstanding under the First-Lien Term Loan Credit Agreement and the other First-Lien Term Loan Documents.

"**First-Lien WCF Administrative Agent**" has the meaning assigned to that term in the Preamble to this Agreement.

"**First-Lien WCF Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

13

**"First-Lien WCF Claimholders"** means, at any relevant time, the holders of First-Lien WCF Obligations at that time, including the First-Lien WCF Administrative Agent, the First-Lien WCF Lenders and the agents, issuing banks and trustees under the First-Lien WCF Documents.

**"First-Lien WCF Collateral"** means all of the Property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First-Lien WCF Obligations.

**"First-Lien WCF Collateral Documents"** means, collectively, this Agreement, the Deed of Trust, the Security Deposit Agreement, each Consent and Agreement, the First-Lien Pledge Agreement (Merger Sub), the First-Lien Pledge Agreement (La Paloma), the First-Lien Security Agreement (Merger Sub), the First-Lien Security Agreement (La Paloma) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First-Lien WCF Obligations or under which rights or remedies with respect to such Liens are governed.

**"First-Lien WCF Documents"** means, collectively, the First-Lien WCF Agreement, each of the notes issued thereunder, each of the letters of credit issued thereunder, the First-Lien WCF Collateral Documents and each of the other agreements, documents and instruments providing for or evidencing any other First-Lien WCF Obligation among one or more holders of First-Lien WCF Obligations, on-the-one-hand, and any Grantor, on-the-other, to the extent such are effective at the relevant time.

**"First-Lien WCF Lenders"** has the meaning assigned to that term in the Recitals to this Agreement.

**"First-Lien WCF Obligations"** means all Obligations outstanding under the First-Lien WCF Agreement and the other First-Lien WCF Documents.

**"Fuel"** means pipeline quality natural gas.

**"Fuel Transaction"** means the purchase, sale or transportation of Fuel, including any financial settlement in lieu thereof.

**"Government Rule"** means any statute, law, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement, directive, requirement of, or other governmental restriction or any similar binding form of decision of or determination by, or any binding interpretation or administration of any of the foregoing by, any Governmental Authority, whether now or hereafter in effect.

**"Governmental Authority"** means any United States federal, state, municipal, local, territorial, or other governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, judicial or administrative body.

**"Grantors"** means the Borrower, the Buyer, and each other Person that has or may from time to time hereafter execute and deliver a Collateral Document as a "grantor" or "pledgor" (or the equivalent thereof).

14

"**Hazardous Material**" means:    (a) any petroleum or petroleum products, flammable materials, explosives, radioactive materials, asbestos that is friable, urea formaldehyde foam insulation and equipment that contains dielectric fluid containing polychlorinated biphenyls; (b) any materials or substances which are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants", "pollutants" or words of similar import under any Environmental Law; and (c) any other material or substance, exposure to which is prohibited, limited or regulated as such under any Environmental Law including the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., or any similar state statute.

"**Indebtedness**" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First-Lien Term Loan Credit Agreement, the First-Lien Special LC Facility, the First-Lien WCF Agreement or the Second-Lien Term Loan Agreement, as applicable.

"**Indemnified Person**" has the meaning assigned to that term in Section 7.12(a).

"**Independent Engineer**" has the meaning assigned to that term in Section 7.9(a).

"**Insurance Advisor**" has the meaning assigned to that term in Section 7.9(b).

"**Interest Expense**" means, for any period, all interest (including, if applicable, post-petition interest), commitment fees, letter of credit fees and Breakage Costs in respect of outstanding First-Lien Obligations (excluding Interest Rate Protection Agreements and excluding all interest, fees and Breakage Costs which are the responsibility of MS Counterparty under the MSCG Fee Letter) and Second-Lien Obligations accrued, capitalized or payable during such period (whether or not actually paid during such period).

"**Interest Rate Hedge Obligations**" means Obligations of La Paloma to Interest Rate Hedge Providers under Interest Rate Protection Agreements.

"**Interest Rate Hedge Provider**" means any Person providing an Interest Rate Protection Agreement; provided, that such Person is a Lender (or an Affiliate thereof) and such Person has entered into an Accession Agreement in the form attached hereto as Exhibit A.

"**Interest Rate Protection Agreement**" means one or more interest rate swap agreements, caps, collars, or other master interest rate hedging mechanisms which La Paloma has entered into for the purpose of hedging La Paloma's interest rate exposure under the Financing Documents, in each case, having a term that does not extend beyond the scheduled maturity date of the indebtedness hedged thereby and otherwise in form and substance reasonably satisfactory to the First-Lien WCF Administrative Agent.

"**La Paloma**" has the meaning assigned to that term in the Preamble to this Agreement.

15

"**Legal Requirements**" means all Federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions affecting the Project or the use thereof, whether now or hereafter enacted and in force, including any that require repairs, modifications or alterations in or to the Project or in any way limit the use and enjoyment thereof and any that may relate to environmental requirements (including all Environmental Laws), and all permits, certificates, licenses, authorizations and regulations relating thereto.

"**Lender**" means a First-Lien WCF Lender, First-Lien Special LC Facility Lender, First-Lien Term Loan Lender and/or Second-Lien Lender.

"**Lien**" means, with respect to any Property of any Person, any deed of trust, lien, pledge, charge, lease, easement, servitude, security interest or encumbrance of any kind in respect of such Property of such Person. For purposes of this Agreement and the other Collateral Documents, a Person shall be deemed to own subject to a Lien any Property which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such Property.

"**Material Adverse Effect**" means a material adverse effect on one or more of the following: (a) the business, operations or condition (financial or otherwise) of La Paloma; (b) the ability of Merger Sub or La Paloma to perform its material obligations under any Financing Document (other than the MS Tolling Agreement) to which it is a party in accordance with the terms of such Financing Document; (c) the rights or remedies of the Collateral Agent or any of the other Secured Parties under any Financing Document (other than the MS Tolling Agreement); or (d) the validity, enforceability or priority of the Liens granted to the Collateral Agent pursuant to the Collateral Documents.

"**Merger**" means the merger of Merger Sub with and into La Paloma in accordance with the terms of the Merger Agreement and the Certificate of Merger, with La Paloma being the surviving limited liability company.

"**Merger Agreement**" means that certain Agreement and Plan of Merger, dated as of the Closing Date by and between Merger Sub and La Paloma.

"**Merger Sub**" has the meaning assigned to that term in the Preamble to this Agreement.

"**MS Counterparty**" has the meaning assigned to that term in the Preamble to this Agreement.

"**MS First-Lien Grant Date**" means June 30, 2012 (underline provided that MS Counterparty shall have exercised its Extension Option (under and as defined in the MS Tolling Agreement) on or before such date).

"**MS Residual Obligations**" means, as of any date of determination, the amount of Termination Payments which are then due and payable by the Borrower to MS Counterparty under the MS Tolling Agreement after giving effect to the application of the

16

proceeds, if any, of (a) the MS Synthetic Letters of Credit, (b) the Special LC Facility Letters of Credit and (c) any other amounts paid by the Borrower to MS Counterparty in satisfaction of such Termination Payments.

"**MS Synthetic Letters of Credit**" means each of the letters of credit issued under the First-Lien Term Loan Credit Agreement for the benefit of MS Counterparty.

"**MS Tolling Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**MSCG Fee Letter**" means that certain letter agreement, dated as of July 8, 2005, by and between Deutsche Bank AG New York Branch and MS Counterparty.

"**New First-Lien Agent**" has the meaning assigned to that term in Section 5.3.

"**New First-Lien Debt Notice**" has the meaning assigned to that term in Section 5.3.

"**New Second-Lien Agent**" has the meaning assigned to that term in Section 5.4.

"**New Second-Lien Debt Notice**" has the meaning assigned to that term in Section 5.4.

"**Obligations**" means all obligations of every nature of each Grantor from time to time owed to the First-Lien Claimholders, the Second-Lien Claimholders, the Third-Lien Claimholders or any of them under the First-Lien Documents, the Second-Lien Documents or Third-Lien Documents (as applicable), whether for principal, Interest Expense, premium (if any) or payments for early termination of or ordinary course settlement payments under Interest Rate Protection Agreements, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing.

"**Pending Claims**" means (a) all of La Paloma's right, title and interest in and to each of the CAISO Receivable, the SCE Receivable and the PG&E Receivable (excluding in each case, Retained Rights and Advances), (b) all of La Paloma's right, title and interest in and to the EPC Buydown Damages (as defined in the Consideration Agreement as of the Closing Date), (c) any moneys received by La Paloma following the Closing Date in respect of Priority Letters of Credit (as defined in the Consideration Agreement as of the Closing Date) described in item 4 of Section 8.07 of the Seller's Disclosure Schedule attached to the Purchase and Sale Agreement as of the Closing Date and (d) Instruments and Proceeds (each as defined in the Seller's Security Agreement as of the Closing Date) in respect of the foregoing.

"**Permitted Liens**" means, with respect to any Grantor, the Liens permitted to exist on the Property of such Grantor under the Financing Documents.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

17

"**PG&E Receivable**" has the meaning assigned to that term in the Consideration Agreement as of the Closing Date.

"**Power**" means electric capacity as measured in MWs, energy as measured in MWh, and/or any other electric related products or services available for sale from the Facility, including Ancillary Services.

"**Power Transaction**" means the purchase or sale of Power, including any financial settlement in lieu thereof; provided that the purchase of electrical energy for use at the Project (and not for re-sale or re-delivery to third parties) shall be deemed not to be a Power Transaction.

"**Project**" means the Facility and the Site.

"**Project Party**" means each Person from time to time party to, and having obligations under, a material agreement of La Paloma related to the use, operation, administration, improvement, construction and maintenance of the Project with respect to which the Borrower is required to enter into a consent and agreement under the Financing Documents.

"**Property**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"**Purchase and Sale Agreement**" means the Purchase and Sale Agreement, dated as of May 10, 2005, among the Buyer, the Seller and, solely for purposes of Section 9.04 hereof, La Paloma.

"**Qualifying Secured Project Documents**" means agreements entered into in connection with any Significant Fuel Transaction or Significant Power Transaction (other than the MS Tolling Agreement).

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Release**" means, with respect to any Hazardous Material, any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of such Hazardous Material into the indoor or outdoor environment, including the movement of such Hazardous Material through ambient air, soil, surface water, groundwater, wetlands, land or subsurface strata.

"**Required Second-Lien Lenders**" means, at any time, the holders of more than 50% of the sum of:

(a)    the aggregate outstanding principal amount of Second-Lien Obligations (in each case, including outstanding letters of credit whether or not then available or drawn);

18

(b)      other than in connection with the exercise of remedies, the aggregate unfunded commitments to extend credit under the Second-Lien Term Loan Agreement which, when funded, would constitute Second-Lien Obligations; and

(c)      (i) from and after the date any Termination Payments are due and payable, the aggregate outstanding amount of MS Residual Obligations or (ii) from and after the date on which all of the Second-Lien Obligations (other than the MS Residual Obligations) have been repaid in full in cash, cash collateralized (if and to the extent applicable) and all commitments related thereto have been terminated, in each case in accordance with the terms of the applicable Second-Lien Documents, the aggregate outstanding amount of MS Residual Obligations.

**"Retained Rights"** means that portion of the CAISO Receivable, the SCE Receivable and the PG&E Receivable, and the proceeds thereof, which La Paloma does not have an obligation to assign or pay to the Seller pursuant to the Purchase and Sale Agreement.

**"SCE Acknowledgment and Consent Agreement"** means an Acknowledgment and Consent Agreement substantially in the form attached hereto as Exhibit B.

**"SCE Receivable"** has the meaning assigned to that term in the Consideration Agreement as of the Closing Date.

**"Second-Lien"** means a second priority Lien granted pursuant to the Second-Lien Collateral Documents to the Collateral Agent (for the benefit of the holders of the Second-Lien Obligations) upon the Second-Lien Collateral to secure Second-Lien Obligations.

**"Second-Lien Administrative Agent"** has the meaning set assigned to that term in the Preamble to this Agreement.

**"Second-Lien Claimholders"** means, at any relevant time, the holders of Second-Lien Obligations at that time, including the Second-Lien Administrative Agent, the Second-Lien Lenders, the agents, issuing banks and trustees under the Second-Lien Documents and MS Counterparty.

**"Second-Lien Collateral"** means all of the Property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second-Lien Obligations.

**"Second-Lien Collateral Documents"** means, collectively, the Deed of Trust, the Security Deposit Agreement, each Consent and Agreement, the Second-Lien Security Agreement (Merger Sub), the Second-Lien Security Agreement (La Paloma), the Second-Lien Pledge Agreement (Merger Sub), the Second-Lien Pledge Agreement (La Paloma) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Second-Lien Obligations or under which rights or remedies with respect to such Liens are governed.

19

"**Second-Lien Debt Service Reserve Account**" means the Account of such name established pursuant to the Security Deposit Agreement.

"**Second-Lien Documents**" means, collectively, the Second-Lien Term Loan Agreement, each of the notes issued thereunder, each of the letters of credit issued thereunder, the Second-Lien Collateral Documents, the MS Tolling Agreement and each of the other agreements, documents and instruments providing for or evidencing any other Second-Lien Obligation among one or more holders of Second-Lien Obligations, on-the-one-hand, and any Grantor, on-the-other, to the extent such are effective at the relevant time.

"**Second-Lien Lenders**" has the meaning set assigned to that term in the Recitals to this Agreement.

"**Second-Lien Obligations**" means all Obligations outstanding under the Second-Lien Term Loan Agreement and the other Second-Lien Documents related thereto, and the MS Residual Obligations.

"**Second-Lien Pledge Agreement (La Paloma)**" means the Second-Lien Pledge Agreement, dated as of the Closing Date, by the Buyer and the Collateral Agent (for the benefit of the Second-Lien Claimholders), in respect of the pledge by the Buyer of its membership interests in La Paloma.

"**Second-Lien Pledge Agreement (Merger Sub)**" means the Second-Lien Pledge Agreement, dated as of the Closing Date, by the Buyer and the Collateral Agent (for the benefit of the Second-Lien Claimholders), in respect of the pledge by the Buyer of its membership interests in Merger Sub.

"**Second-Lien Security Agreement (Merger Sub)**" means the Second-Lien Security Agreement, dated as of the Closing Date, by Merger Sub and the Collateral Agent (for the benefit of the Second-Lien Claimholders).

"**Second-Lien Security Agreement (La Paloma)**" means the Second-Lien Security Agreement, dated as of the Closing Date, by La Paloma and the Collateral Agent (for the benefit of the Second-Lien Claimholders).

"**Second-Lien Term Loan Agreement**" has the meaning assigned to that term in the Recitals to this Agreement

"**Second-Lien Term Loan Claimholders**" means, at any relevant time, the holders of Second-Lien Obligations at that time under the Second-Lien Term Loan Agreement.

"**Second-Lien Recovery**" has the meaning set forth in Section 6.5.

"**Secured Debt Representative**" means the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and the Second-Lien Administrative Agent.

20

"**Secured Parties**" means the Collateral Agent, the Depositary, the First-Lien Claimholders, the Second-Lien Claimholders and the Third-Lien Claimholders.

"**Security Agent**" means Citibank, N.A., not in its individual capacity, but solely as security agent for the beneficiaries of the Pending Claims.

