## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LA PALOMA GENERATING., | : | Case No.: 16-12700 (CSS) |
| COMPANY, et al., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| _____ | : | |

### OPINION[1]

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D.  Collins
Jason M. Madron
One Rodney Square
920 North King Street
Wilmington, DE  19801

-and-

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz
Craig A. Bruens
Nick S. Kaluk, III
Elie J. Worenklein
919 Third Avenue
New York, NY  10022

Counsel for Debtors and
Debtors-in-Possession

**FOX ROTHSCHILD LLP**
Jeffrey M. Schlerf
L. John Bird
919 North Market Street
Suite 300
Wilmington, DE  19801

-and-

**WHITE & CASE LLP**
Thomas E. Lauria
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL  33131

-and-

**WHITE & CASE LLP**
Roberto Kampfner (argued)
555 South Flower Street, Suite 2700
Los Angeles, CA  90071

-and-

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12…" Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Xavier Becerra
Attorney General of California
Robert W. Bryne
Senior Assistant Attorney General
Eric M. Katz
Supervising Deputy Attorney General
H. Alexander Fisch (argued)
Deputy Attorney General

Counsel for California Air
Resources Board

**WHITE & CASE LLP**
J. Christopher Shore
Andrew Zatz
1221 Avenue of the Americas
New York, NY 10020

Counsel for LNV Corporation

Dated: November 9, 2017

Sontchi, J. _____

This case requires the Court to apply California law to the interpretation of regulations promulgated by the California Air Resources Board implementing a "cap and trade" program for carbon emissions.

## JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference entered by the United States District Court for the District of Delaware on February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (L).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court has the judicial power to enter a final order in this matter.

## BACKGROUND

La Paloma Generating Company, LLC ("La Paloma," and, together with its affiliated debtors in the above-captioned chapter 11 cases, the "Debtors") owns a natural

gas fired electricity generation facility in McKittrick, California (the "Facility"). Operation of the Facility entails the release of greenhouse gases ("GHG") into the atmosphere.  In 2015, the most recent year for which emissions data is publicly available, La Paloma's operation of the Facility resulted in emissions of 2,068,035 metric tons of carbon dioxide equivalent ("$CO_2e$").[2]  Although precise numbers were not provided, the Court understands that La Paloma's emissions as a result of operating the Facility have continued at a similar rate in 2016 and 2017.

In 2006, the California legislature gave the California Air Resources Board ("CARB") the authority to create a "cap and trade" program for the emission of GHG in California.  CARB, in turn, promulgated the "Regulation," pursuant to the California Global Warming Solutions Act of 2006, Health and Safety Code, §§ 38500 et seq. (the "Act").  The Act requires California to reduce GHG emissions to 1990 levels by 2020.

The Act broadly authorized CARB, in its discretion, to "adopt a regulation that establishes a system of market-based declining annual aggregate emission limits for sources or categories of sources that emit greenhouse gas emissions."  Beyond this broad authorization, the California legislature offered limited guidance as to how CARB should carry out the statutory mandate.  Ultimately, pursuant to the Regulation, CARB established a market-based declining annual aggregate emissions program—commonly referred to as a "cap and trade" program.  The "cap" is established by CARB limiting the number of "Compliance Instruments" available per year, which amount is reduced

---

[2] $CO_2e$ is a standard unit of measure of greenhouse gas emissions.

annually.   The "trade" component is achieved by permitting the free exchange of Compliance Instruments between "Covered Entities."[3]   Covered Entities in the cap and trade program can emit greenhouse gases in an amount that they choose, but they must surrender compliance instruments equivalent to such emissions.[4]

Each year, on November 1, a Covered Entity is generally obligated to surrender Compliance Instruments to CARB.[5]   Depending upon the year, the calculation of the surrender obligation is based either on (a) 30% of the Covered Entity's GHG emissions in the preceding calendar year;[6] or (b) all GHG emissions within the preceding three calendar years as to which surrender was not made in connection with an Annual Compliance Obligation.[7]   In general, Annual Compliance Obligations relating to 2016 emissions came due on November 1, 2017 and Triennial Compliance Obligations relating to 2015 through 2017 emissions come due on November 1, 2018.   Compliance with the surrender obligation is accomplished by transferring from the Covered Entity's Compliance Instrument Holding Account to its Compliance Account sufficient qualifying Compliance Instruments to meet the compliance obligation specified in sections 95855 and 95853 of the Regulation.[8]

---

[3]  Covered Entities represent approximately 80% of California's emissions.

[4]  Regulation, § 95856(a).

[5]  *Id.* § 95856(d), (f).

[6]  *Id.* §§ 95856(d), 95855(b) (the "Annual Compliance Obligation").

[7]  *Id.* §§ 95856(f)(3), 95853 (the "Triennial Compliance Obligation").

[8]   *Id.* § 95856(c) ("A covered entity must transfer from its holding account to its compliance account a sufficient number of valid compliance instruments to meet the compliance obligation set forth in sections 95853 and 95855.").

