# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LA PALOMA GENERATING | : | Case No.: 16-12700 (CSS) |
| COMPANY, et al., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Related Docket Nos. 695 and 739** |
| _____ | : | |

# OPINION[1]

**RICHARDS, LAYTON &
FINGER, P.A.**
Mark D. Collins
Jason M. Madron
One Rodney Square
920 North King Street
Wilmington, DE 19801

-and-

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz
Craig A. Bruens
Nick S. Kaluk, III
Elie J. Worenklein
919 Third Avenue
New York, NY 10022

Counsel for Debtors and
Debtors-in-Possession

**FOX ROTHSCHILD LLP**
Jeffrey M. Schlerf
L. John Bird
919 North Market Street
Suite 300
Wilmington, DE 19801

-and-

**WHITE & CASE LLP**
Thomas E. Lauria
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131

-and-

**WHITE & CASE LLP**
Roberto Kampfner (argued)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071

-and-

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12…" Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**MORGAN, LEWIS & BOCKIUS LLP**
Jody C. Barillare
The Nemours Building
1007 North Orange Street, Suite 501
Wilmington, DE  19801
          -and-
Glenn E. Siegel
Joshua Dorchak
Rachel Jaffe Mauceri
101 Park Avenue
New York, New York 10178

Counsel to the Ad Hoc Group of
Second Lien Creditors

**WHITE & CASE LLP**
Douglas P. Baumstein
J. Christopher Shore
Andrew Zatz
1221 Avenue of the Americas
New York, NY  10020

Counsel for LNV Corporation

Dated:  December 27, 2018

Sontchi, CJ._____

## INTRODUCTION[2]

      Before the Court is the (i) Ad Hoc Group of Second Lien Creditors' (the "Second-Lien Group") *Motion to Enforce Intercreditor Agreement*[3] (the "Second-Lien Group Motion"), and (ii) LNV Corporation's ("LNV" or "First-Lien Creditor") *Motion of LNV Corporation to Enforce Intercreditor Agreement* (the "LNV Motion," and together with the 2L Group Motion, the "Motions").[4]  The Motions seek to define the rights of both the Second-Lien Group and LNV to distributions under the Plan, which are currently being held by the Collateral Agent.  Based on the language of the Intercreditor Agreement, the Court finds that the First-Lien Creditors are to be paid-in-full prior to the Second-Lien

---

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

[3]  D.I. 695.

[4]  D.I. 739.

Creditors receiving payment based on the Second-Lien Claim.  As a result, the Court will grant the LNV Motion (D.I. 739) and deny the Second-Lien Group Motion (D.I. 695).

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the United States Bankruptcy Court for the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(A), (B), (E) and (K).  The Court has the judicial power to enter a final order.

## BACKGROUND

### A.    Background of the Chapter 11 Cases

On December 6, 2016, the above-captioned debtors (the "Debtors") filed voluntary petitions with this Court for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On September 21, 2017, the Debtors filed the Amended Joint Plan for La Paloma Generating Company, LLC, et al.[5] (the "Plan").  On October 30, 2017, the Court confirmed the Plan.[6]

### B.    First-Lien Obligations

LNV is the sole lender under (i) the First-Lien Working Capital Agreement, dated as of February 20, 2014, by and between LPGC, the First-Lien Lender and L/C issuers party thereto, and Bank of America, N.A., as administrative agent (the "First-Lien WCF Agreement); and (ii) the First-Lien Term Loan Credit Agreement, dated as of February

---

[5] D.I. 637. La Paloma Generating Company, LLC is referred to herein as "LPGC."

[6] *See Findings of Fact, Conclusions of Law and Order Under Section 1129 of the Bankruptcy Code and Bankruptcy Rule 3020 Confirming Joint Chapter 11 Plan or La Paloma Generating Company, LLC, et al., and Approving the Sale of Assets Thereunder.* D.I. 869 (the "Confirmation Order").