"**Security Deposit Agreement**" means the Security Deposit Agreement, dated as of the Closing Date, among the Borrower, the Depositary and the Collateral Agent (for the benefit of the Secured Parties).

"**Seller**" means La Paloma Holding Company, LLC, a Delaware limited liability company.

"**Seller's Security Agreement**" means the Security Agreement, dated as of the Closing Date, by and between La Paloma and the Security Agent.

"**Significant Fuel Transaction**" means a Fuel Transaction (in one or a series of transactions with the same counterparty) with a scheduled term (including renewal options that are exercisable at the sole discretion of the Borrower's counterparty) in excess of six months or having an anticipated notional contract value in excess of $50,000,000.

"**Significant Power Transaction**" means a Power Transaction (in one or a series of transactions with the same counterparty) with a scheduled term (including renewal options that are exercisable at the sole discretion of the Borrower's counterparty) in excess of six months or having an anticipated notional contract value in excess of $50,000,000.

"**Site**" means the "Site" and the "Easements", collectively, as each such term is defined in the Deed of Trust.

"**Special LC Facility Letters of Credit**" means each of the letters of credit issued under the First-Lien Special LC Facility for the benefit of MS Counterparty.

"**Special LC Facility Voting Amount**" means the greater of (a) the lesser of (i) $50,000,000 and (ii) the then current aggregate stated amount of the Special LC Facility Letters of Credit and (b) the aggregate amount which MS Counterparty has drawn or could draw on under the Special LC Facility Letters of Credit at such time (for purposes of this definition, each of the conditions to drawing on such Special LC Facility Letters of Credit shall be deemed to have been satisfied at such time).

"**Standstill Period**" has the meaning set forth in Section 3.1(b).

"**Taxes**" means, with respect to any Person, all taxes, assessments, imposts, duties, governmental charges or levies imposed directly or indirectly on such Person or its income, profits or Property by any Governmental Authority.

"**Termination Payments**" means, as of any date of determination, the sum (without duplication) of (a) the Net Settlement Amount (as defined under the MS Tolling Agreement) then due and payable to MS Counterparty; (b) all Unpaid Amounts (as defined

21

under the MS Tolling Agreement) then due and payable to MS Counterparty; and (c) any and all other amounts then due and payable to MS Counterparty under the MS Tolling Agreement.

"**Third-Lien**" means a third priority Lien granted pursuant to the Third-Lien Collateral Documents to the Collateral Agent (for the benefit of the holders of the Third-Lien Obligations) upon the Third-Lien Collateral to secure Third-Lien Obligations.

"**Third-Lien Claimholders**" means, at any relevant time, the holders of Third-Lien Obligations at that time under the Third-Lien Documents; provided that such holder has entered into an Accession Agreement in the form attached hereto as Exhibit A.

"**Third-Lien Collateral**" means all of the Property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Third-Lien Obligations.

"**Third-Lien Collateral Documents**" means, collectively, the Deed of Trust, the Security Deposit Agreement, each Consent and Agreement and any other agreement, document or instrument pursuant to which a Lien is granted securing any Third-Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Third-Lien Documents**" means, collectively, the Qualifying Secured Project Documents and the Third-Lien Collateral Documents.

"**Third-Lien Obligations**" means all Obligations outstanding under the Qualifying Secured Project Documents and the other Third-Lien Documents.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions related to such provisions.

"**Use**" means, with respect to any Hazardous Material and with respect to any Person, the generation, manufacture, processing, distribution, handling, use, treatment, recycling or storage of such Hazardous Material or transportation to or from the property of such Person of such Hazardous Material.

**1.2    Terms Generally**. For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    unless otherwise expressly provided, all references in this Agreement to designated "Articles", "Sections", "Exhibits", "Schedules", "clauses" and other subdivisions are to the designated Articles, Sections, Exhibits, Schedules, clauses and other subdivisions of this Agreement;

22

(b)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(c)    unless otherwise expressly specified, any agreement, contract or document defined or referred to herein shall mean such agreement, contract or document as in effect as of the date hereof, as the same may thereafter be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and of this Agreement and the other Financing Documents and including any agreement, contract or document in substitution or replacement of any of the foregoing in accordance with the terms of this Agreement and the other Financing Documents;

(d)    unless the context clearly intends to the contrary, pronouns having a masculine or feminine gender shall be deemed to include the other;

(e)    any reference to any Person shall include its successors and permitted assigns in the capacity indicated, and in the case of any Governmental Authority, any Person succeeding to its functions and capacities; and

(f)    the words "include" or "including" shall be deemed to be followed by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import.

### SECTION 2.  Lien Priorities.

**2.1    Relative Priorities**.  Notwithstanding any provision contained herein, it is the intent of the parties that:

(1)    this Agreement and the other Collateral Documents create three separate and distinct Liens over the Collateral:  the First-Lien securing the payment and performance of the First-Lien Obligations, the Second-Lien securing the payment and performance of the Second-Lien Obligations and the Third-Lien securing the payment and performance of the Third-Lien Obligations;

(2)    the Liens securing the Second-Lien Obligations and the Third-Lien Obligations are subject and subordinate on terms contained in this Agreement to the Liens securing the First-Lien Obligations; and

(3)    the Liens securing the Third-Lien Obligations are subject and subordinate on terms contained in this Agreement to the Liens securing the First-Lien Obligations and the Second-Lien Obligations.

To further effectuate the intent of the parties as provided in the immediately preceding clauses (1), (2) and (3), if a court in a Bankruptcy or otherwise holds that the claims of more than one class of Secured Parties in respect of the Collateral constitute only one secured claim (rather than three separate classes of secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to the lien priorities established or purported to be established hereby, all distributions in such a Bankruptcy or otherwise

23

shall be made as if there were three separate classes of secured claims against the Borrower in respect of the Collateral (with the effect being that,

    (A) to the extent the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second-Lien Claimholders and the Third-Lien Claimholders), the First-Lien Claimholders shall be entitled to receive on a *pro rata* basis all amounts owing to such First-Lien Claimholders under the First-Lien Documents before any distribution is made in respect of the claims arising from the Second-Lien Obligations or the Third-Lien Obligations held by the Second-Lien Claimholders or the Third-Lien Claimholders, respectively, with the Collateral Agent, for itself and on behalf of the Second-Lien Claimholders and the Third-Lien Claimholders and each Second-Lien Claimholder and Third-Lien Claimholder, hereby acknowledging and agreeing to turn over to the First-Lien WCF Administrative Agent (on behalf of the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of the First-Lien Term Loan Claimholders) and the Interest Rate Hedge Providers, amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this clause (A), even if such turnover has the effect of reducing the claim or recovery of the Second-Lien Claimholders or the Third-Lien Claimholders; and

    (B) to the extent that the aggregate value of the Collateral is sufficient (after giving effect to the Discharge of First-Lien Obligations and ignoring for this purpose all claims held by the Third-Lien Claimholders), the Second-Lien Claimholders shall be entitled to receive on a *pro rata* basis all amounts owing to the Second-Lien Claimholders under the Second-Lien Documents before any distribution is made in respect of the claims held by the Third-Lien Claimholders, with each Third-Lien Claimholder hereby acknowledging and agreeing, subject to the immediately preceding clause (A) to turn over to Second-Lien Administrative Agent (for itself and on behalf of the Second-Lien Term Loan Claimholders) and MS Counterparty, amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this clause (B), even if such turnover has the effect of reducing the claim or recovery of the Third-Lien Claimholders).

    (b)    Notwithstanding (i) the date, time, method, manner or order of grant, attachment or perfection of (A) any Liens securing the Third-Lien Obligations granted on the Collateral, (B) any Liens securing the Second-Lien Obligations granted on the Collateral or (C) any Liens securing the First-Lien Obligations granted on the Collateral, (ii) anything contained in any filing or agreement to which the First-Lien WCF Administrative Agent (on behalf of the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of the First-Lien Term Loan Claimholders), the Interest Rate Hedge Providers or the Collateral

24

Agent on their behalf, or any of them collectively, now or hereafter may be a party, (iii) the perfection of or avoidability of such Liens or claims secured thereby, (iv) any provision of the UCC, (v) any other applicable Legal Requirement or any provision set forth in the Second-Lien Documents or the Third-Lien Documents, (vi) any defect or deficiencies in, or failure to perfect, the Liens securing the First-Lien Obligations or (vii) any other circumstance whatsoever, in each case, each of the Collateral Agent (on behalf of each Second-Lien Claimholder), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders ), MS Counterparty, the Collateral Agent (on behalf of each Third-Lien Claimholder), and each Third-Lien Claimholder hereby agree that:

(1)     any Lien on the Collateral securing any First-Lien Obligations now or hereafter held by or on behalf of any First-Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Second-Lien Obligations or any Third-Lien Obligations;

(2)     any Lien on the Collateral securing any Second-Lien Obligations now or hereafter held by or on behalf of any Second-Lien Claimholders or any agent or trustee therefore, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise and any Lien on the Collateral securing any Third-Lien Obligations now or hereafter held by or on behalf of any Third-Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First-Lien Obligations. All Liens on the Collateral securing any First-Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second-Lien Obligations or any Third-Lien Obligations for all purposes, whether or not such Liens securing any First-Lien Obligations are subordinated to any Lien securing any other obligation of La Paloma, any other Grantor or any other Person;

(3)     any Lien on the Collateral securing any Second-Lien Obligations now or hereafter held by or on behalf of any Second-Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Third-Lien Obligations; and

(4)     any Lien on the Collateral securing any Third-Lien Obligations now or hereafter held by or on behalf of any Third-Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any Second-Lien Obligations. All Liens on the Collateral securing any Second-Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Third-Lien Obligations for all purposes, whether or not such Liens securing any Second-Lien Obligations are

25

subordinated to any Lien securing any other obligation of La Paloma, any other Grantor or any other Person.

**2.2     Prohibition on Contesting Liens**. Each of the First-Lien WCF Administrative Agent, for itself and on behalf of each First-Lien WCF Claimholder, the First-Lien Special LC Facility Administrative Agent, for itself and on behalf of each First-Lien Special LC Facility Claimholder, the First-Lien Term Loan Administrative Agent, for itself and on behalf of each First-Lien Term Loan Claimholder, each Interest Rate Hedge Provider, the Second-Lien Administrative Agent, for itself and on behalf of each Second-Lien Claimholder, MS Counterparty and each Third-Lien Claimholder, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Bankruptcy), the priority, validity or enforceability of a Lien held by or on behalf of any of the First-Lien Claimholders in the First-Lien Collateral, by or on behalf of any of the Second-Lien Claimholders in the Second-Lien Collateral, or by or on behalf of any of the Third-Lien Claimholders in the Third-Lien Collateral, as the case may be, or the provisions of this Agreement; *provided* that nothing in this Agreement shall be construed to prevent or impair the rights of the Collateral Agent, the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholder, any Interest Rate Hedge Provider, the Second-Lien Administrative Agent, MS Counterparty, any other Second-Lien Claimholder or any Third-Lien Claimholder to enforce this Agreement, including Section 4.1 and the provisions of this Agreement relating to the priority of the Liens securing the First-Lien Obligations and the Second-Lien Obligations as provided in Sections 2.1, 2.2 and 3.1.

**2.3     No New Liens**. Whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, the parties hereto agree that La Paloma shall not, and shall not permit any other Grantor to:

(a)     grant or permit any additional Liens on any Property to secure any Third-Lien Obligation unless it has granted or concurrently grants a Lien on such Property to secure the First-Lien Obligations and the Second-Lien Obligations;

(b)     grant or permit any additional Liens on any Property to secure any Second-Lien Obligation unless it has granted or concurrently grants a Lien on such Property to secure the First-Lien Obligations and the Third-Lien Obligations; or

(c)     grant or permit any additional Liens on any Property to secure any First-Lien Obligations unless it has granted or concurrently grants a Lien on such Property to secure the Second-Lien Obligations and the Third-Lien Obligations.

To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the parties hereto, the applicable Secured Party which receives the benefit of such additional Lien and Collateral shall turn over the proceeds of such additional Collateral in accordance with Section 4.2.

SD\491395.17

**2.4     Similar Liens and Agreements**. The parties hereto agree that it is their intention that the Collateral be identical. In furtherance of the foregoing and of Section 9.11, the parties hereto agree, subject to the other provisions of this Agreement:

(a)     upon request by the Collateral Agent, the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the Second-Lien Administrative Agent, MS Counterparty or any Third-Lien Claimholder, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First-Lien Documents, the Second-Lien Documents and the Third-Lien Documents; and

(b)     that the documents and agreements creating or evidencing the Collateral for and guarantees (if any) of the First-Lien Obligations, the Second-Lien Obligations and the Third-Lien Obligations shall be in all material respects the same forms of documents (or such other forms as shall be reasonably acceptable to the Collateral Agent) other than with respect to the First Lien, the Second Lien and the Third Lien nature of the Obligations thereunder.

## SECTION 3. Enforcement.

**3.1     Exercise of Remedies**. (a) (i) Until the Discharge of First-Lien Obligations, whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, subject to Section 3.1(b)(1), the Collateral Agent, at the direction of an Act of Required Lenders, shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second-Lien Administrative Agent, MS Counterparty, any other Second-Lien Claimholders or any Third-Lien Claimholders.  In exercising rights and remedies with respect to the Collateral, the Collateral Agent, at the direction of an Act of Required Lenders, may enforce the provisions of the First-Lien Collateral Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of the Collateral Agent to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and the First-Lien Collateral Documents and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction; provided that unless and until the Collateral Agent shall have received such direction, the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, in order to preserve or protect its Liens on and the value of the Collateral, with respect to any Event of Default as it shall deem advisable in the best interests of the Secured Parties.

(ii) After the Discharge of First-Lien Obligations and until the Discharge of Second-Lien Obligations, whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, subject to Section 3.1(b)(1), the Collateral Agent,

27

at the direction of an Act of Required Lenders, shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of any Third-Lien Claimholders. In exercising rights and remedies with respect to the Collateral, the Collateral Agent, at the direction of an Act of Required Lenders, may enforce the provisions of the Second-Lien Collateral Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of the Collateral Agent to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and the Second-Lien Collateral Documents and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction; provided that unless and until the Collateral Agent shall have received such direction, the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, in order to preserve or protect its Liens on and the value of the Collateral, with respect to any Event of Default as it shall deem advisable in the best interests of the Secured Parties.