On December 6, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

As of the confirmation hearing on October 30, 2017, La Paloma has satisfied all of its obligations under the Regulation, including its obligation to surrender Compliance Instruments.[9] The next compliance deadline, however, was to be November 1, 2017.[10] To remain in compliance with the Regulation, La Paloma would have to surrender Compliance Instruments equal in number to 30% of the metric tons of $CO_2e$ of GHG it emitted in 2016 (the "2017 Debtor Emission Surrender Obligations"). It is the Court's understanding that the Debtors met the 2017 Debtor Emission Surrender Obligations.

Further, on November 1, 2018, La Paloma would need to surrender Compliance Instruments equal in number to the sum of (x) 100% of its emissions in 2017; (y) 70% of its emissions in 2016; and (z) 70% of its emissions in 2015 (collectively with the 2017 Debtor Surrender Obligations, the "Debtor Emission Surrender Obligations").[11]

The Debtors estimate that the cost of acquiring Compliance Instruments sufficient to satisfy the Debtor Emission Surrender Obligations would be approximately $63 million on the open market.

---

[9] *See* Proof of Claim No. 20016, Supp. Statement at 5 ("To the best of CARB's knowledge, La Paloma Generating Company, LLC is presently in full compliance with its obligations under the Cap-and-Trade Program.").

[10] Reg. § 95856(d)(1).

[11] *Id.* §§ 95853; 95855(b); 95856.

On September 21, 2017, the Debtors filed the Amended Joint Plan for La Paloma Generating Company, LLC *et al.*[12] (the "Plan"). The Plan contemplates the sale of substantially all of the Debtors' assets (the "Acquired Assets") free and clear of all claims and interests.[13] Because of their magnitude and unique nature, the Plan provides that the Court will specifically determine the extent, if any, to which the purchaser of the Acquired Assets (a "Purchaser") will be liable to satisfy the Debtor Emission Surrender Obligations.[14] In advance of the confirmation hearing, by stipulation, the Debtors, CARB, and LNV Corporation[15] agreed to submit the following issue to the Court:

> Can the Debtors transfer (whether under section 363 of the Bankruptcy Code or otherwise applicable law) substantially all of their assets, including their electricity generation facility, to a purchaser free and clear of, and without the purchaser assuming, any obligation to surrender compliance instruments under the California Cap-and-Trade Program for emissions generated by the Debtors and/or their facility during the period before the transfer of the assets?[16]

The Court heard argument on this issue at the confirmation hearing on October 30, 2017 (the "Confirmation Hearing"). At the Confirmation Hearing, the Court confirmed the

---

[12] D.I. 637.

[13] Plan, § 5.1.

[14] *Id.* § 5.14.

[15] LNV Corporation ("LNV"), as lender under (i) that certain First-Lien Working Capital Agreement, dated as of February 20, 2014, by and between La Paloma Generating Company, LLC, and the lenders and L/C issuers party thereto, and Bank of America, N.A., as administrative agent and (ii) that certain First-Lien Term Loan Credit Agreement, dated as of February 20, 2014, by and between La Paloma, the lenders party thereto, and Bank of America, N.A., as administrative agent; and now the "Purchaser."

[16] D.I. 715.

Debtors' plan[17] and took the CARB Dispute Stipulation, as defined in the Confirmation Order, under advisement.[18]   This is the Court's opinion thereon.   Herein, the Court is determining the potential liability of any Purchaser to satisfy, through the surrender of Compliance Instruments, the Debtor Emission Surrender Obligations.

## STANDARD OF REVIEW

In interpreting a regulation promulgated under California law, "rules of statutory construction also govern [the Court's] interpretation of regulations promulgated by administrative agencies.   We give the regulatory language its plain, commonsense meaning.  If possible, [the Court] must accord meaning to every word and phrase in the regulation, and [the Court] must read regulations as a whole so that all of the parts are given effect."[19]   The Court's

> primary aim is to ascertain the intent of the administrative agency that issued the regulation.  When that intent " 'cannot be discerned directly from the language of the regulation, we may look to a variety of extrinsic aids, including the purpose

---

[17]  *See* Findings of Fact, Conclusions of Law and Order Under Section 1129 of the Bankruptcy Code and Bankruptcy Rule 3020 Confirming *Joint Chapter 11 Plan or La Paloma Generating Company, LLC, et al.,* and Approving the Sale of Assets Thereunder. D.I. 869 (the "Confirmation Order").

[18]  The Confirmation Order states:

> The Bankruptcy Court will issue a separate ruling and order with respect to the issue that has been submitted to the Court for determination by the Debtors, CARB and LNV as set forth in the Order Approving Stipulation Among La Paloma Generating Company, LLC and its Affiliated Debtors and Debtors in Possession, LNV Corporation; and California Air Resources Board. [D.I. 715] (the "**CARB Dispute Stipulation**").

Confirmation Order, at ¶ 61.