20, 2014, by and between LPGC, the First-Lien Lender, and Bank of America, N.A., as administrative agent (the "First-Lien Term Loan Credit Agreement"). The obligations under the First-Lien WCF Agreement and the First-Lien Term Loan Credit Agreement (collectively, the "First-Lien Obligations"), are secured by first-priority liens on substantially all of the assets of the Debtors pursuant to, among other things, the (i) Second Amended and Restated Deed of Trust Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of February 20, 2014, and recorded on February 24, 2014 with the Kern County, California Recorder's Office (the "Deed of Trust") and (ii) the First-Lien Security Agreement, dated as of August 16, 2015 (the "First-Lien Security Agreement"). The First-Lien Security Agreement was reaffirmed under the First-Lien WCF Agreement and First-Lien Term Loan Credit Agreement pursuant to that certain Reaffirmation and Agreement, dated as of February 20, 2014 (the "Reaffirmation Agreement"). Under the First-Lien Security Agreement and the Deed of Trust, proceeds of a sale of the Debtors' assets are to be distributed through the Collateral Agent.[7]

### C. Second-Lien Obligations

On February 20, 2014, LPGC entered into that certain Second Lien Term Loan Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Second-Lien Credit Agreement"), by and among LPGC, SunTrust Bank,

---

[7] The "Collateral Agent" is defined in the Intercreditor Agreement as "THE BANK OF NEW YORK, in its capacity as collateral agent for the Secured Parties . . . ." Intercreditor Agreement at Preamble and §1.1 ("'Collateral Agent'' has the meaning assigned to that term in the Preamble to this Agreement."). Furthermore, "Secured Parties" is defined as "the Collateral Agent, the Depository, the First-Lien Claimholders, the Second-Lien Claimholders and the Third-Lien Claimholders." *Id.* at § 1.1 ("Secured Parties").

as administrative agent (the "Second-Lien Administrative Agent"), Macquarie Bank Limited, as the letter of credit issuer, and the lenders party thereto (the "Second-Lien Lenders"). The Debtors' obligations under the Second-Lien Credit Agreement (the "Second-Lien Obligations") are secured by the same assets as the First-Lien Obligations on a junior basis.

### D. Intercreditor Agreement[8]

On August 16, 2005, the Debtors, the Collateral Agent, the administrative agents under each of the First-Lien WCF Agreement, the First-Lien Term Loan Credit Agreement and the Second-Lien Credit Agreement, and certain other parties entered into the Intercreditor Agreement.  Section 9.9 of the Intercreditor Agreement expressly provides that it "shall be governed by and construed in accordance with the laws of the State of New York . . . ."  The Intercreditor Agreement was reaffirmed under the First-Lien WCF Agreement, the First-Lien Term Loan Credit Agreement and the Second-Lien Credit Agreement pursuant to the Reaffirmation Agreement.

As Section 3.1(k) of the Intercreditor Agreement expressly permits, the Second-Lien Agent filed a proof of claim (the "Second-Lien Claim").  The Second-Lien Claim expressly states: "This Claim is a secured claim to the extent of the Debtor's interest in the Collateral, pursuant to the Security Agreements, subject to the Intercreditor

---

[8] *Declaration of Elaine A. Fenna In Support of the Ad Hoc Group of Second Lien Creditors' Motion to Enforce Intercreditor Agreement* (D.I. 696), Exh. A (Collateral Agency and Intercreditor Agreement, dated as of August 15, 2005) (the "Intercreditor Agreement").

Agreement and applicable law."[9] The Second-Lien Claim also notes that "the Debtor has asserted that the foregoing security interest is unperfected, at least with respect to the Collateral that is not the subject of the foregoing Deed of Trust."[10]