(b)     Until the Discharge of First-Lien Obligations has occurred, whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and each Second-Lien Claimholder:

(1)     will not exercise or seek to exercise any rights or remedies with respect to any Collateral or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure); provided, however, the foregoing shall not prevent MS Counterparty from exercising its rights or remedies as though it is an unsecured creditor with respect to the MS Tolling Agreement (so long as such actions are consistent with the MS Tolling Agreement and any Consent and Agreement to which MS Counterparty is a party), the MS Synthetic Letters of Credit and the First-Lien Special LC Facility; provided, however, that the Collateral Agent (on behalf of the Second-Lien Claimholders) and any Second-Lien Claimholders (other than MS Counterparty) may exercise any or all such rights or remedies after the passage of a period of at least 180 days has elapsed since the later of: (i) the date on which the Second-Lien Administrative Agent declared the existence of any Event of Default and demanded the repayment of all the principal amount of any Second-Lien Obligations; and (ii) the date on which the First-Lien Administrative Agents received notice from the Second-Lien Administrative Agent of such declarations of an Event of Default (the "**Standstill Period**"); provided, further, however, that notwithstanding anything herein to the contrary, in no event shall the Collateral Agent (on behalf of the Second-Lien Claimholders) the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty or any other Second-Lien Claimholders exercise any rights or remedies with respect to the Collateral if, notwithstanding the expiration of the Standstill Period, the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholders shall have commenced and be diligently pursuing the exercise of their rights or remedies with respect to all or any

28

material portion of the Collateral (prompt notice of such exercise to be given to the Second-Lien Administrative Agent, MS Counterparty and each Third-Lien Claimholder);

(2)    will not contest, protest or object to any foreclosure proceeding or action brought by the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholder or any other exercise by the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholder of any rights and remedies relating to the Collateral under any of the First-Lien Documents or otherwise;

(3)    subject to their rights (if any) under clause (b)(1) above, will not object to the forbearance by the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholder from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral, in each case so long as the Liens granted to secure the Second-Lien Obligations of the Second-Lien Claimholders attach to the proceeds thereof subject to the relative priorities described in Section 4.1;

(4)    will not oppose or otherwise contest any claim by the Collateral Agent, any First-Lien Claimholder, the First-Lien Special LC Facility Administrative Agent, the First-Lien WCF Administrative Agent or the First-Lien Term Loan Administrative Agent for allowance in any Bankruptcy of First-Lien Obligations consisting of post-petition interest, fees or expenses; and

(5)    will not challenge the validity, enforceability, perfection or priority of the Liens held for the benefit of any First-Lien Claimholders.

(c)    The Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and each Second-Lien Claimholder agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor, unless and until the Discharge of First-Lien Obligations has occurred, except as expressly provided in Section 3.1(b)(1). Without limiting the generality of the foregoing, unless and until the Discharge of First-Lien Obligations has occurred, except as expressly provided in Sections 3.1(b), 3.1(k) and 6.3(b), the sole right of the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and any Second-Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second-Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First-Lien Obligations has occurred.

(d)    Subject to Sections 3.1(b), 3.1(k) and 6.3(b):

(1)    the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and each Second-Lien Claimholder agrees to not

29

take any action that would hinder any exercise of remedies under any of the First-Lien Documents or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise;

(2)    the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and each Second-Lien Claimholder hereby waives any and all rights it may have as a second lien creditor or otherwise to object to the manner in which the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholders seek to enforce or collect the First-Lien Obligations or the Liens securing the First-Lien Obligations granted in any of the First-Lien Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholders is adverse to the interest of the Second-Lien Claimholders; and

(3)    the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and each Second-Lien Claimholder hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second-Lien Collateral Documents or any other Second-Lien Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholders with respect to the Collateral as set forth in this Agreement and any First-Lien Documents.

(e)    Except as specifically set forth herein or in the Security Deposit Agreement, the Second-Lien Administrative Agent, MS Counterparty and the other Second-Lien Claimholders may exercise rights and remedies as though they are unsecured creditors against La Paloma or any other Grantor that has guaranteed or granted Liens to secure the Second-Lien Obligations in accordance with the terms of the Second-Lien Documents and applicable Legal Requirements; provided that in the event that any Second-Lien Claimholder becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as though they are an unsecured creditor with respect to the Second-Lien Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First-Lien Obligations) as the other Liens securing the Second-Lien Obligations are subject to this Agreement.

(f)    Except as specifically set forth herein or in the Security Deposit Agreement, nothing in this Agreement shall prohibit the receipt by the Second-Lien Administrative Agent, MS Counterparty or any other Second-Lien Claimholders of the required payments of Interest Expense, principal and other amounts owed in respect of the Second-Lien Obligations so long as such receipt is not the direct or indirect result of the exercise by the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty or any other Second-Lien Claimholder of rights or remedies as a secured creditor (including set-off) or enforcement in contravention of this Agreement of any Lien held by any of them or as otherwise expressly prohibited hereby.

Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholders may have with respect to the First-Lien Collateral.

(g)     Until the Discharge of First-Lien Obligations and the Discharge Second-Lien Obligations has occurred, whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, the Collateral Agent (on behalf of the Third-Lien Claimholders) and each Third-Lien Claimholder:

(1)     will not exercise or seek to exercise any rights or remedies with respect to any Collateral or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure);

(2)     will not contest, protest or object to any foreclosure proceeding or action brought by the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholders, the Collateral Agent (on behalf of the Second Lien Claimholders) or any Second-Lien Claimholders, or any other exercise by the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholders, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholders of any rights and remedies relating to the Collateral under any of the First-Lien Documents or any of the Second-Lien Documents, as the case may be, or otherwise;

(3)     will not object to the forbearance by the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholder, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholder from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral, in each case so long as the Liens granted to secure the Third-Lien Obligations of the Third-Lien Claimholders attach to the proceeds thereof subject to the relative priorities described in Section 4.1;

(4)     will not oppose or otherwise contest any claim by the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholder, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholder for allowance in any Bankruptcy of First-Lien Obligations or Second-Lien Obligations consisting of post-petition interest, fees or expenses; and

(5)     will not challenge the validity, enforceability, perfection or priority of the Liens held for the benefit of any First-Lien Claimholder or any Second-Lien Claimholder.

(h)     The Collateral Agent (on behalf of the Third-Lien Claimholders) and each Third-Lien Claimholder agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor, unless and until the Discharge of First-Lien Obligations and the Discharge of Second-Lien Obligations has occurred. Without limiting the generality of the foregoing, unless and until the Discharge of First-Lien Obligations and the Discharge of Second-Lien

31

Obligations has occurred, except as expressly provided in Section 3.1(l), the sole right of the Collateral Agent (on behalf of the Third-Lien Claimholders) and each Third-Lien Claimholder with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Third-Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First-Lien Obligations and the Discharge of Second-Lien Obligations has occurred.

(i)      Each Third-Lien Claimholder, subject to Section 3.1(l), hereby:

(1)      agrees that the it will not take any action that would hinder any exercise of remedies under any of the First-Lien Documents, the Second-Lien Documents or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise;

(2)      waives any and all rights it may have as a third lien creditor or otherwise to object to the manner in which the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholder, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholder seek to enforce or collect the First-Lien Obligations or the Second-Lien Obligations or the Liens securing the First-Lien Obligations or the Second-Lien Obligations granted in any of the First-Lien Collateral or the Second-Lien Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholder, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholder is adverse to the interest of the Third-Lien Claimholders; and

(3)      acknowledges and agrees that no covenant, agreement or restriction contained in any of the Third-Lien Documents (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholder, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholder with respect to the Collateral as set forth in this Agreement, the First-Lien Documents or the Second-Lien Documents.

(j)      (1)      The Third-Lien Claimholders may exercise rights and remedies as though they are unsecured creditors against La Paloma or any other Grantor that has guaranteed or granted Liens to secure the Third-Lien Obligations in accordance with the terms of the Third-Lien Documents and applicable Legal Requirements; provided that in the event that any Third-Lien Claimholder becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as though they are an unsecured creditor with respect to the Third-Lien Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First-Lien Obligations and the Second-Lien Obligations) as the other Liens securing the Third-Lien Obligations are subject to this Agreement.

(2)      Nothing in this Agreement shall prohibit the receipt by any of the Third-Lien Claimholders of the required payments of amounts owed in respect of the

32

Third-Lien Obligations so long as such receipt is not the direct or indirect result of the exercise by any of the Third-Lien Claimholders of rights or remedies as a secured creditor (including set-off) or enforcement in contravention of this Agreement of any Lien held by any of them or as otherwise expressly prohibited hereby. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholder, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholder may have with respect to the First-Lien Collateral or the Second-Lien Collateral, as applicable.

(k)     Notwithstanding the foregoing, the Second-Lien Administrative Agent, MS Counterparty and each other Second-Lien Claimholder may:

(1)     file a claim or statement of interest in a Bankruptcy of La Paloma or any other Grantor;

(2)     take any action not adverse to the priority status of the Liens on the Collateral securing the First-Lien Obligations, or the rights of the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholder in order to create, perfect, preserve or protect its Lien on the Collateral;

(3)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of any of the Second-Lien Claimholders, including any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)     vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second-Lien Obligations and the Collateral; and

(5)     exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period to the extent permitted by Section 3.1(a)(ii) or 3.1(b)(1).

(l)     Notwithstanding the foregoing, each Third-Lien Claimholder may:

(1)     file a claim or statement of interest in a Bankruptcy of La Paloma or any other Grantor;

(2)     take any action (not adverse to the priority status of the Liens on the Collateral securing the First-Lien Obligations or the Second-Lien Obligations, or the rights of Collateral Agent (on behalf of the First-Lien Claimholders), any First-Lien Claimholder, the Collateral Agent (on behalf of the Second-Lien Claimholders) or any Second-Lien Claimholder) in order to create, perfect, preserve or protect its Lien on the Collateral;

33

(3)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of any of the claims of the Third-Lien Claimholders, including any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement; and

(4)     vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Third-Lien Obligations and the Collateral.

**3.2     Consents**. Notwithstanding anything to the contrary contained herein or any of the other Collateral Documents, with respect to the exercise of any rights or remedies of any of the Secured Parties under any of the Consent and Agreements, the Collateral Agent shall act solely at the specific, written direction of the First-Lien WCF Administrative Agent or, following the termination of the First-Lien WCF Agreement, the First-Lien Term Loan Administrative Agent or, following the termination of the First-Lien Term Loan Agreement, the First-Lien Special LC Facility Administrative Agent or, following the termination of the First-Lien Special LC Facility and so long as the MS First-Lien Grant Date has occurred, MS Counterparty (provided that the Collateral Agent shall not accept the direction of MS Counterparty with respect to the exercise of any rights or remedies of any of the Secured Parties under any of the Consent and Agreements to which MS Counterparty or an Affiliate thereof is a party (in which case, the Collateral Agent shall accept the direction of the Second-Lien Administrative Agent)), or, following the Discharge of First-Lien Obligations, the Second-Lien Administrative Agent, or following the termination of the Second-Lien Term Loan Agreement, MS Counterparty. Notwithstanding anything to the contrary herein, without the prior written consent of the Collateral Agent, no Secured Party shall instruct or direct the Collateral Agent to take any actions under any Consent and Agreement which violate or breach the terms of the applicable agreement to which such Consent and Agreement relates.

**3.3     Termination Payments**. If the Borrower fails to pay any Termination Payments to MS Counterparty as and when required under the MS Tolling Agreement, then MS Counterparty agrees that to the extent it seeks to satisfy such obligation to pay such Termination Payments with the proceeds of the MS Synthetic Letter of Credit, the Special LC Facility Letters of Credit, the First-Lien Collateral and/or the Second-Lien Collateral, MS Counterparty shall proceed to satisfy such obligation to pay such Termination Payments (a) *first*, with the proceeds of the MS Synthetic Letters of Credit and the Special LC Facility Letters of Credit, (b) *second*, from and after the MS First-Lien Grant Date, with the proceeds of the First-Lien Collateral (up to the amount of the First-Lien MS Secured Obligations) and (c) *third*, with the proceeds of the Second-Lien Collateral (in each case, subject to the terms of the applicable Financing Document).

**SECTION 4. Payments.**

**4.1     Application of Proceeds**. Regardless of whether any Bankruptcy has been commenced by or against La Paloma or any other Grantor, any money collected or to be

34

applied by the Collateral Agent pursuant to this Agreement and the Collateral Documents (other than monies for its own account), together with any other monies which may then be held by, or under the control of, the Collateral Agent under any of the Accounts shall be applied in the following order (it being agreed that the Collateral Agent shall apply such amounts in the following order as promptly as is reasonably practicable after the receipt thereof, provided that such amounts shall not be so applied until such time as the amount of the First-Lien Obligations, Second-Lien Obligations and, if applicable, Third-Lien Obligations have been determined in accordance with the terms hereof (and, in the case of the First-Lien MS Secured Obligations (if any) and the MS Residual Obligations (if any), in accordance with the terms of the MS Tolling Agreement), including and subject to Section 4.3 below), except as otherwise expressly provided for in the Security Deposit Agreement, including Section 3.21(e) thereof:

(a) *first*, on a *pro rata* basis, to the payment of all amounts due to the Collateral Agent, the Depositary, the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the Second-Lien Administrative Agent, and any of the other agents, trustees and issuing banks under any of the First-Lien Documents and the Second-Lien Documents;

(b) *second*, on a *pro rata* basis, to the payment of (i) any Interest Expense then due and payable on the First-Lien WCF Obligations, the First-Lien Special LC Facility Obligations and the First-Lien Term Loan Obligations, (ii) ordinary course settlement payments under the Interest Rate Protection Agreements then due and payable to the Interest Rate Hedge Providers and (iii) from and after the MS First-Lien Grant Date, to the payment of the First-Lien MS Secured Obligations then due and payable under the MS Tolling Agreement, in each case, with interest at the rates specified in the applicable First-Lien Documents, MS Tolling Agreement or Interest Rate Protection Agreements in respect of overdue payments (to the extent that payment of such interest shall be legally enforceable);

(c) *third*, on a *pro rata* basis, to the payment of (i) all principal and other amounts then due and payable in respect of the First-Lien Obligations (including the cash collateralization (at 102.5% of the aggregate undrawn amount) of all outstanding letters of credit issued under the First-Lien WCF Agreement, the First-Lien Special LC Facility and the First-Lien Term Loan Credit Agreement (it being acknowledged and agreed that notwithstanding anything to the contrary in any Collateral Document, such cash collateralization shall be for the sole benefit of the First-Lien WCF Claimholders, the First-Lien Special LC Facility Claimholders or the First-Lien Term Loan Claimholders, as the case may be, and such cash collateralization shall be effectuated in a manner reasonably satisfactory to the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent or the First-Lien Term Loan Administrative Agent, as the case may be)) and (ii) all termination payments under Interest Rate Protection Agreements then due and payable to Interest Rate Hedge Providers;

(d) *fourth*, on a *pro rata* basis, to the payment of any amounts (including principal, Interest Expense and, if applicable, premium) due and payable in

35

respect of the Second-Lien Obligations (including MS Residual Obligations and the cash collateralization (at 102.5% of the aggregate undrawn amount) of all outstanding letters of credit issued under the Second-Lien Term Loan Agreement (it being acknowledged and agreed that notwithstanding anything to the contrary in any Collateral Document, such cash collateralization shall be for the sole benefit of the Second-Lien Claimholders, and such cash collateralization shall be effectuated in a manner satisfactory to the Second-Lien Administrative Agent), with interest at the rate specified in the Second-Lien Documents in respect of overdue payments (to the extent that payment of such interest shall be legally enforceable);

       (e)    *fifth*, on a *pro rata* basis, to the payment of any amounts owing to the Third-Lien Claimholders under the applicable Third-Lien Documents; and

       (f)    *sixth*, any remaining amounts to La Paloma.

**4.2    Payments Over.**  (a) So long as the Discharge of First-Lien Obligations has not occurred, whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second-Lien Administrative Agent, MS Counterparty, any other Second-Lien Claimholder or any Third-Lien Claimholder in connection with the exercise of any right or remedy (including set-off) by the Collateral Agent or any such Person relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the Collateral Agent (for the benefit of the First-Lien Claimholders) in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The Collateral Agent is hereby authorized to make any such endorsements as agent for the Second-Lien Administrative Agent, MS Counterparty, any such other Second-Lien Claimholders or any such Third-Lien Claimholders.  This authorization is coupled with an interest and is irrevocable until the Discharge of First-Lien Obligations.