[19]  *Butts v. Bd. of Trustees of the California State Univ.*, 225 Cal. App. 4th 825, 835, 170 Cal. Rptr. 3d 604, 612 (2014).

of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part.[20]

Courts must "defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise unless the challenged construction contradicts the clear language and purpose of the interpreted provision."[21]   However, "the binding power of an agency's interpretation of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation."[22]   Furthermore, "[w]hen the agency's intent cannot be discerned directly from the language of the regulation, [courts] look to a variety of extrinsic aids, including the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part."[23]   As the *Manriquez* Court stated, "[w]henever possible, we will interpret the regulation to make it workable

---

[20]  *Id.* at 835–36 (citations omitted).

[21]  *Ross v. California Coastal Com.*, 199 Cal. App. 4th 900, 938 (2011), *as modified on denial of reh'g* (Oct. 11, 2011) (citations omitted) (also holding that "without deference to the agency's interpretation would create unwarranted uncertainty in connection with many local coastal program amendment approvals." *Id.* (citations omitted)). *W.M. Barr & Co. v. S. Coast Air Quality Mgmt. Dist.,* 207 Cal. App. 4th 406, 429, 143 Cal. Rptr. 3d 403, 420 (2012) ("An administrative agency often interprets a statute within its administrative jurisdiction and thus may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise, expressed as interpretation, that is the source of the presumptive value of the agency's views in statutory construction.'" (citations, internal quotation marks and modifications omitted); *In re Acknowledgment Cases*, 239 Cal. App. 4th 1498, 1505, (2015), *reh'g denied* (Sept. 30, 2015), *review denied* (Nov. 24, 2015) ("Although courts have the final responsibility for interpreting a statute, an administrative agency's interpretation of a statute involving its area of expertise is entitled to great weight.").

[22]  *W.M. Barr & Co. v. S. Coast Air Quality Mgmt. Dist.*, 207 Cal. App. 4th 406, 429, 143 Cal. Rptr. 3d 403, 420 (2012) (citations and quotation marks omitted).

[23]  *Manriquez v. Gourley*, 105 Cal. App. 4th 1227, 1235 (2003) (internal citation omitted) ("*Manriquez*").

and reasonable."[24]  Finally, courts "must accord meaning to every word and phrase in a regulation, and . . . read regulations as a whole so that all of the parts are given effect."[25]

As the Regulation is clear and unambiguous, the Court begins with the plain language of the Regulation, as well as the intent of CARB, in its analysis.

## DISCUSSION

### A.  Parties' Arguments

LNV asserts that the Debtors' assets may be sold free and clear of all liens and claims pursuant to section 363(f)(1).  LNV continues that the default rule is that the purchaser of an asset assumes no associated liabilities of the seller and, absent a specific statutory requirement, successor liability does not arise.  LNV asserts that here the plain language of the Regulation does not impose successor liability on purchasers of assets such as the Facility.  Thus, LNV asserts that it is not liable for the 2017 Debtor Emission Surrender Obligations in the amount of approximately $63 million.

CARB, on the other hand, asserts that the Debtors cannot transfer substantially all of their assets—including their electricity generating facility—to a purchaser free and clear of any obligation to surrender compliance instruments under the California cap and trade program for emissions generated by such facility during the pre-transfer period. California's regulatory scheme caps aggregate GHG emissions by requiring entities that acquire emissions-generating facilities to surrender compliance instruments to account

---

[24] *Id.*

[25] *Hoitt v. Dep't of Rehab.*, 207 Cal. App. 4th 513, 523 (2012).

for prior emissions.  CARB argues that the integrity of the cap and trade program depends on the total number of compliance instruments surrendered being equivalent to total emissions.

## B.  Sale of Assets

Section 363(f) of the Bankruptcy Code "permits sale of property free and clear of any interest in the property of an entity other the estate."[26]  The Third Circuit has instructed bankruptcy courts to interpret the term "interest" broadly and authorized the sale of assets free and clear of any obligations that are "connected to or arise from the assets sold" or that could "potentially travel with the property being sold."[27]  Other circuit courts of appeal agree.[28]

Whether property "may" be sold free and clear of an interest pursuant to section 363(f)(1) of the Bankruptcy Code turns on whether "applicable nonbankruptcy law permits sale of such property free and clear of such interest."[29]  Applicable nonbankruptcy law here is California law, and, in particular, the Regulation.

---

[26]  S. Rep. No. 95-989, at 56 (1977-78).

[27]  *In re Trans World Airlines, Inc.*, 322 F.3d 283, 285, 288 (3d Cir. 2003) (permitting the sale of assets free and clear of travel vouchers issued to settle discrimination claims).

[28]  *See In re Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) ("[T]he term 'interest' is a broad term no doubt selected by Congress to avoid 'rigid and technical definitions drawn from other areas of law.'") (quoting *Russello v. United States*, 464 U.S. 16, 21 (1983)) (internal modifications omitted); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 576 (4th Cir. 1996) (assets could be sold free and clear of pension obligations under the Coal Act).

[29]  11 U.S.C. § 363(f)(1).