## E. The Settlement and the Plan

The Debtors filed the Plan on September 21, 2017, incorporating a settlement reached with LNV following extensive settlement negotiations.  The settlement resolves a number of disputes relating, in part, to the lapsed UCC financing statement filed in favor of the Collateral Agent (the "First Lien Settlement").  These settled issues include (i) the amount of LNV's credit bid and secured claim, (ii) the extent to which the assets to be sold are subject to a perfected lien and (iii) the extent to which the Debtors' postpetition revenue is subject to perfected lien.  Among other things, the Plan provides that LNV will credit bid for the Debtors' power facility and related assets, LNV will receive certain cash indisputably pledged to it, the liens of the Collateral Agent are left intact, and the First-Lien Lender has agreed to forego the benefit of its liens on certain assets for the benefit of unsecured creditors.  Distributions that theoretically would go to the Second-Lien Lenders on account of their unsecured claim (which is their entire claim), i.e., the Contested Funds, are to be held in reserve with the Collateral Agent (commensurate with the First-Lien Security Agreement, Deed of Trust and Intercreditor Agreement) pending a determination by this Court as to whether the Second-Lien Lenders are entitled to such

---

[9] *Declaration of Elaine A. Fenna In Support of the Ad Hoc Group of Second Lien Creditors' Motion to Enforce Intercreditor Agreement* (D.I. 696), Ex. B at 3 (the "Second-Lien Claim").

[10] Second-Lien Claim, at Add. p. 3.

distribution in light of the Intercreditor Agreement.[11]  The Plan also provides that the Intercreditor Agreement "shall remain in full force and effect" and "shall be fully enforceable according to its terms."[12]

### ANALYSIS

Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law."[13]

Under New York law, which governs the Intercreditor Agreement,[14] the Court need not look "outside the four corners" of a complete document to determine what the parties intended.[15]  Here, neither party has alleged that the Intercreditor Agreement is an incomplete document, so it is not necessary to resort to extrinsic evidence to interpret it. Moreover, neither party contends that any term in the Intercreditor Agreement is ambiguous—instead, each party relies on its own "plain reading" in reaching competing results.  A contract is not ambiguous merely because the parties offer different constructions of the same term.[16]  The Court finds that the Intercreditor Agreement is not ambiguous.

---

[11] *See* Plan, § 4.4.

[12] *Id.* § 5.7(a).

[13] 11 U.S.C. § 510(a).

[14] Intercreditor Agreement, § 9.9.

[15] *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990).

[16] *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

As the Court reaches the conclusion that the Intercreditor Agreement is unambiguous, the Court then relies on long-recognized canons of interpretation to determine its meaning. First, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing."[17] Second, should there be an inconsistency between a specific and general provision of a contract, the specific controls.[18] Third, "[a] reading of the contract should not render any portion meaningless."[19]

LNV asserts that under the explicit terms "all principal and other amounts" payable to the First-Lien Lender in respect of the First-Lien Obligations must be paid in full before the Second-Lien Lenders are allowed to receive any recovery on account of the Second Lien Obligations. The Second-Lien Lenders assert that because the First-Liens lapsed *prior* to the Petition Date, that all money should be distributed in accordance with the Plan, which includes to the Second-Lien Lenders pursuant to their proof of claim.

## A. Payments Over

Section 4.2 of the Intercreditor Agreement provides:

> **Payments Over.** (a) So long as the Discharge of First-Lien Obligations has not occurred, whether or not any Bankruptcy has **been** commenced by or against La Paloma or any other Grantor, *any Collateral or proceeds thereof* (including assets or proceedings subject to Liens referred to in the final sentence of Section 2.3) received by Second-Lien Administrative

---

[17] *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks and citation omitted).

[18] *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *Waldman v. New Phone Dimensions, Inc.*, 487 N.Y.S.2d 29, 31 (N.Y. App. Div. 1985).

[19] *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (quotation marks and citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

> Agent, the MS Counterpart, any other Second-Lien Claimholder, or any Third-Lien Claimholder *in connection with the exercise of any right or remedy (including set-off) by the Collateral Agent or any such Person relating to the Collateral in contravention of this Agreement* shall be segregated and held in trust and forthwith paid over to the Collateral Agreement (for the benefit of the First-Lien Claimholders) . . . .[20]

Pursuant to Section 4.2(a), LNV must show that each of this section's four elements are satisfied:

> i. The distribution must be "Collateral or proceeds thereof;"
>
> ii. The distribution must be received "in connection with the exercise of any right or remedy" by the Second-Lien Claimholders;
>
> iii. Any such exercise of a right or remedy must "relat[e] to the Collateral;" and
>
> iv. The exercise of such right or remedy must be "in contravention of this [Intercreditor] Agreement."