       (b)    After the Discharge of First-Lien Obligations and so long as the Discharge of Second-Lien Obligations has not occurred, whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by any Third-Lien Claimholder in connection with the exercise of any right or remedy (including set-off) by the Collateral Agent or any of the Third-Lien Claimholders relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the Collateral Agent (for the benefit of the Second-Lien Claimholders) in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  After the Discharge of First-Lien Obligations, the Collateral Agent is hereby authorized to make any such endorsements as agent for any such Third-Lien Claimholders.  This authorization is coupled with an interest and is irrevocable until the Discharge of Second-Lien Obligations.

       (c)    Notwithstanding anything to the contrary in this Section 4.2, MS Counterparty shall not be obligated to (i) hold in trust and/or pay over to the Collateral

36

Agent any of the proceeds of the MS Synthetic Letters of Credit and/or Special LC Facility Letters of Credit or (ii) share the proceeds of the MS Synthetic Letters of Credit and/or Special LC Facility Letters of Credit with any of the other Secured Parties.

**4.3**   **Debt Balances**. (a) Upon the written request of the Collateral Agent, each Interest Rate Hedge Provider, MS Counterparty, each Third-Lien Claimholder and each Secured Debt Representative shall promptly (and, in any event, within five (5) Business Days) give the Collateral Agent written notice of the aggregate amount of the Obligations then outstanding owed by the Borrower to such Interest Rate Hedge Provider, such MS Counterparty, such Third-Lien Claimholder or the Secured Parties represented by such Secured Debt Representative (as the case may be) under the applicable Financing Documents and any other information that the Collateral Agent may reasonably request.

(b)   Without limiting the foregoing, upon receipt of any of the monies referred to in Section 4.1 above or Section 3.21(e) of the Security Deposit Agreement, the Collateral Agent shall promptly provide notice to each Interest Rate Hedge Provider, MS Counterparty, each Third-Lien Claimholder and each Secured Debt Representative of the receipt of such monies. Within ten (10) Business Days of the receipt of such notice, each Interest Rate Hedge Provider, MS Counterparty, each Third-Lien Claimholder and each Secured Debt Representative shall give the Collateral Agent written certification by an authorized officer or representative thereof in substantially the form attached hereto as Exhibit D of the aggregate amount of the Obligations then outstanding owed by the Borrower to such Interest Rate Hedge Provider, such MS Counterparty, such Third-Lien Claimholder or the Secured Parties represented by such Secured Debt Representative (as the case may be) under the applicable Financing Documents to be certified to as presently due and owing (and, promptly upon receipt thereof, the Collateral Agent shall provide a copy of each such certification to each Interest Rate Hedge Provider, MS Counterparty, each Third-Lien Claimholder and each Secured Debt Representative). Unless otherwise directed by a court of competent jurisdiction or each Interest Rate Hedge Provider, MS Counterparty, each Third-Lien Claimholder and each Secured Debt Representative, the Collateral Agent shall use the information provided for in such notices as the basis for applying such monies in accordance with Section 4.1 above or Sections 3.21(e)(ii) and (iii) of the Security Deposit Agreement, as the case may be.

### SECTION 5. Other Agreements.

**5.1**   **Releases**. (a) If in connection with the exercise of any of the Secured Parties' remedies under the Collateral Documents (subject to Section 3.1(a)) the Collateral Agent disposes of any part of the Collateral or in connection with any conveyance, sale, lease, transfer or other disposition permitted under the Financing Documents (including Section 3.15 of the Security Deposit Agreement) any part of the Collateral is conveyed, sold, leased, transferred or otherwise disposed of, then the Liens, if any, of the Collateral Agent for the benefit of any of the Secured Parties' on such Collateral shall be automatically, unconditionally and simultaneously released. The Collateral Agent (on behalf of the Secured Parties) shall promptly execute and deliver such termination

37

statements, releases and other documents as reasonably required or requested to effectively confirm such release.

(b)    To the extent that the Collateral Agent or any of the Secured Parties (i) have released any Lien on Collateral and any such Liens are later reinstated or (ii) obtain any new liens, then each such reinstated Lien or new liens shall be subject to the lien priority and subordination provisions of this Agreement.

**5.2    Refinancing of First-Lien Documents and Second-Lien Documents.**

(a)    Subject to Section 5.2(d), the First-Lien Term Loan Credit Agreement may be Refinanced at any time, and/or the First-Lien WCF Agreement may be Refinanced at any time, in each case, without notice to, or the consent of any of the other Secured Parties, all without affecting the lien priority and subordination or other provisions of this Agreement; provided, as the case may be:

(1)    that the holders (or an agent or trustee thereof) of such Refinancing debt with respect to the First-Lien Term Loan Credit Agreement or the First-Lien WCF Agreement (as applicable) shall have entered into an Accession Agreement at the time of such Refinancing unless such holders (or an agent or trustee thereof) are already bound by the terms of this Agreement;

(2)    that with respect to the Refinancing of the First-Lien Term Loan Credit Agreement, the aggregate principal amount of such new replacement first-lien term loan and synthetic letter of credit facility shall not be in excess of the sum of (A) the sum of (i) the then aggregate outstanding principal amount of loans under the First-Lien Term Loan Credit Agreement, (ii) the aggregate stated amount of synthetic letters of credit issued and outstanding thereunder and (iii) any amounts due in connection with the Refinancing thereof (including Interest Expense, premium, fees and expenses and any amounts necessary to cash collateralize letters of credit thereunder) and (B) the aggregate amount of reasonable transaction fees and expenses (including reasonable accounting, legal, investment banking, consultant, title company and rating agency fees and expenses) incurred by the Borrower in connection with such Refinancing; and

(3)    that with respect to the Refinancing of the First-Lien WCF Agreement, the aggregate principal amount of such new replacement first-lien working capital facility shall not be in excess of the sum of (A) 65,000,000 and any amounts due in connection with the Refinancing thereof (including Interest Expense, premium, fees and expenses and any amounts necessary to cash collateralize letters of credit thereunder) and (B) the aggregate amount of reasonable transaction fees and expenses (including reasonable accounting, legal, investment banking, consultant, title company and rating agency fees and expenses) incurred by the Borrower in connection with such Refinancing.

(b)    The Special LC Facility may be Refinanced at any time without notice to, or the consent of any of the other Secured Parties, all without affecting the lien priority and subordination or other provisions of this Agreement; provided:

38

(1)    that the holders (or an agent or trustee thereof) of such new replacement letter of credit facility shall have entered into an Accession Agreement at the time of such Refinancing unless such holders (or an agent or trustee thereof) are already bound by the terms of this Agreement;

(2)    the aggregate principal amount of such new replacement letter of credit facility shall not be in excess of the sum of (i) the then aggregate stated amount of the Special LC Facility Letters of Credit, (ii) any amounts due in connection with the Refinancing of the Special LC Facility (including fees and expenses and any amounts necessary to cash collateralize letters of credit thereunder) and (iii) the aggregate amount of reasonable transaction fees and expenses (including reasonable accounting, legal, investment banking, consultant, title company and rating agency fees and expenses) incurred by the Borrower in connection with such Refinancing;

(3)    at the time of such Refinancing, the Borrower is obligated under the MS Tolling Agreement (or any agreement entered into by the Borrower in replacement thereof as permitted under the Financing Documents) to provide or cooperate with MS Counterparty (or such new replacement counterparty) in obtaining such new replacement letter of credit facility;

(4)    the terms and conditions of such new replacement letter of credit facility do not obligate the Borrower to accrue or pay any interest, fees, expenses, indemnities or other costs thereunder prior to the first date (if ever) that the letter of credit issued thereunder is drawn by MS Counterparty (or such new replacement counterparty); and

(5)    the maturity date under such new replacement letter of credit facility is on or after August 16, 2011.

(c)    Subject to Section 5.2(d), the Second-Lien Term Loan Agreement may not be Refinanced until the Discharge of the First-Lien Obligations (other than the First-Lien MS Secured Obligations). Thereafter, the Second-Lien Term Loan Agreement may be Refinanced at any time without notice to or the consent of any of the Third-Lien Claimholders, all without affecting the lien priority and subordination or other provisions of this Agreement, provided, as the case may be:

(1)    that the holders (or an agent or trustee thereof) of such Refinancing debt with respect to the Second-Lien Term Loan Agreement shall have entered into an Accession Agreement at the time of such refinancing unless such holders (or an agent or trustee thereof) are already bound by the terms of this Agreement; and

(2)    the aggregate principal amount of such new replacement second-lien term loan facility shall not be in excess of the sum of (A) $172,000,000and any amounts due in connection with the Refinancing thereof (including Interest Expense, premium, fees and expenses) and (B) the aggregate amount of reasonable transaction fees and expenses (including reasonable accounting, legal, investment banking, consultant, title

SD\491395.17

company and rating agency fees and expenses) incurred by the Borrower in connection with such Refinancing.

(d) Notwithstanding anything to the contrary in this Section 5.2, the First-Lien Term Loan Credit Agreement, the First-Lien WCF Agreement and the Second-Lien Term Loan Agreement may be Refinanced at any time without notice to, or the consent of any of the other Secured Parties, all without affecting the lien priority and subordination or other provisions of this Agreement; provided, as the case may be:

(1) that the holders (or an agent or trustee thereof) of such Refinancing debt with respect to each of the First-Lien Term Loan Credit Agreement, the First-Lien WCF Agreement and the Second-Lien Term Loan Agreement shall have entered into an Accession Agreement at the time of such refinancing unless such holders (or an agent or trustee thereof) are already bound by the terms of this Agreement;

(2) that the credit rating assigned to the new replacement first-lien term loan facility by each of S&P and Moody's (or their respective successors and assigns or, if either such corporation ceases to be in the business of providing credit ratings, by another nationally recognized statistical rating organization) is equal to or better than the credit rating assigned to the Indebtedness under the First-Lien Term Loan Credit Agreement by S&P and Moody's, respectively, on the Closing Date;

(3) the aggregate principal amount of such new replacement first-lien term loan facility and first-lien working capital facility shall not be in excess of the lower of (x) the sum of (i) $290,000,000 (or such higher amount as may be acceptable to the First-Lien Special LC Facility Administrative Agent (acting at the direction of the First-Lien Special LC Facility Claimholders )) and (ii) the aggregate amount of reasonable transaction fees and expenses (including reasonable accounting, legal, investment banking, consultant, title company and rating agency fees and expenses) incurred by the Borrower in connection with such Refinancing and (y) an amount which would cause the Asset Coverage Ratio to be less than 1.25:1.0 on the date of such Refinancing (provided, that the restriction set forth in this clause (y) shall only apply if an Appraisal is being prepared in connection with such Refinancing (it being understood that the Borrower shall be under no obligation to prepare any such an Appraisal)); and

(4) that such Refinancing of the First-Lien Term Loan Credit Agreement, the First-Lien WCF Agreement and the Second-Lien Term Loan Agreement is consummated on the same date.

Notwithstanding the foregoing, if (x) the Borrower requests pursuant to clause (3) above that the aggregate principal amount of such new replacement first-lien term loan facility and first-lien working capital facility be in excess of $290,000,000 plus the amounts described in clause (d)(3)(x)(ii) above and the First-Lien Special LC Facility Administrative Agent does not approve such request, (y) the Borrower fails to obtain the minimum credit rating pursuant to clause (d)(2) above, or (z) the aggregate principal amount of such new replacement first-lien term loan facility and first-lien working capital facility is in excess of the amount determined pursuant to clause (d)(3)(y) above, then, in

40

each case, subject to the terms of the MS Tolling Agreement (including any term therein which requires the Borrower to replace any of the Special LC Facility Letters of Credit), the Borrower shall have the right in connection with such Refinancing to purchase, or cause another Person to purchase, the entire (but not part of the) aggregate amount of outstanding First-Lien Special LC Facility Obligations (including unfunded commitments and reimbursement obligations under letters of credit) at par (without regard to any prepayment penalty or premium, but including all outstanding principal, accrued and unpaid Interest Expense and other amounts due and payable to the First-Lien Special LC Facility Claimholders under the First-Lien Special LC Facility), without warranty or representation or recourse.

**5.3    When Discharge of First-Lien Obligations Deemed to Not Have Occurred.** If, at any time after the Discharge of First-Lien Obligations (other than the First-Lien MS Secured Obligations and the First-Lien Special LC Facility Obligations) has occurred, La Paloma thereafter enters into any Refinancing of any First-Lien Document evidencing a First-Lien Obligation which Refinancing is permitted by the Second-Lien Documents, then such Discharge of First-Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such Discharge of First-Lien Obligations), and, from and after the date on which the New First-Lien Debt Notice (as defined below) is delivered to the Collateral Agent, MS Counterparty and the Second-Lien Administrative Agent in accordance with the next sentence, the obligations under such Refinancing of the First-Lien Document shall automatically be treated as First-Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the administrative agent under such First-Lien Documents shall be a First-Lien Administrative Agent for all purposes of this Agreement. Upon receipt of a notice (the **"New First-Lien Debt Notice"**) stating that La Paloma has entered into a new First-Lien Document (which notice shall include the identity of the new First-Lien Administrative Agent, such agent, the **"New First-Lien Agent"**), the Collateral Agent, the other First-Lien Administrative Agent, the Second-Lien Administrative Agent, MS Counterparty, each Interest Rate Hedge Provider, and each Third-Lien Claimholder shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as La Paloma or such New First-Lien Agent shall reasonably request in order to provide to the New First-Lien Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement. The New First-Lien Agent shall enter into an Accession Agreement in the form attached hereto as Exhibit A. If the new First-Lien Obligations under the new First-Lien Documents are secured by assets of the Grantors constituting Collateral that do not also secure the Second-Lien Obligations, then the Second-Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second-Lien Collateral Documents and this Agreement. If the new First-Lien Obligations under the new First-Lien Documents are secured by assets of the Grantors constituting Collateral that do not also secure the Third-Lien Obligations, then the Third-Lien Obligations shall be secured at such time by a third priority Lien on such assets to the same extent provided in the Third-Lien Collateral Documents and this Agreement.

41

**5.4    When Discharge of Second-Lien Obligations Deemed to Not Have Occurred.** If, at any time after the Discharge of Second-Lien Obligations (other than the MS Residual Obligations) has occurred, La Paloma thereafter enters into any Refinancing of any Second-Lien Document evidencing a Second-Lien Obligation, then such Discharge of Second-Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such Discharge of Second-Lien Obligations), and, from and after the date on which the New Second-Lien Debt Notice (as defined below) is delivered to the Collateral Agent and the Third-Lien Claimholders in accordance with the next sentence, the obligations under such Refinancing of the Second-Lien Document shall automatically be treated as Second-Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the administrative agent under such Second-Lien Documents shall be the Second-Lien Administrative Agent for all purposes of this Agreement. Upon receipt of a notice (the **"New Second-Lien Debt Notice"**) stating that La Paloma has entered into a new Second-Lien Document (which notice shall include the identity of the new Second-Lien Administrative Agent, such agent, the **"New Second-Lien Agent"**), the Collateral Agent and each Third-Lien Claimholder shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as La Paloma or such New Second-Lien Agent shall reasonably request in order to provide to the New Second-Lien Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement. The New Second-Lien Agent shall enter into an Accession Agreement in the form attached hereto as Exhibit A. If the new Second-Lien Obligations under the new Second-Lien Documents are secured by assets of the Grantors constituting Collateral that do not also secure the Third-Lien Obligations, then the Third-Lien Obligations shall be secured at such time by a third priority Lien on such assets to the same extent provided in the Third-Lien Collateral Documents and this Agreement.