Under California law, the general rule of successor liability is that the corporate purchaser of another corporation assets presumptively does not assume the seller's liabilities unless:

> (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation or merger of the two corporations; (3) the purchasing corporation is a mere continuation of the sellers; or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts.[30]

## C. The Regulation

The obligation to surrender Compliance Instruments is imposed exclusively under section 95856 of the Regulation.[31]  Section 95856 imposes such obligations on "Covered Entities" alone, and not on any other person.  As explained below, the Purchaser cannot and will not become a Covered Entity until it purchases and operates the Facility.

Further, the amount of a Covered Entity's surrender obligations under section 95856 is determined by reference to just two other provisions:   section 95853[32] ("Calculation of Covered Entity's Triennial Compliance Obligation") and section 95855[33] ("Annual Compliance Obligation").  Those provisions expressly and unambiguously limit a Covered Entity's surrender obligations to those on account of "its emissions."

---

[30] *City of San Diego v. Nat'l Steel & Shipbuilding Co.*, No. 09CV2275 AJB BGS, 2011 WL 5104624, at *4 (S.D. Cal. Oct. 27, 2011) (footnote and citations omitted).

[31] In full, section 95856 of the Regulation is attached hereto as Appendix A. Cal. Code Regs. tit. 17, § 95856.

[32] In full, section 95853 of the Regulation is attached hereto as Appendix A. Cal. Code Regs. tit. 17, § 95853.

[33] In full, section 95855 of the Regulation is attached hereto as Appendix A. Cal. Code Regs. tit. 17, § 95855.

1.      **A Purchaser Would Be a Covered Entity Only After Purchasing and Operating the Facility**

Under the Regulation, only entities—and not assets—are Covered Entities.  An entity must meet two criteria in order to become a Covered Entity.  First, it must be engaged in an enumerated activity.  Second, it must generate emissions in excess of the applicable threshold for that activity.  La Paloma is a Covered Entity because it (a) owns and operates the Facility, which (b) results in in emissions in excess of the applicable threshold for owners of electricity generating facilities.  The Facility is not a Covered Entity.  It is just the asset that makes La Paloma a Covered Entity.  The Purchaser would become a Covered Entity only upon acquisition of the Facility and operation of the Facility to emit in excess of the applicable threshold.

A Covered Entity is defined by the Regulation to be:

> an entity within California that has one or more [specified] processes or operations and has a compliance obligation as specified in subarticle 7 of [the Regulation]; *and* that has emitted, produced, imported, manufactured, or delivered in 2009 or any subsequent year more than the applicable threshold level specified in section 95812(a) of this rule.[34]

The "processes and operations" that qualify an entity as a Covered Entity are expressly enumerated in section 95811, entitled "Covered Entities."   Section 95811 provides, in relevant part:

> This article[35] applies to all of the following *entities* with associated GHG emissions pursuant to section 95812 . . .

---

[34]  Regulation § 95802(a)(84) (emphasis added).

[35]  "This article" refers to "Article 5: California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms."

(b) First Deliverers of Electricity.

    1.    Electricity generating facilities: the operator of an electricity generating facility located in California; or

    2.    Electricity importers.[36]

Section 95811 is clear that it is the entities that own and operate electricity generating plants—and not the plants themselves—that are the Covered Entities.  As an initial matter, the introductory sentence of section 95811 refers explicitly to "entities."  Further, it uses the defined term "First Deliverer[ ] of Electricity" to identify who can be a Covered Entity.  The First Deliverer of Electricity is defined as "the ***owner or operator*** of an electricity generating facility in California or an electricity importer."[37]  And, section 95811(b)(1) itself unambiguously reiterates this concept by stating that only an "entity" that is "the operator of an electricity generating facility located in California" qualifies to become a Covered Entity.  Nowhere does the Regulation state that a power plant is or can be a Covered Entity.[38]

In addition, in order to be a Covered Entity, an entity must not only own or operate an electricity generating facility in California, but it must also operate such facility in a manner so as to exceed the annual emission threshold for First Deliverers of Electricity.[39]

---

[36]  Regulation at § 95811(b)(1) – (2) (emphases added).

[37]  *Id.* at § 95802(a)(147) (emphasis added).

[38]  Imposing liability on "owners or operators" is a common theme throughout the Regulation.  Section 95811(a) states that Covered Entities also include "the operator of a facility within California that has one or more of the following processes or operations:  (1) Cement production; (2) Cogeneration; (3) Glass production . . . ."

[39]  Regulation at § 95802(a)(84).

This threshold is established in section 95812—"Inclusion Thresholds for Covered Entities"—as 25,000 metric tons of $CO_2e$ per year.[40]

Based upon the foregoing, La Paloma is currently a Covered Entity. The Purchaser of the Facility could only become a Covered Entity upon (a) becoming the owner or operator of the Facility; and (b) subsequently operating the Facility and causing the release of emissions at the Facility in excess of 25,000 metric tons of $CO_2e$ within a calendar year. Given the level of emissions from the Facility under La Paloma's operation—in the area of 2 million metric tons per year—the Purchaser closing a sale in October or November and operating the Facility thereafter would not become a Covered Entity until sometime after the closing of the sale of the Facility.