Not surprisingly, LNV asserts that all four elements are met and the Second-Lien Lenders argue that three have not been met. Pursuant to the First-Lien settlement, distributions that theoretically would go to the Second-Lien Lenders on account of their unsecured claim (which is their entire claim) are being held with the Collateral Agent pending determination of these Motions. As such, the Court will go through each element in turn:

(i) "Any Collateral or proceeds thereof." Section 1.2 of the Intercreditor Agreement defines "Collateral" as "all of the Property of any Grantor, whether real, personal, mixed, constituting or intending to constitute all of the First-Lien Collateral, the

---

[20] Intercreditor Agreement, § 4.2(a) (emphasis added).

Second-Lien Collateral or the Third-Lien Collateral."[21]  Furthermore, Section 2.1(b) of the

Intercreditor Agreement clarifies that the First-Lien Lenders' priority over the Second-

Lien Lenders in Collateral is not affected by any issue concerning "(iii) the perfection of

or avoidability of such liens or claims secured [by the First-Lien Security Agreement or]

. . . (vi) any defect or deficiencies in, or failure to perfect, the Liens securing the First-Lien

Obligations."[22]  Thus, the prepetition lapse of the First-Lien Holders' claims does not give

rise to issues between and among the First-Lien and Second-Lien Lenders.

The Second-Lien Lenders assert, without argument, that there *has* to be

unencumbered assets.[23]  However, without argument or reference to the documentation

regarding such unencumbered assets, the Court is hard-pressed to find that such a broad

definition of "Collateral" does not include substantially all of the assets of the Debtors.

Substantially all of the Debtors' assets were sold pursuant to the Plan[24] and the sale

proceeds were distributed as part of the confirmed Plan.[25]  Intuitively, there are no truer

---

[21] Intercreditor Agreement, § 1.2.  The "First-Lien Collateral" includes the First-Lien Term Loan Collateral, the First-Lien Special LC Facility Collateral, and the First-Lien WCF Collateral, which encompass substantially all of the Debtors' assets, including postpetition revenue.  *See* Deed of Trust at 5 (granting Collateral Agent, on behalf of the First-Lien Lender and the Second-Lien Lenders, security in "all rents, revenues, proceeds, issues, profits, royalties, income and other benefits now or hereafter derived from the [Facility] . . ."); First-Lien Security Agreement, § III(a) (granting Collateral Agent, on behalf of the First-Lien Lender, security in all personal property of LPGC, including, in subclause (xi), "all other cash, products, offspring, rents, revenues, issues, profits, payment intangibles, royalties, income, benefits, accessions, letter-of-credit rights, supporting obligations, additions, substitutions and replacements of and to any and all of the foregoing, including all Proceeds . . . of and to any of the property of [LPGC] described in the preceding paragraphs of this Article III . . .").

[22] Intercreditor Agreement, § 2.1(b).

[23] *See Motion to Enforce Intercreditor Agreement* (D.I. 695) at fn. 5.

[24] Plan §§ 4.3 and 5.5.

[25] Pursuant to the Plan, LNV credit bid $150 million of the First-Lien Claims to purchase all of the Debtors' assets (whether or not they are subject to a validly perfected security interest) and received $27 million in cash collateral.  Plan §§ 4.3 and 5.5; *Disclosure Statement for the Joint Chapter 11 Plan of La Paloma Generating*

definition of "proceeds of Collateral" other than the proceeds from the sale of that Collateral.[26]   In that regard, the Court finds that distributions pursuant to the Plan are "Collateral or proceeds thereof."

(ii) "Exercise of Remedies."   The Second-Lien Lenders asserts that *even if* the distributions are Collateral or proceeds thereof, such distributions are *not* being "received . . . in connection with the exercise of any right or remedy."   The Second-Lien Lenders claims that such distributions would be from its proof of claim and not and exercise of any right or remedy.   Here, the Intercreditor Agreement authorizes the Second-Lien Lenders, through their Agent, to file a proof of claim.[27]   LNV asserts that the Second-Lien Lenders have been active participants in these cases and have continually advocated for distributions which *is* an exercise of their remedies.