**5.5    Purchase Right.** Without prejudice to the enforcement of the rights and remedies of the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholder under the Collateral Documents, the First-Lien Claimholders agree at any time following an acceleration of all of the First-Lien Obligations in accordance with the terms of the applicable First-Lien Documents, the First-Lien Claimholders will offer the Second-Lien Term Loan Claimholders (by delivery of a notice of offer to the Second-Lien Administrative Agent) the option to purchase the entire (but not part) aggregate amount of outstanding First-Lien Obligations (including unfunded commitments under the First-Lien Documents and reimbursement obligations under letters of credit) at par (without regard to any prepayment penalty or premium, but including all outstanding principal, accrued and unpaid Interest Expense and other amounts due and payable to the First-Lien Claimholders under the First-Lien Documents), without warranty or representation or recourse. The Second-Lien Term Loan Claimholders (or the Second-Lien Administrative Agent on their behalf) shall irrevocably accept or reject such offer within ten Business Days of the receipt thereof and the parties shall endeavor to close promptly thereafter (and, in any event, shall close within 30 Business Days of the receipt thereof unless otherwise agreed to by the First-Lien Administrative Agents). If the Second-Lien Term Loan Claimholders (or the Second-Lien Administrative Agent on their behalf) accept such offer, it shall be exercised pursuant to documentation mutually acceptable to each of

42

the Secured Debt Representatives. If the Second-Lien Term Loan Claimholders (or the Second-Lien Administrative Agent on their behalf) reject such offer (or do not so irrevocably accept such offer within the required timeframe), the First-Lien Claimholders shall have no further obligations pursuant to this Section 5.5 and may take any further actions in their sole discretion in accordance with the First-Lien Documents.

     **5.6**    **Certain Actions.** So long as any Obligations remain outstanding in respect of more than one class of Secured Parties, the following provisions shall apply:

     (a)    The First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the Second-Lien Administrative Agent, MS Counterparty, each Interest Rate Hedge Provider and each Third-Lien Claimholder hereby agree to give the Collateral Agent and each other Secured Debt Representative prompt written notice of the occurrence of (i) any Event of Default under such Person's Financing Documents of which such Person has written notice, and (ii) acceleration of the maturity of such Person's Obligations under such Person's Financing Documents wherein such Secured Party's Obligations have been declared to be or have automatically become due and payable earlier than the scheduled maturity thereof or termination date thereunder (or similar remedial actions including demands for cash collateral, have been taken) and setting forth the aggregate amount of Obligations that have been so accelerated under such Financing Documents, in each case, as soon as practicable after the occurrence thereof (and, in any event, within five Business Days after the occurrence thereof); provided, however, that the failure to provide such notice shall not limit or impair the rights of the Secured Parties, or the obligations of La Paloma and the other Grantors, hereunder or under the other Financing Documents. No Secured Debt Representative shall be deemed to have knowledge or notice of the occurrence of an Event of Default under the Financing Documents to which it is a party until such Secured Debt Representative has received a written notice of such Event of Default from the Collateral Agent, a Secured Debt Representative, La Paloma, the other Grantors or any other Person for whom such Secured Debt Representative is acting as agent or trustee.

     (b)    The Collateral Agent hereby agrees to give each other Secured Debt Representative, MS Counterparty, each Interest Rate Hedge Provider and each Third-Lien Claimholder written notice of the occurrence of an Event of Default following receipt thereof of written notice to it and provide a copy of all other information provided to it by any Grantor or the Depository under the Collateral Documents upon request.

     (c)    The Collateral Agent is hereby irrevocably authorized and empowered to act as the attorney-in-fact for the Borrower with respect to the giving of any instructions or notices delivered in accordance with, and to the extent the Collateral Agent is permitted to do so under, the Security Deposit Agreement. The Collateral Agent hereby agrees that (without limiting anything set forth in the Security Deposit Agreement), upon an Act of Required Lenders during the occurrence and continuation of an Event of Default or as otherwise contemplated by the Security Deposit Agreement (including Section 3.21 thereof), it shall give such notices and instructions under the Security Deposit Agreement to the Depositary.

43

(d)    Each Grantor hereby agrees that, at any time and from time to time, at its sole cost and expense, it shall promptly execute and deliver all further agreements, instruments, documents and certificates and take all further action that may be necessary in order to fully effect the purposes of this Agreement and the Collateral Documents (including, to the extent required by any Collateral Document, the delivery of possession of any Collateral represented by certificated securities that hereafter comes into existence or is acquired in the future by the Collateral Agent as pledgee for the benefit of the Secured Parties) and to enable the Collateral Agent to exercise and enforce its rights and remedies under the Collateral Documents with respect to the Collateral or any part thereof.

**5.7    Legend**. La Paloma agrees that each Second-Lien Document, each note issued thereunder and each Third-Lien Document shall include the following language (or language to similar effect approved by the Collateral Agent):

"Notwithstanding anything to the contrary contained herein or in any related agreement, the lien and security interest granted by La Paloma Generating Company, LLC and any of its Affiliates in connection with the transactions contemplated hereby and the exercise of remedies by the holder hereof (or its agent, trustee or representative) are subject to the provisions of the Collateral Agency and Intercreditor Agreement, dated as of August 16, 2005 (as amended, modified or supplemented from time to time, the **"Intercreditor Agreement"**), among Borrower, La Paloma Acquisition Co, LLC, Morgan Stanley Senior Funding, Inc., as First-Lien WCF Administrative Agent, First-Lien Term Loan Administrative Agent and Second-Lien Administrative Agent, Morgan Stanley Capital Group Inc., The Bank of New York, as Collateral Agent, and certain other persons party or that may become party thereto from time to time. In the event of any conflict between the terms of this Agreement and the Intercreditor Agreement, the terms of the Intercreditor Agreement shall govern and control."

**5.8    MS Counterparty Springing First Lien**. Notwithstanding anything to the contrary herein (but subject to the terms of the MS Tolling Agreement), from and after the MS First-Lien Grant Date, (a) up to $75,000,000 of the Borrower's Obligations (the **"First-Lien MS Secured Obligations"**) to MS Counterparty under the MS Tolling Agreement shall be deemed to be First-Lien Obligations hereunder (including for purposes of Sections 2.1 and 4.1), (b) such First-Lien MS Secured Obligations shall be deemed to be secured by the First-Lien Collateral on a First-Lien basis, (c) the MS Tolling Agreement shall be deemed to be a First-Lien Document and (d) MS Counterparty shall be deemed to be a First-Lien Claimholder. Upon the reasonable request of Collateral Agent (as directed in writing by the Applicable First-Lien Administrative Agent) or MS Counterparty, each of the parties hereto agrees to execute and deliver to the other parties hereto any amendments to this Agreement and the other Collateral Documents necessary to give effect to the intent of the parties that from and after the MS First-Lien Grant Date, MS Counterparty shall have a First-Lien on the First-Lien Collateral to secure the First-Lien MS Secured Obligations.

44

## SECTION 6. Bankruptcy.

**6.1    Finance and Sale Issues.** Until the Discharge of First-Lien Obligations has occurred, if La Paloma or any other Grantor shall be subject to any Bankruptcy and the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent or the First-Lien Term Loan Administrative Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code), on which the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent or the First-Lien Term Loan Administrative Agent or any other creditor has a Lien or to permit La Paloma or any other Grantor to obtain financing, whether from any First-Lien Claimholder or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (**"DIP Financing"**), then each of the Collateral Agent (on behalf of the Second-Lien Claimholders and/or the Third-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty and each Third-Lien Claimholder, agrees that it will raise no objection to such Cash Collateral use or DIP Financing and to the extent the Liens securing the First-Lien Obligations are subordinated to or *pari passu* with such DIP Financing, the Collateral Agent (on behalf of the Second-Lien Claimholders and the Third-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty and each Third-Lien Claimholder will subordinate their Liens in the Collateral to the Liens securing such DIP Financing (and all Obligations relating thereto) and will not request adequate protection or any other relief in connection therewith (except, as expressly agreed by the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent and the First-Lien Term Loan Administrative Agent or to the extent permitted by Section 6.3); provided that, the Collateral Agent (on behalf of the Second-Lien Claimholders) and the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty retain the right to object to any ancillary agreements or arrangements regarding Cash Collateral use or the DIP Financing that are materially prejudicial to their interests. Each of the Collateral Agent (on behalf of the Secured Parties), each First-Lien Administrative Agent, the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and each Third-Lien Claimholder agree that it will raise no objection or oppose a motion to sell or otherwise dispose of any Collateral free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the Collateral Agent (as directed by an Act of Required Lenders) has consented to such sale or disposition of such assets, and such motion does not impair the rights of the Collateral Agent (on behalf of the Second-Lien Claimholders) or the Second-Lien Claimholders under Section 363(k) of the Bankruptcy Code.

**6.2    Relief from the Automatic Stay.** Until the Discharge of First-Lien Obligations has occurred, the Collateral Agent (on behalf of the Second-Lien Claimholders and the Third-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty and each Third-Lien Claimholder agree that none of them shall seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Bankruptcy in respect of the Collateral, without the prior written consent of the First-Lien WCF Administrative Agent

45

(on behalf of the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of the First-Lien Special LC Facility Claimholders) and the First-Lien Term Loan Administrative Agent (on behalf of the First-Lien Term Loan Claimholders), unless a motion for adequate protection permitted under Section 6.3 has been denied by the Bankruptcy Court.

After the Discharge of First-Lien Obligations and until the Discharge of the Second-Lien Obligations has occurred, the Collateral Agent (on behalf of any Third-Lien Claimholders) and each Third-Lien Claimholder agrees that it shall not seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Bankruptcy in respect of the Collateral, without the prior written consent of the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders) and MS Counterparty, unless a motion for adequate protection permitted under Section 6.3 has been denied by the Bankruptcy Court.

    **6.3**    **Adequate Protection**. (a) The Collateral Agent (on behalf of the Second-Lien Claimholders and the Third-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty and each Third-Lien Claimholder agree that none of them shall contest (or support any other Person contesting):

    (1)    any request by the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder for adequate protection; or

    (2)    any objection by the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent,  the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder to any motion, relief, action or proceeding based on the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder claiming a lack of adequate protection.

    (b)    Notwithstanding the foregoing provisions in this Section 6.3, in any Bankruptcy:

    (1)    if the Collateral Agent (on behalf of the First-Lien Claimholders), First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and each First-Lien Claimholder (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any Cash Collateral use or DIP Financing, then the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself or the Second-Lien Term Loan Claimholders) or MS Counterparty may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the Liens securing the First-Lien

46

Obligations and such Cash Collateral use or DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Lien Obligations are so subordinated to the First-Lien Obligations under this Agreement; and

(2)    in the event the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself or the Second-Lien Term Loan Claimholders) or MS Counterparty seeks or requests adequate protection in respect of Second-Lien Obligations and such adequate protection is granted in the form of additional collateral, then the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself or any of the Second-Lien Term Loan Claimholders) and MS Counterparty agrees that the Collateral Agent (on behalf of the First-Lien Claimholders), shall also be granted a senior Lien on such additional collateral as security for the First-Lien Obligations and for any Cash Collateral use or DIP Financing provided by any First-Lien Claimholders and that any Lien on such additional collateral securing the Second-Lien Obligations shall be subordinated to the Lien on such collateral securing the First-Lien Obligations and any such DIP Financing provided by the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholders (and all Obligations relating thereto) and to any other Liens granted to the Collateral Agent (on behalf of the First-Lien Claimholders) or any First-Lien Claimholders as adequate protection on the same basis as the other Liens securing the Second-Lien Obligations are so subordinated to such First-Lien Obligations under this Agreement. Except as otherwise expressly set forth in Section 6.1 or in connection with the exercise of remedies with respect to the Collateral, nothing herein shall limit the rights of the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty or the other Second-Lien Claimholders from seeking adequate protection with respect to their rights in the Collateral in any Bankruptcy (including adequate protection in the form of a cash payment, periodic cash payments or otherwise).

**6.4    No Waiver.** Subject to Sections 3.1(b) and (d), nothing contained herein shall prohibit or in any way limit the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any other First-Lien Claimholder from objecting in any Bankruptcy or otherwise to any action taken by the Collateral Agent (on behalf of the Second-Lien Claimholders or the Third-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty, any other Second-Lien Claimholder or any Third-Lien Claimholder, including the seeking by the Collateral Agent (on behalf of the Second-Lien Claimholders or the Third-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty, any other Second-Lien Claimholder or any Third-Lien Claimholder of adequate protection or the asserting by the Collateral Agent (on behalf of the Second-Lien Claimholders or the Third-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty, any other Second-Lien Claimholder or any Third-Lien Claimholder of any of its rights and remedies under the Second-Lien Documents, the Third-Lien Documents or otherwise, as the case may be.

**6.5**  **Avoidance Issues**.  If the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder is required in any Bankruptcy or otherwise to turn over or otherwise pay to the estate of the Borrower or any other Grantor any amount paid in respect of First-Lien Obligations  (a **"First-Lien Recovery"***)*, then such Collateral Agent (on behalf of the First-Lien Claimholders), First-Lien WCF Administrative Agent, First-Lien Special LC Facility Administrative Agent, First-Lien Term Loan Administrative Agent or First-Lien Claimholders shall be entitled to a reinstatement of First-Lien Obligations with respect to all such recovered amounts.

If the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty or any other Second-Lien Claimholder is required in any Bankruptcy or otherwise to turn over or otherwise pay to the estate of La Paloma or any other Grantor any amount paid in respect of Second-Lien Obligations  (a **"Second-Lien Recovery"***)*, then such Collateral Agent (on behalf of any Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty or other Second-Lien Claimholders shall be entitled to a reinstatement of Second-Lien Obligations with respect to all such recovered amounts.

If this Agreement shall have been terminated prior to such First-Lien Recovery or Second-Lien Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

**6.6**  **Reorganization Securities**.  If, in any Bankruptcy, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of First-Lien Obligations, Second-Lien Obligations and Third-Lien Obligations, then, to the extent the debt obligations distributed on account of the First-Lien Obligations, Second-Lien Obligations and Third-Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**6.7**  **Post-Petition Interest**.  (a) None of the Collateral Agent (on behalf of the Second-Lien Claimholders or Third-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty, any other Second-Lien Claimholder or any Third-Lien Claimholder shall oppose or seek to challenge any claim by the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder for allowance in any Bankruptcy of First-Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Collateral Agent's (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent's, the First-Lien Special LC Facility Administrative Agent's, the First-Lien Term Loan Administrative Agent's or any First-Lien Claimholder's Lien, without regard to the existence of the Lien of the Collateral Agent (on behalf of the

48

Second-Lien Claimholders or the Third-Lien Claimholder), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty and the Third Lien Claimholders on the Collateral.

(b)    None of the Collateral Agent (on behalf of the First-Lien Claimholders and/or the Third-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any other First-Lien Claimholder or any Third-Lien Claimholder shall oppose or seek to challenge any claim by the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty or any other Second-Lien Claimholder for allowance in any Bankruptcy of Second-Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien of the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders) or MS Counterparty on the Collateral (after taking into account the First-Lien Collateral).