### 2. Change of Ownership of Covered Facility

The Regulation and companion Regulation for the Mandatory Reporting of Greenhouse Gas Emissions ("MRR") require the Covered Entity to submit compliance instruments at the time of a surrender deadline equivalent to the compliance obligation due. Under the Regulation, when the ownership of a facility changes, certain information must be submitted to CARB within 30 days of finalization of the ownership change.[41] The Regulation provides that:

> It is the responsibility of the entities participating in the change of ownership to transfer any compliance instruments from tracking system holding accounts that they control prior to closure. Prior to closure, the Executive Officer may transfer compliance instruments from an entity's compliance account to its holding account upon request by the entity. If a covered

---

[40] *Id.* § 95812(c)(2)(A).

[41] *Id.* § 95835(b).

> entity no longer owns or operates any active facility in its tracking account due to a change of facility ownership, then that covered entity may exit the Program and close its tracking system accounts within five business days after the facility or facilities are transferred in the tracking system to the purchasing entity.[42]

This provision—Section 95835(b)(8)—indicates that a Covered Entity may exit the cap and trade program within five business days after a Facility is transferred to the purchasing entity, even though the surrender event for submitting compliance instruments for past emissions will occur in the future. [43]   CARB asserts that the necessary implication of Section 95835(b)(8) is that the purchasing entity is responsible for the compliance obligation after the change of ownership, even with respect to emissions generated before the change in ownership.   CARB asserts that the purchaser of a facility would then become a "Covered Entity" and essentially "take over" the reporting requirements of the former-Covered Entity.   In CARB's own words:

---

[42] *Id.* § 95835(b)(8).

[43]  The text of Section 95835(b)(8) of the Regulation is as follows:

> (b) Change of Facility Ownership. When the ownership of a facility changes, the following information must be submitted to ARB within 30 calendar days of finalization of the ownership change:

>> (8) It is the responsibility of the entities participating in the change of ownership to transfer any compliance instruments from tracking system holding accounts that they control prior to closure. Prior to closure, the Executive Officer may transfer compliance instruments from an entity's compliance account to its holding account upon request by the entity. If a covered entity no longer owns or operates any active facility in its tracking account due to a change of facility ownership, then that covered entity may exit the Program and close its tracking system accounts within five business days after the facility or facilities are transferred in the tracking system to the purchasing entity.

Cal. Code Regs. tit. 17, § 95835.

> In light of the structure of the [Regulation] and Section 95835(b)(8) in particular, only one Covered Entity is responsible for the compliance obligation for any one facility at a particular point in time. In this case, because there is only one operator of the Facility at any given time, there is only one Covered Entity *vis-à-vis* the Facility that is obligated to comply with the [Regulation] at any given point. That entity is necessarily the operator of the Facility at the time of the surrender deadline. If the change in ownership precedes the surrender deadline, the Purchaser is responsible for surrendering compliance instruments to account for the outstanding compliance obligation.

However, the Regulation does not dictate that substitution and assumption of liability. In no way does Section 95835(b)(8) impugn liability on the purchase of the Covered Entity's assets. This portion of the Regulation simply allows a Covered Entity that no longer operates a Facility to exit the cap and trade program.

### 3. Intent of the Regulation

CARB asserts that its interpretation is based on a proper reading of the Regulation as a whole. Specifically, the "compliance obligation" definition, as well as Sections 95852 and 95856 of the Regulation do not indicate that a compliance obligation is limited to emissions generated by any specific operator. In the context of a change in ownership of a facility, the appropriate interpretation is that the Regulation and MRR require the Covered Entity that exists at the time of a surrender deadline to submit compliance instruments equivalent to the compliance obligation due. CARB asserts that the Covered Entity, as the facility operator at the time of the surrender deadline, is responsible for ensuring that any outstanding compliance obligation is satisfied, regardless of whether the emissions reflected by the outstanding compliance obligation occurred before the

change in ownership.  That is why, after a change in facility ownership, the selling entity

is able to exit the cap and trade program almost immediately, regardless of whether there

is an outstanding compliance obligation vis-à-vis operation of the facility.[44]  CARB argues

that because its construction is reasonable and does not "contradict[] the clear language

and purpose of the interpreted provision,"[45]  this Court should defer to CARB's

interpretation of the Regulation.

However, the Court only defers to the agency, in this case CARB, if the statute

contains "an unresolved ambiguity."[46]    "[T]he binding power of an agency's

interpretation of a statute or regulation is contextual: its power to persuade is both

circumstantial and dependent on the presence or absence of factors that support the merit

of the interpretation."[47]  In the case *sub judice*, the Court finds that there is no ambiguity

in the Regulation regarding successor liability.

---

[44] *See* 17 C.C.R. § 95835(b)(8).

[45] *Ross v. California Coastal Com.*, 199 Cal. App. 4th 900, 938 (2011), *as modified on denial of reh'g* (Oct. 11, 2011) (citations omitted) (challenging the agency's determination of a "reasonable time for review and comment").