The parties refer to this Court's opinions in *Energy Future Holdings*[28] to argue whether the Second-Lien Holder's filing of a proof of claim was an "exercise of remedies." Therein, and in both *EFH I* and *EFH II*, the Court held that it was "not inclined to hold that filing a proof of claim was an exercise of remedies."[29]   However, in *Energy Future*

---

*Company, LLC, et al.* (D.I. 676) (the "Disclosure Statement") at 32-38.  LNV also received a deficiency claim of approximately $153 million and the Second-Lien Lenders received a deficiency claim of approximately $109 million, both of which would recover from the same pool of assets as the general unsecured creditors' claims.  *See* Disclosure Statement at 32-34.

[26] *Aircraft Trading Servs., Inc. v. Braniff, Inc.*, 819 F.2d 1227, 1233 (2d Cir. 1987) (containing frequently-cited language that perfected security interest in collateral continues in proceeds after the sale of the collateral).

[27] Intercreditor Agreement, § 3(k).

[28] *Delaware Trust Co. v. Wilmington Trust, N.A. (In re Energy Future Holdings Corp.)*, 546 B.R. 566, 584 (Bankr. D. Del. 2016) ("*EFH I*") and *Delaware Trust Company v. Wilmington Trust, N.A. (In re Energy Future Holdings Corp.)*, 566 B.R. 669, 687 (Bankr. D. Del. 2017), aff'd, 585 B.R. 341 (D. Del. 2018) ("*EFH II*").

[29] *EFH I*, 546 B.R. at 583-84; *EFH II*, 566 B.R. at 687.

*Holdings*, the intercreditor agreement in dispute defined "exercise of remedies" and such

definition did not include the filing of a claim; the cash collateral order entered by the

Court in those cases specifically stated that the first lien creditors were exempted from

filing a proof of claim, and the proof of claim played no role in generating plan

distributions.[30]

Contrary to the *Energy Future Holdings* intercreditor agreement, the Intercreditor

Agreement explicitly includes filing a proof of claim amount the "exercise of remedies"

in Section 3.1.   Section 3.1(a)(i) states:

> In exercising rights and remedies with respect to the
> Collateral, the Collateral Agent, at the direction of an Act of
> Required Lenders, may enforce the provisions of the First-
> Lien Collateral Documents and exercise remedies thereunder,
> all in such order and in such manner as they may determine
> in the exercise of their sole discretion.   Such exercise and
> enforcement shall include the rights of the Collateral Agent to
> sell or otherwise dispose of Collateral upon foreclosure, to
> incur expenses in connection with such sale or disposition,
> and to exercise all the rights and remedies of a secured
> creditor under the UCC and the First-Lien Collateral
> Documents and of a secured creditor under Bankruptcy Laws
> of any applicable jurisdiction; provided that unless and until
> the Collateral Agent shall have received such direction, the
> Collateral Agent may (but shall not be obligated to) take such
> action, or refrain from taking such action, in order to preserve
> or protect its Liens on and the value of the Collateral, with
> respect to any Event of Default as it shall deem advisable in
> the best interests of the Secured Parties. . . . [31]

Such language is substantially repeated in Section 3.1(a)(ii) regarding the Second-Lien

Lenders.   In other words, exercise of remedies is about foreclosure and seizing property

---

[30] *EFH II*, 566 B.R. at 687.

[31] Intercreditor Agreement, § 3.1(a)(i).

pursuant to various restrictions.  However, Section 3.1(k) of the Intercreditor Agreement

also explicitly states:

> Notwithstanding the foregoing, the Second-Lien Administrative Agent, MS Counterparty and each other Second-Lien Claimholder may:
>
> > (1) file a claim or statement of interest in a Bankruptcy of La Paloma or any other Grantor . . .