**6.8    Waiver.** (a) The Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (for itself and on behalf of the Second-Lien Term Loan Claimholders) and MS Counterparty waives any claim it may hereafter have against the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder arising out of the election of the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Bankruptcy.

(b)    The Collateral Agent (on behalf of the Third-Lien Claimholders) and the Third-Lien Claimholders waive any claim they may hereafter have against the Collateral Agent (on behalf of the First-Lien Claimholders and/or the Second-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholder, the Second-Lien Administrative Agent, MS Counterparty or any other Second-Lien Claimholder arising out of the election of the Collateral Agent (on behalf of the First-Lien Claimholders or any Second-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholder, the Second-Lien Administrative Agent, MS Counterparty or any other Second-Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Bankruptcy.

**SECTION 7.    Collateral Agent**

**7.1    Appointment**. Each of the First-Lien WCF Administrative Agent (on behalf of itself and the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of itself and the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of itself and the First-Lien Term Loan Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty, each Third-Lien Claimholder, and each Interest Rate Hedge Provider hereby irrevocably designates and appoints The Bank of New York, as the Collateral Agent under this Agreement and the other Financing Documents, and each of the First-Lien WCF Administrative Agent (on behalf of itself and the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of itself and the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of itself and the First-Lien Term Loan Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty, each Third-Lien Claimholder, and each Interest Rate Hedge Provider irrevocably authorizes The Bank of New York, in the capacity of Collateral Agent, to (a) execute, deliver and perform the obligations, if any, of the Collateral Agent under this Agreement and each other Financing Document and (b) take such action on its behalf under the provisions of this Agreement and the other Financing Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Financing Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Financing Document or otherwise exist against the Collateral Agent.

**7.2    Delegation of Duties**. The Collateral Agent may execute any of its duties under this Agreement and the other Financing Document by or through agents or attorneys-in-fact and shall be entitled to advice of counsel of its choice concerning all matters pertaining to such duties. The Collateral Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact selected by it with reasonable care.

**7.3    Exculpatory Provisions**. (a) Neither the Collateral Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Financing Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (b) responsible in any manner to any Secured Party for any recitals, statements, representations or warranties made by the Borrower or any officer thereof contained in this Agreement or any other Financing Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Agreement or any other Financing Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Document or for any failure of the Borrower or any other party thereto to perform its obligations hereunder or thereunder. The Collateral

50

Agent shall not be under any obligation to any Secured Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Financing Document, or to inspect the properties, books or records of the Borrower or any other Person. Each of the parties hereto acknowledges and agrees that (i) The Bank of New York, in its capacity as collateral agent hereunder, is acting as collateral agent for three-distinct and separate Lien classes and, as provided for herein, may be required to take actions on behalf of one class only, and (ii) the Collateral Agent shall have no liability to any Person (including any Secured Party) as a result of or arising from an action which it takes hereunder which benefits one or two classes of Lien-holders but not all Secured Parties, unless (and without limiting any other right or protection of the Collateral Agent hereunder) such action violates the terms of this Agreement.

(b)    The Collateral Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and no implied duties or covenants shall be read against the Collateral Agent.

(c)    The Collateral Agent shall have no obligation to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder.

(d)    Beyond the exercise of reasonable care in the custody thereof and as otherwise specifically set forth herein, the Collateral Agent shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Collateral Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.

(e)    The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Company to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

7.4    **Reliance by Collateral Agent**. The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to

51

have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to La Paloma), independent accountants and other experts selected by the Collateral Agent. The Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Financing Document unless it shall first receive such legal advice or the concurrence by an Act of Required Lenders as it deems appropriate or it shall first be indemnified or receive security to its satisfaction by the Secured Parties against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Collateral Agent shall be entitled to rely on the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the Second-Lien Administrative Agent, MS Counterparty, each Third-Lien Claimholder and each Interest Rate Hedge Provider, to indicate whether a Person is a holder of a First-Lien Obligation, Second-Lien Obligation or Third-Lien Obligation (as the case may be) of record at any time. The Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Financing Documents in accordance with a written request from the Applicable First-Lien Administrative Agent, the Second-Lien Administrative Agent or MS Counterparty, as the case may be, and such written request and any action taken or failure to act pursuant thereto shall be binding upon all the Secured Parties. The rights, privileges, protections and benefits given to the Collateral Agent including, without limitation, its rights to be indemnified, are extended to, and shall be enforceable by, the Collateral Agent in each of its capacities hereunder, and to each agent, custodian and other Persons employed by the Collateral Agent in accordance herewith to act hereunder.

 **7.5** **Notice of Event of Default**. The Collateral Agent shall not be deemed to have actual knowledge or notice of the occurrence of any Event of Default under any Financing Document unless the Collateral Agent has received written notice from an authorized officer of a Secured Party or La Paloma referring to this Agreement and the applicable Financing Document, describing such Event of Default and stating that such notice is a "Notice of Event of Default." In the event that the Collateral Agent receives such a written notice, the Collateral Agent shall give notice thereof to the other Secured Parties.

 **7.6** **Non-Reliance on Collateral Agent and Other Secured Parties**. Each of the First-Lien WCF Administrative Agent (on behalf of itself and the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of itself and the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of itself and the First-Lien Term Loan Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty, each Third-Lien Claimholder, and each Interest Rate Hedge Provider expressly acknowledges that neither the Collateral Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Collateral Agent hereinafter taken, including any review of the affairs of La Paloma or any of its Affiliates, shall be deemed to constitute any representation or warranty by the Collateral Agent to any such Person. Each of the First-Lien WCF Administrative Agent (on behalf of itself and the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of itself

52

and the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of itself and the First-Lien Term Loan Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty, each Third-Lien Claimholder, and each Interest Rate Hedge Provider represents to the Collateral Agent that it has, independently and without reliance upon the Collateral Agent or any other Creditor and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, operations, property, financial and other condition and creditworthiness of La Paloma and its Affiliates and made its own decision to extend credit to La Paloma and to enter into the Financing Documents to which it is a party.  Each of the First-Lien WCF Administrative Agent (on behalf of itself and the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of itself and the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of itself and the First-Lien Term Loan Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty, each Third-Lien Claimholder, and each Interest Rate Hedge Provider also represents that it will, independently and without reliance upon the Collateral Agent or any other Secured Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analyses, appraisals and decisions in taking or not taking action under this Agreement and the other Financing Documents, and to make such investigation as its deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of La Paloma and its Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Secured Parties by the Collateral Agent hereunder, the Collateral Agent shall not have any duty or responsibility to provide any Secured Party with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of La Paloma or its Affiliates that may come into the possession of the Collateral Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

    **7.7     Collateral Agent in Its Individual Capacity**.  With respect to Obligations made or renewed by it or any of its Affiliates, The Bank of New York and its Affiliates shall have the same rights and powers under this Agreement and the other Financing Documents as any Secured Party and may exercise the same as though The Bank of New York were not the Collateral Agent, and the terms "Secured Party" shall (to the extent applicable) include The Bank of New York in its individual capacity.

    **7.8     Successor Collateral Agent**.  The Bank of New York may resign as Collateral Agent upon 30 days' notice to the Secured Debt Representative and La Paloma. If The Bank of New York should resign as Collateral Agent, the Collateral Agent shall appoint a successor agent at the direction of an Act of Required Lenders reasonably acceptable to the Borrower (it being agreed that the Borrower shall have no such approval rights if an Event of Default has occurred and is continuing), whereupon such successor agent shall succeed to the rights, powers and duties of the Collateral Agent, and the term "Collateral Agent" shall mean such successor agent effective upon such appointment and approval, and The Bank of New York's rights, powers and duties as Collateral Agent shall be terminated, without any other or further act or deed on the part of The Bank of New

53

York or any of the parties to this Agreement or any Secured Parties. If no successor agent has accepted appointment as Collateral Agent by the date that is 30 days following The Bank of New York's notice of resignation, The Bank of New York's resignation shall nevertheless thereupon become effective and the Secured Parties shall assume and perform all of the duties of the Collateral Agent hereunder until such time, if any, as the Applicable First-Lien Administrative Agent (or the Required Second-Lien Lenders if a Discharge of First-Lien Obligations has occurred) appoint a successor agent as provided for above. After any Person's resignation as Collateral Agent, the provisions of this Section shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement and the other Financing Documents.

**7.9    Consultants**.

(a)    Independent Engineer.    The Collateral Agent (acting at the direction of the First-Lien WCF Administrative Agent or, if there is no First-Lien WCF Administrative Agent, the Applicable First-Lien Administrative Agent or, if there is no Applicable First-Lien Administrative Agent, the Second-Lien Administrative Agent) shall be entitled to engage on behalf of the Secured Parties and at the direction of the First-Lien WCF Administrative Agent, at the sole cost and expense of and with the consent of the Borrower (it being agreed that the Borrower shall have no approval rights under this clause if an Event of Default has occurred and is continuing) an Independent Engineer, to be engaged pursuant to an engagement letter with a commercially reasonable scope acceptable in form and substance to the First-Lien WCF Administrative Agent and the Borrower. As of the Closing Date, the Independent Engineer is Harris Group Inc.

(b)    Insurance Advisor.    The Collateral Agent (acting at the direction of the First-Lien WCF Administrative Agent or, if there is no First-Lien WCF Administrative Agent, the Applicable First-Lien Administrative Agent or, if there is no Applicable First-Lien Administrative Agent, the Second-Lien Administrative Agent) shall be entitled to engage, on behalf of the Secured Parties and at the direction of the First-Lien WCF Administrative Agent, at the sole cost and expense of and with the consent of the Borrower (it being agreed that the Borrower shall have no approval rights under this clause if an Event of Default has occurred and is continuing) an Insurance Advisor, to be engaged pursuant to an engagement letter with a commercially reasonable scope acceptable in form and substance to First-Lien WCF Administrative Agent and the Borrower. As of the Closing Date, the Insurance Advisor is Moore-McNeil, LLC.

**7.10    SCE Deliverable**. The Collateral Agent, on behalf of the Secured Parties, shall execute and deliver via overnight mail to Southern California Edison Company on the Closing Date an Acknowledgment and Consent Agreement in the form of attached Exhibit B and shall promptly thereafter deliver evidence of such delivery, along with executed copies of such Acknowledgment and Consent Agreement, to each of the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the Second-Lien Administrative Agent, MS Counterparty and La Paloma.

54

**7.11    Security Documents; Letter Agreement**. Each of the Secured Parties (other than the Collateral Agent) hereby authorizes and instructs the Collateral Agent to, and the Collateral Agent shall on the Closing Date, execute, deliver and perform each of the Collateral Documents to which it is a party (including the preservation, protection and sale of the Collateral, authorizing the Depositary to withdraw and transfer funds in accordance with the Security Deposit Agreement (including Section 3.21 thereof) and paying over proceeds from Pending Claims to the Security Agent) and that certain letter agreement referred to in Section 4.02(b) of the Consideration Agreement, in each case contemplated to be in existence on the Closing Date. Each of the Secured Parties (other than the Collateral Agent) hereby authorizes and instructs the Collateral Agent to, and the Collateral Agent shall (upon the receipt of a written request of the Borrower), on the Discharge Date deliver the certificate referred to in Section 3.19 of the Depositary Agreement to the Depositary stating that the Discharge Date has occurred. The Collateral Agent hereby agrees on the Closing Date to acknowledge its receipt of (i) the original letters of credit set forth on Schedule 5.02 to the Consideration Agreement and (ii) that certain letter agreement referred to in Section 4.02(b) of the Consideration Agreement, which letter agreement is reasonably satisfactory to the Secured Parties.

**7.12    Indemnification.**

(a)    Each Grantor a party hereto, whether or not any of the transactions contemplated hereby shall be consummated, hereby assumes liability for and agrees to defend, indemnify and hold harmless the Collateral Agent, its Affiliates, and their respective officers, directors, employees, agents and representatives (collectively, the "**Indemnified Persons**") from and against any Claims which may be imposed on, incurred by or asserted against an Indemnified Person in any way relating to or arising or alleged to arise out of: (i) the financing, ownership, operation or maintenance of the Project, or any part thereof; (ii) any latent or other defects in the Project whether or not discoverable by an Indemnified Person or La Paloma; (iii) a violation of Environmental Laws or other loss of or damage relating to the Project; (iv) any breach by any Grantor of any of its representations or warranties under the Financing Documents or failure by any Grantor to perform or observe any covenant or agreement to be performed by it under any of the Financing Documents; (v) personal injury, death or property damage relating to the Project, including Claims based on strict liability in tort, and (vi) the transactions contemplated hereby (including the performance by the Collateral Agent of its duties, rights and obligations hereunder); provided, that the foregoing indemnities in clauses (i) through (vi) shall not, as to any Indemnified Person, apply to Claims to the extent they arise out of or result from (A) the gross negligence or willful misconduct of such Indemnified Person as determined in a final, non-appealable judgment by a court of competent jurisdiction, or (B) any Taxes owed by the Indemnified Person in its individual capacity.

(b)    All amounts due under clause (a) shall be payable not later than 30 days after written demand therefor.

(c)    To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in  clause (a) may be unenforceable in whole or in part because

55

they are violative of any law or public policy, each Grantor (without duplication) shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all indemnified liabilities incurred pursuant to clause (a) by any Indemnified Person.

(d)    The agreements in this Section 7.12 shall survive termination of this Agreement.

(e)    Notwithstanding anything to the contrary, neither any Grantor nor any Affiliate thereof shall have any liability or obligation whatsoever in any way relating to or arising or alleged to arise out of the failure of the Collateral Agent acting in accordance with Section 3.22 of the Security Deposit Agreement to turn over payments with respect to the Pending Claims to the Security Agent or any action or failure to act of the Collateral Agent in accordance with Section 3.22 of the Security Deposit Agreement in respect of the Pending Claims.

### SECTION 8.  Reliance; Waivers; Etc.

**8.1    Reliance.**  Other than any reliance on the terms of this Agreement, each of the First-Lien WCF Administrative Agent (on behalf of itself and the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of itself and the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of itself and the First-Lien Term Loan Claimholders) and each Interest Rate Hedge Provider under its First-Lien Documents, acknowledges that it and such Interest Rate Hedge Provider, First-Lien WCF Claimholders, First-Lien Special LC Facility Claimholders and First-Lien Term Loan Claimholders have, independently and without reliance on the Second-Lien Administrative Agent, MS Counterparty, any Second-Lien Claimholders or any Third-Lien Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First-Lien Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First-Lien Documents or this Agreement.  Each of the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders) and MS Counterparty acknowledges that it and the Second-Lien Claimholders have, independently and without reliance on the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders or any Third-Lien Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Second-Lien Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second-Lien Documents or this Agreement.  Each Third-Lien Claimholder acknowledges that it has, independently and without reliance on the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty or any Second-Lien Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Third-Lien Documents and be bound by the terms of

56

this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Third-Lien Documents or this Agreement.