[46] *In re Acknowledgment Cases*, 239 Cal. App. 4th 1498, 1505 (2015), *reh'g denied* (Sept. 30, 2015), *review denied* (Nov. 24, 2015) ("Where the language of a statute is ambiguous, the court may look to outside sources to assist it in that task.  Although courts have the final responsibility for interpreting a statute, an administrative agency's interpretation of a statute involving its area of expertise is entitled to great weight.  Indeed, a court must defer to the agency's interpretation of such a statute unless that interpretation contradicts the clear language and purpose of the statute." (citations omitted)).  *W.M. Barr & Co. v. S. Coast Air Quality Mgmt. Dist.*, 207 Cal. App. 4th 406, 429, (2012)  ("Well-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.  We attempt to give effect to statutes according to the usual, ordinary import of the language employed in framing them and we construe the statutory language in its context, keeping in mind the nature and purpose of the statute in which they appear." (citations, internal quotation marks  and modifications omitted)).

[47] *W.M. Barr & Co. v. S. Coast Air Quality Mgmt. Dist.*, 207 Cal. App. 4th 406, 429, 143 Cal. Rptr. 3d 403, 420 (2012) (citation and internal quotation mark omitted).

CARB is absolutely correct – the intent of the Regulation is to reduce GHG emissions in California. CARB ignores the provisions of the Regulation that explicitly set forth and limit the surrender obligations, and instead relies on reporting provisions and provisions that are specifically made subject to the surrender obligation provisions it ignores. While CARB may be entitled to deference in the interpretation of its own Regulation, it is not entitled to rewrite it or ignore its plain meaning.[48] In fact, CARB's section 95852(b)(1)(A) and MRR argument is a request that the Court read sections 95853 and 95855 out of the Regulation. If section 95852(b)(1)(A) actually governed surrender, sections 95853 and 95855 would have no meaning, violating a cardinal rule of regulatory interpretation.[49] CARB makes this request even in the face of explicit subordination of section 95852 to section 95853 pursuant to section 95856(e)(1), violating the bedrock principle of regulatory interpretation.[50] CARB's request must be rejected because it is contrary to the plain language of the Regulation. The Regulation does not provide for successor liability nor does it in anyway make a Purchaser of a Facility liable for the emissions of the former-Covered Entity. Nor does it explicitly express the need for a purchasing entity to provide for the former-Covered Entity's emissions.[51]

---

[48] *Green v. State of Cal.*, 42 Cal. 4th 254, 260 (2007) ("If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent.").

[49] *See Hoitt v. Dep't. of Rehab.*, 207 Cal. App. 4th 513, 523 (2012) (every word and phrase in a regulation must be accorded meaning).

[50] *Green v. State*, 42 Cal. 4th 254, 260, 165 P.3d 118, 121 (2007) (plain language controls).

[51] Nonetheless, there is nothing from preventing CARB from creating such successor liability in the Regulation in the future.

### 4. "Interest" Under Section 363(f)

CARB also asserts that the Debtor Emission Surrender Obligations are not an "interest" under section 363(f) of the Bankruptcy Code.  CARB asserts that although there is no requirement that an interest also be a claim (and CARB acknowledges it has no claim), it cannot be that all obligations to comply with state law that are connected to property are "interests" in such property.  Otherwise, according to CARB, section 363(f) would permit the sale of contraband free and clear of its prohibited status, or the sale of an emitting facility free and clear of the obligation under the federal Clean Air Act to amend a Title V Permit to reflect a change in ownership.  CARB continues that California has a legitimate interest in reducing GHG emissions.  CARB asserts that this Court should not further expand the definition of "interest" here to frustrate that interest.  To the extent that this Court holds that the obligation to surrender compliance instruments is an "interest," CARB requests adequate protection under section 363(e) of its interest in the surrender of compliance instruments equivalent to all unaccounted-for GHG emissions from the Debtors' electricity generation facility.

Under section 363(f), "[t]he trustee may sell property ... free and clear of any interest in such property of an entity other than the estate, only if- . . . (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest . . . ."[52] As noted above, the Court finds that the Regulation does not provide for successor liability related to the Debtor Emission Surrender Obligations.  Nor is environmental

---

[52] 11 U.S.C. §363(f).  *See also In re Trans World Airlines, Inc.*, 322 F.3d 283, 288 (3d Cir. 2003) (citing 11 U.S.C. § 363(f)).

liability excepted by Section 363(f).  For example, in *In re General Motors Corp.*, the

Bankruptcy Court held:

> Under section 363(f), there could be no successor liability
> imposed on the purchaser for the seller[ ]'s monetary
> obligations related to cleanup costs, or any other obligations
> that were obligations of the seller.  But the purchaser would
> have to comply with its environmental responsibilities
> starting with the day it got the property, and if the property
> required remediation as of that time, any such remediation
> would be the buyer's responsibility:
>
> > When you are talking about free and clear of
> > liens, it means you don't take it subject to claims
> > which, in essence, carry with the property.  It
> > doesn't absolve you from compliance with the
> > law going forward.[53]

In the case *sub judice*, Debtor Emission Surrender Obligations are an interest under

section 363(f) and the Regulation does not impose successor liability nor does section

363(f).[54]

---

[53] *In re Gen. Motors Corp.*, 407 B.R. 463, 508 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010), and *aff'd sub nom. In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010), *and enforcement denied sub nom. In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part, vacated in part, rev'd in part sub nom. In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), *and enforced sub nom. In re Motors Liquidation Co.*, No. 09-50026 (MG), 2017 WL 3835802 (Bankr. S.D.N.Y. Aug. 31, 2017) (citation omitted).