In other word, notwithstanding all of these rules and restrictions on how to exercise

remedies, the Second-Lien Claimholders may, as an *exercise of remedies*, file a claim.  The

Intercreditor Agreement explicitly states that one of the many things that the Second-Lien

Lenders may do, in order to exercise its remedies, is to file a claim.  Language which was

missing from the intercreditor agreement in *Energy Future Holdings*.  As such, the Court

finds that in this case, a filing of a proof of claim is an "exercise of remedies."

   (iii)   <u>Exercise of Remedies must relate to the Collateral</u>.  The next question is

whether the filing of the proof of claim relates to the collateral.  Section 3.1(f) of the

Intercreditor Agreement states:

> Except as specifically set forth herein or in the Security Deposit Agreement, nothing in this Agreement shall prohibit the receipt by the Second-Lien Administrative Agent, MS Counterparty or any other Second-Lien Claimholders of the required payments of Interest Expense, principal and other amounts owed in respect of the Second-Lien Obligations so long as such receipt is not the direct or indirect result of the *exercise* by the Collateral Agent (on behalf of the Second-Lien Claimholders), the Second-Lien Administrative Agent (on behalf of the Second-Lien Term Loan Claimholders), MS Counterparty or any other Second-Lien Claimholder *of rights or remedies as a secured creditor* (including set-off) *or enforcement*

> *in contravention of this Agreement* of any Lien held by any of
> them or as otherwise expressly prohibited hereby.[32]

As filing of a proof of claim is an exercise of remedies under the Intercreditor Agreement and it specifically relates to the Second-Lien Lenders' claims under the Second-Lien Agreement, the Court finds that such exercise of rights relates to the Collateral.

(iv) In contravention of the Intercreditor Agreement.  The Court reads this phrase to mean that the Second-Lien Lenders would have received the funds to "pay over" in "contravention of the agreement."  Here, as filing a proof of claim is permitted under the Intercreditor Agreement, the Second Lien Holders would not be receiving these "funds" in contravention of the Agreement.  However, if the Second-Lien Lenders received proceeds before the First-Lien Obligations are satisfied in full as a result of exercising the Second-Lien Holder's rights or remedies (i.e. filing a proof of claim), then Section 3.1(c) of the Intercreditor Agreement would be violated.

Additional Elements.  An element not discussed by the Second-Lien Lenders is the phrase "[s]o long as the Discharge of the First-Lien Obligations has not occurred."  LNV asserts that the First-Lien Lender's claim is deemed allowed under the First-Lien Settlement in the Plan.[33]  Even if the First-Liens' UCC filings lapsed prior to the Petition Date, they are valid as to the Second-Lien Lenders who entered into an Intercreditor

---

[32] Intercreditor Agreement § 3.1(f) (emphasis added).

[33] The First-Lien Settlement allows the First-Lien Lenders' claim in the amount of $333,085,207.  Plan, § 1.48. The First-Lien Settlement also allowed LNV to credit bid $150 million of their First Lien Claims for substantially all of the Debtors' assets.  However, the First-Lien Obligations will not be paid in full under the Plan.

14

Agreement acknowledging the First-Liens and who are not "surprised" by the existence of the First-Liens.[34]

Even though the Second-Lien Lenders have not actually received any monies to "pay over," if they did, Section 4.2 of the Intercreditor Agreement would require that such monies be "paid over" to the First-Lien Lenders.    Thus, Section 4.2 of the Intercreditor Agreement dictates if the Second-Lien Lenders do collect monies from Plan distributions, collected as a result of exercising their remedies under the Intercreditor Agreement, that such funds must be "paid over" to the First-Lien Lenders.

Thereafter, Section 4.2(a) states that the Collateral or proceeds thereof are remitted to the Collateral Agent and the Collateral Agent must then make distributions of such assets pursuant to the waterfall of Section 4.1(a) of the Intercreditor Agreement.    As set forth above, LNV meets all the criteria of Section 4.2(a); thus, the Court will look to the waterfall in Section 4.1(a).