**8.2    No Warranties or Liability.** Each of the First-Lien WCF Administrative Agent (on behalf of itself and the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of itself and the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of itself and the First-Lien Term Loan Claimholders) and each Interest Rate Hedge Provider under the First-Lien Documents, acknowledges and agrees that each of the Second-Lien Administrative Agent, MS Counterparty, the Second-Lien Claimholders and the Third-Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second-Lien Documents or the Third-Lien Documents, as the case may be, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders) and MS Counterparty will be entitled to manage and supervise their respective loans and extensions of credit under the Second-Lien Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Except as otherwise provided herein, the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders ) and MS Counterparty acknowledge and agree that the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders and the Third-Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First-Lien Documents or the Third-Lien Documents, as the case may be, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the First-Lien WCF Administrative Agent (on behalf of the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of the First-Lien Term Loan Claimholders) and each Interest Rate Hedge Provider will be entitled to manage and supervise their respective loans and extensions of credit under their respective First-Lien Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Except as otherwise provided herein, each Third-Lien Claimholder, acknowledges and agrees that the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty and the Second-Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First-Lien Documents or the Second-Lien Documents, as the case may be, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the Third-Lien Claimholders will be entitled to manage and supervise their respective extensions of credit under their respective Third-Lien Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second-Lien Administrative Agent, MS Counterparty and the Second-Lien Claimholders shall have no duty to the First-Lien WCF Administrative Agent, the First-Lien Special LC

57

Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders or any Third-Lien Claimholders, and the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and the First-Lien Claimholders shall have no duty to the Second-Lien Administrative Agent, MS Counterparty, any Second-Lien Claimholders or any Third-Lien Claimholders and the Third-Lien Claimholders shall have no duty to the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty or any Second-Lien Claimholders to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an Event of Default or default under any agreements with La Paloma or any other Grantor (including the First-Lien Documents, Second-Lien Documents, and the Third-Lien Documents), regardless of any knowledge thereof which they may have or be charged with.

**8.3    No Waiver of Lien Priorities; No Amendments; Approval of Amendments and Waiver.** (a) (i) No right of the First-Lien Claimholders, the First-Lien Administrative Agents or any of them to enforce any provision of this Agreement or any First-Lien Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of La Paloma or any other Grantor or by any act or failure to act by any First-Lien Claimholder or any First-Lien Administrative Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First-Lien Documents, any of the Second-Lien Documents, or any of the Third-Lien Documents, regardless of any knowledge thereof which the First-Lien Administrative Agent or any First-Lien Claimholders, or any of them, may have or be otherwise charged with. (ii) No right of the Second-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty or any of them to enforce any provision of this Agreement or any Second-Lien Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of La Paloma or any other Grantor or by any act or failure to act by any Second-Lien Claimholder, MS Counterparty or the Second-Lien Administrative Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First-Lien Documents, any of the Second-Lien Documents, or any of the Third-Lien Documents, regardless of any knowledge thereof which the Second-Lien Administrative Agent or any Second-Lien Claimholders, or any of them, may have or be otherwise charged with.

(b)    Notwithstanding anything to the contrary in the Financing Documents, none of the Secured Debt Representatives (on behalf of their respective Secured Parties), any Interest Rate Hedge Provider and MS Counterparty shall, without the prior written consent of the other Secured Debt Representatives, each Interest Rate Hedge Provider and MS Counterparty, without incurring any liabilities to the other Secured Debt Representatives or the other parties hereto and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the other Secured Debt Representatives or other Secured Parties is affected, impaired or extinguished thereby) do any one or more of the following:

58

(1)    increase the principal amount of the Obligations (other than (i) obligations under Interest Rate Protection Agreements and the MS Tolling Agreement and (ii) to the extent permitted by Section 5.2), shorten the fixed maturity of any such Obligations, alter the prepayment provisions so as to accelerate the repayment of any such Obligations, or shorten the amortization schedule of any such Obligations, to an amount greater than, or to a date earlier than (as the case may be) that provided for in the applicable Financing Document as in effect on the date of this Agreement or with respect to any Financing Document entered into in connection with a Refinancing of any such Financing Document, as in effect on the date of such Refinancing (except to the extent permitted by Section 5.2); provided, that the foregoing shall not restrict the exercise of remedies by the Secured Parties following the occurrence and during the continuance of an Event of Default, to the extent permitted by the other provisions of this Agreement;

(2)    except as contemplated by this Agreement, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral having at the time of such proposed release an aggregate fair market value in excess of $10,000,000 or the loss of which could reasonably be expected to have a Material Adverse Effect (it being acknowledged and agreed that nothing in this clause (2) shall obligate MS Counterparty to (i) hold in trust and/or pay over to the Collateral Agent any of the proceeds of the MS Synthetic Letters of Credit and/or Special LC Facility Letters of Credit, (ii) share the proceeds of the MS Synthetic Letters of Credit and/or Special LC Facility Letters of Credit with any of the other Secured Parties or (iii) obtain the Secured Parties' consent prior to drawing on any of the MS Synthetic Letters of Credit and/or Special LC Facility Letters of Credit in accordance with the terms of thereof and the MS Tolling Agreement); or

(3)    increase the rate of interest of, change the method of calculation of interest upon, or shorten the time for payment of interest on, any Obligation from that which is provided for in the applicable Financing Documents as in effect on the date of this Agreement or with respect to any Financing Document entered into in connection with a Refinancing of any such Financing Document, as in effect on the date of such Refinancing (provided that the foregoing shall not restrict the imposition of default interest by any of the Secured Parties following the occurrence and during the continuance of an Event of Default), increase the rate of any letter of credit fees or increase the amount of any commitment fees, increase the rate of any letter of credit fronting bank fees or increase any fees payable under the Financing Documents, or shorten the scheduled date of any payment thereof from that which is provided for in the applicable Financing Documents as in effect on the date of this Agreement or with respect to any Financing Document entered into in connection with a Refinancing of any such Financing Document, as in effect on the date of such Refinancing.

(c)    Notwithstanding anything to the contrary herein or in any of the Collateral Documents, (i) none of the Collateral Documents shall be amended, modified or supplemented in any manner adverse to any of the Secured Parties (except as expressly contemplated hereby) or in any manner inconsistent with any of the provisions of this Agreement without the prior written consent of each Secured Debt Representative, each Interest Rate Hedge Provider and MS Counterparty and (ii) none of the definition of

59

"Extension Option" under the MS Tolling Agreement, Section 8.1(c) of the MS Tolling Agreement or the Lien Annex under the MS Tolling Agreement shall be amended, modified or supplemented in any manner adverse to any of the Secured Parties (except as expressly contemplated hereby) or in any manner inconsistent with any of the provisions of this Agreement without the prior written consent of each Secured Debt Representative and each Interest Rate Hedge Provider.

(d)     Except as provided in Section 3.1, Section 5.6(c), Section 8.3(b) and Section 8.3(c) above and notwithstanding anything to the contrary in any of the Financing Documents, if there is an amendment, waiver or consent required under any Financing Document that requires the approval of one or more Lenders under each of the First-Lien WCF Agreement, the First-Lien Special LC Facility, the First-Lien Term Loan Agreement and the Second-Lien Term Loan Agreement, then such amendment, waiver or consent shall be subject to the approval of an Act of First and Second Lien Lenders, provided, however, that such amendment, waiver or consent shall also require the approval of each affected Lender under such Financing Documents if such amendment, waiver or consent shall do any one or more of the following:

(1)     decrease the principal amount of the Obligations (other than obligations under Interest Rate Protection Agreements and the MS Tolling Agreement), shorten the fixed maturity of any such Obligations, alter the prepayment provisions so as to accelerate the repayment of any such Obligations, or shorten the amortization schedule of any such Obligations, to an amount greater than, or to a date earlier than (as the case may be) that provided for in the applicable Financing Document as in effect on the date of this Agreement or with respect to any Financing Document entered into in connection with a Refinancing of any such Financing Document, as in effect on the date of such Refinancing; or

(2)     decrease the rate of interest of any Obligation from that which is provided for in the applicable Financing Documents as in effect on the date of this Agreement or with respect to any Financing Document entered into in connection with a Refinancing of any such Financing Document, as in effect on the date of such Refinancing, decrease the rate of any letter of credit fees or decrease the amount of any commitment fees, decrease the rate of any letter of credit fronting bank fees or decrease any fees payable under the Financing Documents, or shorten the scheduled date of any payment thereof from that which is provided for in the applicable Financing Documents as in effect on the date of this Agreement or with respect to any Financing Document entered into in connection with a Refinancing of any such Financing Document, as in effect on the date of such Refinancing.

(e)     Except as otherwise provided herein, the Collateral Agent (on behalf of the Second-Lien Claimholders and the Third-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty and each Third-Lien Claimholder also agree that the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien Claimholders and the First-Lien Administrative Agents shall have no liability to the Collateral Agent (on behalf of the Second-Lien Claimholders and the Third-Lien Claimholders), the

60

Second-Lien Administrative Agent, MS Counterparty, any Second-Lien Claimholders, or any Third-Lien Claimholders and the Second-Lien Administrative Agent, MS Counterparty, the Collateral Agent (on behalf of the Second-Lien Claimholders and the Third-Lien Claimholders), the Second-Lien Claimholders and the Third-Lien Claimholders hereby waive any claim against the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholder, arising out of any and all actions which the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholders may take or permit or omit to take with respect to:

> (1)   the First-Lien Documents;

> (2)   the collection of the First-Lien Obligations; or

> (3)   the foreclosure upon, or sale, liquidation, use or other disposition of, any Collateral.   The Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders) and MS Counterparty agree that the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and the First-Lien Claimholders have no duty to them in respect of the maintenance or preservation of the First-Lien Collateral, the First-Lien Obligations or otherwise.

> (f)   After the Discharge of First-Lien Obligations and except as otherwise provided herein, the Collateral Agent (on behalf of the Third-Lien Claimholders) and each Third-Lien Claimholder also agree that the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Claimholders, the Second-Lien Administrative Agent and MS Counterparty shall have no liability to the Collateral Agent (on behalf of the Third-Lien Claimholders) or any Third-Lien Claimholders, and the Collateral Agent (on behalf of the Third-Lien Claimholders) and the Third-Lien Claimholders hereby waive any claim against the Collateral Agent (on behalf of the Second-Lien Claimholders), any Second-Lien Claimholders, the Second-Lien Administrative Agent or MS Counterparty, arising out of any and all actions which the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Claimholders, the Second-Lien Administrative Agent or MS Counterparty may take or permit or omit to take with respect to:

> (1)   the Second-Lien Documents;

> (2)   the collection of the Second-Lien Obligations; or

> (3)   the foreclosure upon, or sale, liquidation or other disposition of, any Collateral.  The Collateral Agent (on behalf of any Third-Lien Claimholders) and

61

the Third-Lien Claimholders agree that the Collateral Agent (on behalf of any Second-Lien Claimholders), the Second-Lien Claimholders, MS Counterparty and the Second-Lien Administrative Agent have no duty to them in respect of the maintenance or preservation of the Second-Lien Collateral, the Second-Lien Obligations or otherwise.

(g)     Until the Discharge of First-Lien Obligations, the Collateral Agent (on behalf of the Second-Lien Claimholders), MS Counterparty and the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders ) agree not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

(h)     Until the Discharge of the First-Lien Obligations and the Discharge of the Second-Lien Obligations, the Collateral Agent (on behalf of the Third-Lien Claimholders) and the Third-Lien Claimholders agree not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

**8.4     Obligations Unconditional**. All rights, interests, agreements and obligations of the Collateral Agent (on behalf of any Secured Parties), the First-Lien Administrative Agent and the First-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty, the other Second-Lien Claimholders and the Third-Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)     any lack of validity or enforceability of any First-Lien Documents, any Second-Lien Documents, or any Third-Lien Documents;

(b)     except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First-Lien Obligations, Second-Lien Obligations or Third-Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First-Lien Document any Second-Lien Document or any Third-Lien Document;

(c)     except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First-Lien Obligations, Second-Lien Obligations or Third-Lien Obligations or any guaranty thereof;

(d)     the commencement of any Bankruptcy in respect of La Paloma or any other Grantor; or

62

(e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, La Paloma or any other Grantor in respect of the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the First-Lien Obligations, any First-Lien Claimholders, the Collateral Agent (on behalf of any Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty, the Second-Lien Obligations or any Second-Lien Claimholder, the Collateral Agent (on behalf of any Third-Lien Claimholders), the Third-Lien Obligations or any Third-Lien Claimholder in respect of this Agreement.

### SECTION 9. Miscellaneous.

**9.1    Conflicts**. In the event of any conflict between the provisions of this Agreement and the provisions of the First-Lien Documents, the Second-Lien Documents or Third-Lien Documents, the provisions of this Agreement shall govern and control.

**9.2    Voting**.

(a)    Without limiting anything contained in Section 8.3 and other than ministerial and administrative acts contemplated by the Collateral Documents to which it is a party, the Collateral Agent shall not take any other action (including the exercise of remedies, the amendment of Collateral Documents, the granting of waivers under such Collateral Documents, or grant its consent under any Collateral Documents) unless and to the extent directed to do so by an Act of Required Lenders. If the Collateral Agent determines that discretion is needed in the taking of any action, it may refrain from taking such action until such directions or instructions are received and shall have no liability to the Secured Parties for so refraining.

(b)    In connection with any Act of First and Second Lien Lenders, Act of Required Lenders, Required Second-Lien Lenders or other decision by the Secured Parties under this Agreement, (i) the votes of each series of Obligations entitled to vote thereon shall be cast in the manner provided by, and in accordance with the decision of the holders of such series made pursuant to, the terms of the corresponding Financing Documents and (ii) the votes of each such series shall be aggregated and cast as a single block by the First-Lien WCF Administrative Agent, the First-Lien Term Loan Administrative Agent, the First-Lien Special LC Facility Administrative Agent and the Second-Lien Administrative Agent (as applicable) in accordance with the decision of the applicable Secured Parties under the applicable Financing Documents.

(c)    In connection with any Act of First and Second Lien Lenders, Act of Required Lenders, act or decision by the Required Second-Lien Lenders or other decision by the Secured Parties under this Agreement, the amount of votes which each applicable series of Obligations is entitled to vote hereunder shall be determined on and as of the date the applicable matter is presented by the applicable agent or trustee to the applicable series for vote.

63

**9.3    Debt Service Reserve Accounts**. Each of the parties hereto acknowledges and agrees that the Lien of the Collateral Agent in, to and under or credited thereto (i) the First-Lien Debt Service Reserve Account and all of the funds on deposit therein shall be solely for the benefit of the First-Lien Term Loan Claimholders and (ii) the Second-Lien Debt Service Reserve Account and all of the funds on deposit therein or credited thereto shall be solely for the benefit of the Second-Lien Term Loan Claimholders. In the event any cash collateral accounts are established in connection with cash collateralizing letters of credit as contemplated by the definition of Discharge of First-Lien Obligations, the definition of Discharge of Second-Lien Obligations or the Financing Documents as in effect on the date hereof, such collateral account shall only be for the benefit of the particular Secured Party who issued or has participation interests in such letters of credit being cash collateralized.