[54] *In re Safety-Kleen Corp.*, 380 B.R. 716, 739–40 (Bankr. D. Del. 2008) (*quoting Brzozowski v. Correctional Physician Servs., Inc.*, 360 F.3d 173, 177 (3d Cir. 2004)) ("At common law, the doctrine of successor liability provides that 'where one corporation sells or transfers all or a substantial part of its assets to another, the transferee does not become liable for the debts and liabilities, including torts, of the transferor.'").

## <u>CONCLUSION</u>

As set forth above, the Court holds that LNV does not have successor liability for the Debtor Emission Surrender Obligations.  An order in furtherance of confirmation will be entered.

**Appendix A**

**§ 95853. Calculation of Covered Entity's Full Compliance Period Compliance Obligation.**

(a) A covered entity that exceeds the threshold in section 95812 in any of the four data years preceding the start of a compliance period is a covered entity for the entire compliance period. The covered entity's full compliance period compliance obligation in this situation is calculated as the total of the emissions with a compliance obligation that received a positive or qualified positive emissions data verification statement, or were assigned emissions pursuant to section 95131 of MRR from all data years of the compliance period.

(b) A covered entity that initially exceeds the threshold in section 95812 in the first year of a compliance period is a covered entity for the entire compliance period. The covered entity's full compliance period compliance obligation in this situation is calculated as the total of the emissions that received a positive or qualified positive emissions data verification statement, or were assigned emissions pursuant to section 95131 of MRR from all data years of the compliance period.

(c) A covered entity that initially exceeds the threshold in section 95812 in the second year of a compliance period is a covered entity for the second and any remaining years of this compliance period. The covered entity's full compliance period compliance obligation in this situation is calculated as the total of the emissions that received a positive or qualified positive emissions data verification statement, or were assigned emissions pursuant to section 95131 of MRR for the second and any remaining data years of the compliance period.

(d) A covered entity that initially exceeds the threshold in section 95812 in the final year of a later compliance period has a compliance obligation for its emissions that received a positive or qualified positive emissions data verification statement, or were assigned emissions pursuant to section 95131 of MRR for that year, but the entity's full compliance period compliance obligation for the current compliance period is not due the following year. Instead the entity's reported and verified or assigned emissions for this year will be added to the entity's full compliance period obligation for the subsequent compliance period.

Cal. Code Regs. tit. 17, § 95853.

**§ 95855. Annual Compliance Obligation.**

(a) An entity has an annual compliance obligation for any year when the entity is a covered entity except for the condition specified in section 95853(d); and

(b) The annual compliance obligation for a covered entity equals 30 percent of emissions with a compliance obligation reported from the previous data year that received a positive or qualified positive emissions data verification statement, or were assigned emissions pursuant to section 95131 of MRR.

Cal. Code Regs. tit. 17, § 95855

A-1

**§ 95856.  Timely Surrender of Compliance Instruments by a Covered Entity.**

(a) A covered entity must surrender one compliance instrument for each metric ton of $CO_2e$ of GHG emissions for the annual and full compliance period compliance obligations calculated pursuant to this subarticle beginning with the emissions data report for 2013 emissions and each subsequent year in which the covered entity has a compliance obligation.

(b) Compliance Instruments Valid for Surrender.

(1) A compliance instrument listed in subarticle 4 may be used to satisfy a compliance obligation.

(2) To fulfill a compliance obligation, a compliance instrument issued pursuant to sections 95820(a) and 95821(a) must be issued from an allowance budget year within or before the year for which an annual compliance obligation is calculated or the last year of a compliance period for which a full compliance period compliance obligation is calculated, unless:

(A) The allowance was purchased from a California Allowance Price Containment Reserve sale, is any other California-issued non-vintage compliance instrument, or is an Allowance Price Containment Reserve Allowance or other non-vintage allowance issued by a program approved by ARB pursuant to section 95941 as specified in section 95821(a);

(B) The allowance is used to satisfy an excess emissions obligation; or

(C) The allowance is eligible for compliance use pursuant to sections 95856(h)(1)(D) and 95856(h)(2)(D).

(c) A covered entity must transfer from its holding account to its compliance account a sufficient number of valid compliance instruments to meet the compliance obligation set forth in sections 95853 and 95855.

(d) Deadline for Surrender of Annual Compliance Obligations. For any year in which a covered entity has an annual compliance obligation pursuant to section 95855, it must fulfill that obligation:

(1) By November 1, 5 p.m. Pacific Standard Time (or Pacific Daylight Time, when in effect), of the calendar year following the year for which the obligation is calculated if the entity reports by April 10 pursuant to section 95103 of MRR; or

(2) By November 1, 5 p.m. Pacific Standard Time (or Pacific Daylight Time, when in effect), of the calendar year following the year for which the obligation is calculated if the entity reports by June 1 pursuant to section 95103 of MRR.

(3) In years 2015, 2018, and 2021 there is no annual compliance obligation for the preceding compliance period, only a full compliance period compliance obligation.

(4) Transfers to compliance accounts may be restricted during the time the tracking system is processing the surrender of the annual compliance obligation.

A-2

(e) Determination of Full Compliance Period Compliance Obligation.

(1) When a positive or qualified positive emissions data verification statement or assigned emissions for any year is received by ARB, then those emissions for the source categories in section 95852 equal the full compliance period compliance obligation pursuant to section 95853.

(2) If a positive or qualified positive emissions data verification statement for any year of the compliance period is not received by ARB by the applicable verification deadline as set forth in MRR, ARB will assign emissions according to the requirements set forth in section 95103(g) of MRR for the emissions for the source categories in section 95852. The assigned emissions value then equals the compliance obligation.

(f) Surrender of Full Compliance Period Compliance Obligation.

(1) The covered entity must transfer sufficient valid compliance instruments to its compliance account to fulfill its full compliance period compliance obligation by November 1, 5 p.m. Pacific Standard Time (or Pacific Daylight Time, when in effect), of the calendar year following the final year of the compliance period. Transfers to compliance accounts may be restricted during the time the tracking system is processing the surrender of the full compliance period compliance obligation.

(2) The total number of compliance instruments submitted to fulfill the full compliance period compliance obligation is subject to the quantitative use limit pursuant to section 95854.

(3) The surrender of compliance instruments must equal the full compliance period compliance obligation calculated pursuant to section 95853 less compliance instruments surrendered to fulfill the annual compliance obligation for the years in the compliance period.

(g) In determining whether the covered entity has fulfilled its compliance obligations, the Executive Officer shall:

(1) In the case of annual and full compliance period compliance obligations, determine the status of compliance with the annual or full compliance period compliance obligation by evaluating the number and types of compliance instruments in the Compliance Account; and

(A) Retire the compliance instruments surrendered; and

(B) Inform programs to which California is linked or recognizes, pursuant to subarticles 12 and 14, of the retirements, including the serial numbers of the compliance instruments retired.

(h) Annual and Full Compliance Period Compliance Instrument Requirements.

(1) When a covered entity or opt-in covered entity surrenders compliance instruments to meet its annual compliance obligation

A-3

pursuant to section 95856(d), the Executive Officer will retire them from the Compliance Account in the following order:

(A) Offset credits specified in section 95820(b) and sections 95821(b) through (d), up to eight percent of the emissions with a compliance obligation pursuant to section 95854;

(B) Allowances purchased from a California Allowance Price Containment Reserve sale followed by Allowance Price Containment Reserve Allowances and then other non-vintage allowances issued by a program approved by ARB pursuant to section 95941 as specified in section 95821(a);

(C) Allowances specified in section 95820(a) and 95821(a) with earlier vintage allowances retired first; and

(D) The current calendar year's vintage allowances and allowances allocated just before the annual surrender deadline up to the true-up allowance amount as determined in sections 95891(b), 95891(c)(2)(B), or 95894(c) if an entity was eligible to receive true up allowances pursuant to section 95891(b), 95891(c)(2)(B), or 95894(c).

(2) When a covered entity or opt-in covered entity surrenders compliance instruments to meet its full compliance period compliance obligation pursuant to section 95856(f), the Executive Officer will retire them from the Compliance Account in the following order:

(A) Offset credits specified in section 95820(b) and sections 95821(b) through (d) with oldest credits retired first and subject to the quantitative usage limit set forth in section 95854:

(B) Allowances purchased from a California Allowance Price Containment Reserve sale followed by Allowance Price Containment Reserve Allowances and then other non-vintage allowances issued by a program approved by ARB pursuant to section 95941 as specified in section 95821(a);

(C) Allowances specified in section 95820(a) and 95821(a) with earlier vintage allowances retired first; and

(D) The current calendar year's vintage allowances and allowances allocated just before the full compliance period surrender deadline up to the true-up allowance amount as determined in section 95891(b), 95891(c)(2)(B), or 95894(c) if an entity was eligible to receive true up allowances pursuant to section 95891(b), 95891(c)(2)(B), or 95894(c).

(3) An entity that is not eligible to receive true up allowances pursuant to section 95891(b), 95891(c)(2)(B), or 95894(c) cannot use the current calendar year's vintage allowances or allowances allocated just before the current surrender deadline to meet the timely surrender of compliance instrument requirements in section 95856.

A-4

(4) An electric distribution utility will not be in violation of section 95892(d)(5) when the Executive Officer retires compliance instruments, if the electric distribution utility has a sufficient quantity of eligible compliance instruments not allocated pursuant to section 95870(d) in its compliance account, at the time the timely surrender of compliance instruments by a covered entity is due pursuant to section 95856, that is at least equal to its compliance obligation for any transactions for which the use of allocated allowance value is prohibited under section 95892(d)(5).

Cal. Code Regs. tit. 17, § 95856.

A-5