## B.  Waterfall Provision

Section 4.1 of the Intercreditor Agreement provides:

---

[34] *See, e.g., Colony Beach & Tennis Club Assn., Inc. v. Colony Lender, LLC (In re Colony Beach & Tennis Club, Inc.)*, 508 B.R. 468, 480 (Bankr. M.D. Fla. 2014), *aff'd sub nom. Colony Lender, LLC v. Breakpointe, LLC*, No. 8:13-BK-00348-KRM, 2015 WL 3689075 (M.D. Fla. June 12, 2015) ("The lapse of a financing statement does not mean that the creditor's security interest is extinguished.  It means only that the security interest becomes vulnerable to later—perfected security interests and judicial liens, which are not going to arise as long as the automatic stay is in effect."); *Highland Constr. Mgmt. Servs., LP v. Wells Fargo, N.A (In re Highland Constr. Mgmt. Servs., LP)*, 497 B.R. 829, 834–35 (Bankr. E.D. Va. 2013) (footnote omitted), *aff'd sub nom. In re Highland Const. Mgmt. Servs.*, LP, 583 F. App'x 217 (4th Cir. 2014) ("The basic UCC concept is that once a security interest is perfected by filing a financing statement, it remains perfected notwithstanding the lapse of the financing statement that perfected the security interest in the first instance as to parties who held liens as of the date the financing statement lapsed.  This is the retrospective rule.  The prospective rule is that once a financing statement lapses, the security interest becomes unperfected as to all parties who obtain a lien subsequent to the lapse.  They are treated in the same manner as if the original financing statement had never been filed.").

> Regardless of whether any Bankruptcy has been commenced by or against La Paloma or any other Grantor, any money collected or to be applied by the Collateral Agent pursuant to this Agreement and the Collateral Documents (other than monies for its own account), together with any other monies which may then be held by, or under the control of, the Collateral Agent under any of the Accounts shall be applied in the following order . . . :
>
> . . .
>
> > (c) *third*, on a *pro rata* basis, to the payment of (i) all principal and other amounts then due and payable in respect of the First-Lien Obligations . . .
>
> > (d) *fourth*, on a *pro rata* basis, to the payment of any amounts (including principal, Interest Expense and, if applicable, premium) due and payable in respect of the Second-Lien Obligations . . .

When interpreting a contract under New York law, the "primary objective is to give effect to the intent of the parties as revealed by the language of their agreement. The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."[35] The Intercreditor Agreement states that "[n]otwithstanding any provision contained herein, it is the intent of the parties that . . . .(2) the Liens securing the Second-Lien Obligations . . . are subject and subordinate on terms contained in this Agreement to the Liens securing the First-Lien Obligations."[36] Furthermore, under Section 3.1(c) of the Intercreditor Agreement, the Second-Lien Lenders expressly agree that they "will not take or receive

---

[35] *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (citations, quotation marks and modifications omitted). *See also Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 842 F.3d 247, 256 (3d Cir. 2016).

[36] Intercreditor Agreement, § 2.1(2).

any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor, unless and until the Discharge of First-Lien Obligations has occurred . . . ."[37]

Reading the Intercreditor Agreement as a whole, including the subordination of the Second-Lien Obligations and the waterfall provision in Section 4.1 indicate that the parties intended for the First-Lien Obligations to be paid in full before the Second-Lien Lenders are allowed to receive any recovery on behalf of the Second-Lien Obligations.[38]

The Second-Lien Lenders assert that the Intercreditor Agreement provides for "lien subordination" and not "payment subordination."  In *Highland Park CDO I Grantor Tr., Series A v. Wells Fargo Bank, N .A.,*[39] the District Court in the Southern District of New York was faced with a similar intercreditor agreement.  Therein, the *Highland Park* court held:

> The section titled "Payment Subordination" states that in the event of a default on the senior loan (which the parties do not contest has occurred here), "Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan."  Indeed, the agreement further provides that in the event Highland receives any payment on the mezzanine loan before the senior loan is paid in full, Highland must place that payment in trust and pay it over to Wells Fargo to satisfy the senior loan.  These contractual

---

[37]  Intercreditor Agreement, § 3.1(c).

[38]  "'Contracts are . . . to be interpreted to avoid inconsistencies and to give meaning to all [their] terms.'" *Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.),* 842 F.3d 247, 256 (3d Cir. 2016) (*quoting Barrow v. Lawrence United Corp.,* 146 A.D.2d 15, 18, 538 N.Y.S.2d 363 (N.Y. App. Div. 1989)).

[39]  No. 08 CIV. 5723 (NRB), 2009 WL 1834596 (S.D.N.Y. June 16, 2009).

> provisions are obviously designed to ensure that the senior
> loan is paid in full before Highland is permitted to keep any
> money received in repayment of the mezzanine loan.[40]

Although the *Highland Park* intercreditor agreement specifically provides for "Payment Subordination," it also stands for the proposition that intercreditor agreements delineate the relationship between groups of creditors.  Furthermore, the Intercreditor Agreement states that the First-Lien Obligations shall be satisfied in full prior to the payment of the Second-Lien Obligations.[41]  Additionally, throughout the pendency of the bankruptcy cases, no party-in-interest sought to avoid, or avoided, the First-Lien Claims. Furthermore, First-Lien Claims were reinstated as part of the Settlement embodied in the plan.[42]  Thus, the First-Lien Claims are in full force and effect as to the Debtors and the Second-Lien Lenders.

In *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.)*,[43] the second lien creditors objected to confirmation of the debtors' plan and filed an adversary proceeding against the first lien creditors, asserting that certain of the debtors' assets were not subject to the first lien creditors' security interest.[44] The intercreditor agreement expressly prohibited the junior lenders from challenging the priority of the senior creditors' claims, including on the basis of nonperfection of the

---

[40] *Id.* at *3 (citations to record omitted).

[41] *See* Intercreditor Agreement, § 2.1 and 3.1.

[42] *See* Plan at §§ 4.4 and 5.7(a).

[43] 419 B.R. 585 (Bankr. S.D.N.Y. 2009).

[44] *Id.* at 591-92.

18

senior liens.[45]  The bankruptcy court mooted the adversary proceeding by determining

that the intercreditor agreement in that case prevented the second lien creditors from

objecting to the plan.[46]  The Second-Lien Lenders attempt to distinguish *Ion Media* by

asserting that here the Second-Lien Lenders have not contested LNV's liens.  However,

the similarities are in the language of the *Ion Media* intercreditor agreement and how it

establishes the relationship between the senior and junior creditors.  The *Ion Media* court

held:

> Giving effect to the plain language of the Intercreditor
> Agreement in this manner also reinforces general principles
> of public policy.  Affirming the legal efficacy of unambiguous
> intercreditor agreements leads to more predictable and
> efficient commercial outcomes and minimizes the potential
> for wasteful and vexatious litigation.  The sophisticated
> parties who entered into the Intercreditor Agreement were
> certainly aware of the nature of ION's business and the well-
> known restrictions and limitations applicable to security
> interests in FCC Licenses.  This reality adds credence to the
> notion that the parties fully intended to place the Second Lien
> Lenders in an indisputably subordinate position and to
> prevent interference with the stipulated senior rights of the
> First Lien Lenders.[47]

Here, the Court too finds that reading of the Intercreditor Agreement in its entirety leads

to the same result.  Sophisticated parties negotiated and entered into this Intercreditor

Agreement with the intention to subordinate the Second-Lien Lenders to the liens of the

First-Lien Lenders.

---

[45] *Id*. at 594.

[46]  *Id*. at 597-98.

[47]  *Id*. at 595.

As a result, the Court will enforce Section 4.1 of the Intercreditor Agreement and require that the First-Lien Claim receive payment in full prior to payment of the Second-Lien Claim.

## CONCLUSION

The Court finds that the Collateral Agent shall make all distributions payable under the Plan on account of the Second-Lien Claims to the First-Lien Lenders, as required by the Intercreditor Agreement.  The Court will GRANT the Motion of LNV Corporation to Enforce Intercreditor Agreement (D.I. 739) and will DENY the Ad Hoc Group of Second Lien Creditors' Motion to Enforce Intercreditor Agreement (D.I. 695). An Order will be issued.