**9.4    Effectiveness; Continuing Nature of this Agreement; Severability**. This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of lien subordination and any First-Lien Claimholders may continue, at any time and without notice to the Second-Lien Administrative Agent or any Second-Lien Claimholder subject to the Second-Lien Documents and without notice to any Third-Lien Claimholders subject to the Third-Lien Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Grantor constituting First-Lien Obligations in reliance hereof. This is a continuing agreement of lien subordination and any Second-Lien Claimholders may continue, at any time and without notice to any Third-Lien Claimholders subject to the Third-Lien Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Grantor constituting Second-Lien Obligations in reliance hereof. The Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders), MS Counterparty and the Third-Lien Claimholders, hereby waive any rights they may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Bankruptcy. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to La Paloma or any other Grantor shall include La Paloma or such Grantor as debtor and debtor-in-possession and any receiver or trustee for La Paloma or any other Grantor (as the case may be) in any Bankruptcy. This Agreement shall terminate and be of no further force and effect:

(a)    with respect to the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the First-Lien Claimholders and the First-Lien Obligations, on the date of Discharge of First-Lien Obligations, subject to the rights of the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and the First-Lien Claimholders under Sections 5.3 and 6.5;

64

(b)    with respect to the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty the Second-Lien Claimholders and the Second-Lien Obligations, on the date of Discharge of Second-Lien Obligations, subject to the rights of the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty and the Second-Lien Claimholders under Sections 5.4 and 6.5;

(c)    with respect to the Third-Lien Claimholders and the Third-Lien Obligations, this Agreement shall terminate on the date of the Discharge of Second-Lien Obligations; provided, that if and to the extent required by the applicable Third-Lien Documents each of the Third-Lien Claimholders and the applicable Grantors shall enter into any replacement collateral documents and intercreditor agreements and agreements appointing a new collateral agent concurrent with such date (it being acknowledged and agreed that each such replacement agreements shall be in substantially the same form and substance (other than with respect to the lien priorities contemplated hereby) as the Third-Lien Collateral Documents in existence immediately prior to such date).

**9.5    Amendments; Waivers**.  No amendment, modification or waiver of any of the provisions of this Agreement by the Collateral Agent (on behalf of the Secured Parties), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the Interest Rate Hedge Providers, the Second-Lien Administrative Agent, MS Counterparty or the Third-Lien Claimholders shall be deemed to be made unless, in the case of amendments or modifications, the same shall be in writing signed on behalf of each party hereto or its authorized agent and, in the case of any waiver, by the party providing the waiver, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, no Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights are affected (which includes, but is not limited to, any amendment to the Grantors' ability to cause additional obligations to constitute First-Lien Obligations or Second-Lien Obligations as the Borrower may designate).

**9.6    Information Concerning Financial Condition of La Paloma and its Subsidiaries**.  The First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the First-Lien Claimholders, the Second-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty and the Third-Lien Claimholders shall each be responsible for keeping themselves informed of (a) the financial condition of the Borrower and its Affiliates and all endorsers and/or guarantors of the First-Lien Obligations, the Second-Lien Obligations or Third-Lien Obligators and (b) all other circumstances bearing upon the risk of nonpayment of the First-Lien Obligations,  the Second-Lien Obligations or the Third-Lien Obligations. The First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and the First-Lien Claimholders shall have no duty to advise the Second-Lien Administrative Agent, MS Counterparty, any Second-Lien Claimholders or any Third-Lien Claimholders of

65

information known to it or them regarding such condition or any such circumstances or otherwise. The Second-Lien Administrative Agent, MS Counterparty and the Second-Lien Claimholders shall have no duty to advise the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders or any Third-Lien Claimholders of information known to it or them regarding such condition or any such circumstances or of information known to it or them regarding such condition or any such circumstances or otherwise. The Third-Lien Claimholders shall have no duty to advise the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any First-Lien Claimholders, any Second-Lien Claimholders, MS Counterparty or the Second-Lien Administrative Agent of information known to it or them regarding such condition or any such circumstances or of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any of the Secured Parties, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other Secured Party, it or they shall be under no obligation:

(1)    to make, and such Secured Party shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(2)    to provide any additional information or to provide any such information on any subsequent occasion;

(3)    to undertake any investigation; or

(4)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

**9.7    Subrogation.** With respect to the value of any payments or distributions in cash, property or other assets that the Collateral Agent (on behalf of the Second-Lien Claimholders), any Second-Lien Claimholders, MS Counterparty or the Second-Lien Administrative Agent pays over to the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholders under the terms of this Agreement, the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Claimholders, MS Counterparty and the Second-Lien Administrative Agent shall be subrogated to the rights of the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and the First-Lien Claimholders; provided that, the Collateral Agent (on behalf of the Second-Lien Claimholders), MS Counterparty and the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders ) hereby agree not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First-Lien Obligations has occurred. La Paloma acknowledges and agrees that the value of any payments or distributions in cash,

66

property or other assets received by the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty or the Second-Lien Claimholders that are paid over to the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or the First-Lien Claimholders pursuant to this Agreement shall not reduce any of the Second-Lien Obligations.

**9.8    Application of Payments**.  All payments received by the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent or any First-Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First-Lien Obligations as provided for in the First-Lien Documents.  The Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty and any Second-Lien Claimholders, assents to any extension or postponement of the time of payment, subject to Section 8.3(b), of the First-Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First-Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefore.  After the Discharge of Second-Lien Obligations, all payments received by the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty or any Second-Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the Second-Lien Obligations as provided for in the Second-Lien Documents.  The Collateral Agent (on behalf of the Third-Lien Claimholders) and the Third-Lien Claimholders, assent to any extension or postponement of the time of payment, subject to Section 8.3, of the Second-Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the Second-Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

**9.9    GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVERS.**

(a)    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK EXCLUDING CHOICE OF LAW PRINCIPLES OF SUCH LAWS WHICH WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT AND ANY ACTION FOR ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO HEREBY

67

ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND APPELLATE COURTS FROM ANY THEREOF. THE BORROWER HEREBY IRREVOCABLY DESIGNATES, APPOINTS AND EMPOWERS CT CORPORATION SYSTEM AS ITS DESIGNEE, APPOINTEE AND AGENT TO RECEIVE, ACCEPT AND ACKNOWLEDGE FOR AND ON ITS BEHALF, AND IN RESPECT OF ITS PROPERTY, SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS WHICH MAY BE SERVED IN ANY ACTION OR PROCEEDING IN THE STATE OF NEW YORK. IF FOR ANY REASON SUCH DESIGNEE, APPOINTEE AND AGENT SHALL CEASE TO BE AVAILABLE TO ACT AS SUCH, THE BORROWER AGREES TO DESIGNATE A NEW DESIGNEE, APPOINTEE AND AGENT IN NEW YORK CITY ON THE TERMS AND FOR THE PURPOSES OF THIS PROVISION SATISFACTORY TO THE COLLATERAL AGENT. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT ITS ADDRESS REFERRED TO IN SECTION 9.10. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY DO SO UNDER APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT IN THE COURTS REFERRED TO ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED IN ANY OTHER JURISDICTION.

(c)     TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY MATTER ARISING HEREUNDER.

**9.10   Notices**. All notices to any Secured Party permitted or required under this Agreement shall also be sent to the other Secured Parties. Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile (provided that if any notice is delivered by means of telex or telefacsimile, such notice shall only be effective if the recipient confirms via telephone, electronic mail or telefacsimile receipt of such notice to the sender) or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall

be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties or the applicable Accession Agreement.

**9.11    Further Assurances.** The Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and each First-Lien Claimholder under the First-Lien Documents, the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty and each Second-Lien Claimholder under the Second-Lien Documents, the Collateral Agent (on behalf of the Third-Lien Claimholders) and each Third-Lien Claimholder under the Third-Lien Documents, and each Grantor, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Collateral Agent (on behalf of the Secured Parties), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, MS Counterparty or the Second-Lien Administrative Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

**9.12    Binding on Successors and Assigns.** This Agreement shall be binding upon the Collateral Agent (on behalf of the Secured Parties), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the First-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty, the Second-Lien Claimholders, the Third-Lien Claimholders and their respective successors and assigns.

**9.13    Specific Performance.** Each of the Collateral Agent (on behalf of the Secured Parties), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, the Second-Lien Administrative Agent, MS Counterparty, each Interest Rate Hedge Provider, and each Third-Lien Claimholder may demand specific performance of this Agreement. The Collateral Agent (on behalf of the Secured Parties), the First-Lien WCF Administrative Agent (on behalf of the First-Lien WCF Claimholders), the First-Lien Special LC Facility Administrative Agent (on behalf of the First-Lien Special LC Facility Claimholders), the First-Lien Term Loan Administrative Agent (on behalf of the First-Lien Term Loan Claimholders) and each Interest Rate Hedge Provider under the First-Lien Documents, the Second-Lien Administrative Agent (on behalf of itself and the Second-Lien Term Loan Claimholders ) and MS Counterparty under the Second-Lien Documents and each Third-Lien Claimholder under the Third-Lien Documents hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the Collateral Agent (on behalf of the Secured Parties), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, any of the First-Lien Claimholders, the Second-Lien Administrative Agent, MS Counterparty, any of the Second-Lien Claimholders or any of the Third-Lien Claimholders, as the case may be.

69

**9.14    Headings**. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**9.15    Counterparts**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**9.16    Authorization**. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**9.17    No Third Party Beneficiaries**. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the Collateral Agent (on behalf of the Secured Parties), the First-Lien Claimholders, the Second-Lien Claimholders and the Third-Lien Claimholders. Nothing in this Agreement shall impair, as between La Paloma and the other Grantors and the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent and the First-Lien Claimholders, or as between La Paloma and the other Grantors and the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty and the Second-Lien Claimholders, or as between La Paloma and the other Grantors and the Collateral Agent (on behalf of the Third-Lien Claimholders), and the Third-Lien Claimholders, the obligations of La Paloma and the other Grantors to pay principal, interest, fees and other amounts as provided in the First-Lien Documents, the Second-Lien Documents, and Third-Lien Documents, respectively.

**9.18    Provisions Solely to Define Relative Rights**. The provisions of this Agreement are and are intended for the purpose of defining the relative rights of the Collateral Agent (on behalf of the First-Lien Claimholders), the First-Lien WCF Administrative Agent, the First-Lien Special LC Facility Administrative Agent, the First-Lien Term Loan Administrative Agent, and the First-Lien Claimholders, the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent, MS Counterparty and the Second-Lien Claimholders and the Collateral Agent (on behalf of the Third-Lien Claimholders) and the Third-Lien Claimholders. None of La Paloma, any other Grantor or any other creditor thereof shall have any rights hereunder and neither La Paloma nor any Grantor may rely on the terms hereof, other than in each case the provisions of Sections 4.1, 5.1, 5.2, 5.3, 5.4, 7.8, 7.9, 7.10, 7.11, 7.12, 9.5, 9.9, 9.10, 9.11, 9.12, 9.14, 9.15, 9.16, 9.17, 9.18 and 9.19 hereof. Nothing in this Agreement is intended to or shall impair the obligations of La Paloma or any other Grantor, which are absolute and unconditional, to pay the First-Lien Obligations, the Second-Lien Obligations

70

and the Third-Lien Obligations as and when the same shall become due and payable in accordance with their terms.

**9.19    La Paloma Obligations.**  La Paloma and Buyer shall have no obligations hereunder and this Agreement shall not be effective against La Paloma or Buyer (other than in each case, the provisions of this Section 9.19), until completion of the Merger.  Prior to completion of the Merger, the obligations of the Borrower pursuant to this Agreement shall be solely those of Merger Sub.  Upon consummation of the Merger, La Paloma shall assume, and La Paloma hereby assumes, all of the obligations and other liabilities of Merger Sub under this Agreement and the other Financing Documents and references to the Borrower contained in this Agreement shall from and after such time be deemed to refer to La Paloma.

**9.20    Force Majeure.**  In no event shall the Collateral Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of god, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**9.21    Consequential Damages.**  Anything in this Agreement to the contrary notwithstanding, in no event shall the Collateral Agent be liable under or in connection with this Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Collateral Agent has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

71

IN WITNESS WHEREOF, the parties hereto have executed this Collateral Agency and Intercreditor Agreement as of the date first written above.

**First-Lien WCF Administrative Agent**

**MORGAN  STANLEY  SENIOR  FUNDING, INC.,**
as First-Lien WCF Administrative Agent,

By:_____
    Name:      Eugene F. Martin
    Title:       Vice President
        Morgan Stanley Senior Funding, Inc

**NOTICE ADDRESS:**
One Pierrepont Plaza, 7th Floor
300 Cadman Plaza West
Brooklyn, New York 11201
Attention: Lisa Malone
Telephone: (718) 754-7425
Fax: (212) 507-3558

**First-Lien Term Loan Administrative Agent**

**MORGAN  STANLEY  SENIOR  FUNDING, INC.,**
as First-Lien Term Loan Administrative Agent,

By:_____
    Name:      Eugene F. Martin
    Title:       Vice President
        Morgan Stanley Senior Funding, Inc

**NOTICE ADDRESS:**
One Pierrepont Plaza, 7th Floor
300 Cadman Plaza West
Brooklyn, New York 11201
Attention: Lisa Malone
Telephone: (718) 754-7425
Fax: (212) 507-3558

**First-Lien Special LC Facility Administrative Agent**

**DEUTSCHE BANK AG NEW YORK BRANCH,** as First-Lien Special LC Facility Administrative Agent,

By: _____
    Name:
    Title:

By: _____
    Name:  MILIND PASAD
    Title:  VP

**NOTICE ADDRESS:**
60 Wall Street
New York, New York  10005
Attention:  Milind Pasad
Telephone:  (212) 250-5877
Fax:  (212) 797-5420

**Second-Lien Administrative Agent**

**MORGAN   STANLEY   SENIOR   FUNDING, INC.,**
as Second-Lien Administrative Agent

By: _____

      Name:           Eugene F. Martin
      Title:             Vice President
             Morgan Stanley Senior Funding, Inc

**NOTICE ADDRESS:**
One Pierrepont Plaza, 7th Floor
300 Cadman Plaza West
Brooklyn, New York  11201
Attention:  Lisa Malone
Telephone:  (718) 754-7425
Fax:  (212) 507-3558

**MS Counterparty**

**MORGAN STANLEY CAPITAL GROUP INC.,**
as MS Counterparty,

By: _____
    Name:    SIMON GREENHEUX
    Title:    VICE PRESIDENT

**NOTICE ADDRESS:**
2000 Westchester Avenue
Purchase, New York  10577
Telephone:  (914) 225-1430
Fax:  (212) 507-8843
Attention: Commodities Department - 1st Floor

Collateral Agent

THE BANK OF NEW YORK,
as Collateral Agent

By: _____
Name:
Title:    BARBARA A. BEVELAQUA
          VICE PRESIDENT

NOTICE ADDRESS:
101 Barclay Street 21W
New York, New York  10286
Telephone:  (212) 815-3188
Fax:  (212) 815-5707
Attention:  Corporate Trust Administration

**Acknowledged and Agreed to by:**

**Merger Sub**

**CEH LA PALOMA MERGER CO, LLC,**
Prior to the consummation of the Merger, as Borrower

By: *Lori A. Cuervo*
    Name:
    Title:

**NOTICE ADDRESS:**
1221 Lamar, Suite 1020
Houston, Texas  77010
Attention: Milton Scott
Telephone:  (713) 650-9300
Fax:  (713) 650-9311

**La Paloma**

**LA PALOMA GENERATING COMPANY, LLC,**
From and after the consummation of the Merger, as Borrower

By: *Lori A. Cuervo*
    Name:
    Title:

**NOTICE ADDRESS:**
1221 Lamar, Suite 1020
Houston, Texas  77010
Attention: Milton Scott
Telephone:  (713) 650-9300
Fax:  (713) 650-9311

**Buyer**

**LA PALOMA ACQUISITION CO, LLC,**
as Buyer

By: *Lori A. Cuervo*
    Name:
    Title: